1  WEISSLAW LLP
   Joel E. Elkins (SBN 256020)
2  jelkins@weisslawllp.com
   9107 Wilshire Blvd, Suite 450
3  Beverly Hills, CA 90210
   Telephone:  (310) 208-2800
4  Facsimile:  (310) 209-2348

5  *Counsel for Plaintiff*

6  [*Additional Counsel in Signature Block*]

7            **IN THE UNITED STATES DISTRICT COURT**
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
8
9  MICHAEL RILEY, Derivatively on        Case No.:
   Behalf of OSI SYSTEMS, INC.,
10
                    Plaintiff,
11
           v.                            **VERIFIED STOCKHOLDER**
                                         **DERIVATIVE COMPLAINT**
12
   DEEPAK CHOPRA, ALAN EDRICK,
13 AJAY MEHRA, STEVEN C. GOOD,           **JURY TRIAL DEMANDED**
   MEYER LUSKIN, WILLIAM F.
14 BALLHAUS, JR., JAMES B.
   HAWKINS, GERALD CHIZEVER,
15 and DAVID T. FEINBERG, M.D.,

16                  Defendants,

17        and

18 OSI SYSTEMS, INC., a Delaware
   Corporation,
19
                    Nominal Defendant.
20

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    Plaintiff Michael Riley ("Plaintiff"), by and through his counsel, derivatively

2  on behalf of Nominal Defendant OSI Systems, Inc. ("OSIS" or the "Company"),

3  submits this Verified Stockholder Derivative Complaint against the Individual

4  Defendants (defined herein) and alleges the following upon information and belief,

5  except as to those allegations concerning Plaintiff, which are alleged upon personal

6  knowledge.  Plaintiff's information and belief is based upon, among other things,

7  his counsels' investigation, which included, *inter alia*, review and analysis of:

8  (i) regulatory filings made by OSIS with the U.S. Securities and Exchange

9  Commission ("SEC"); (ii) press releases issued and disseminated by OSIS;

10  (iii) purported class action lawsuits filed in the United States District Court for the

11  Central District of California against OSIS and defendants Deepak Chopra

12  ("Chopra") and Alan Edrick ("Edrick") alleging violations of the anti-fraud

13  provisions of the federal securities laws based on the alleged issuance of false and

14  misleading statements of material fact, and the alleged omission to state material

15  facts necessary to make other statements made not misleading, between August 21,

16  2013 and December 6, 2017 (the "Relevant Period") with respect to OSIS's

17  acquisition of an Albanian concession through bribery or other illicit means; and

18  (iv) other publicly available information, including media and analyst reports,

19  concerning OSIS.

20

<u>**NATURE OF THE ACTION**</u>

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty and other violations of law brought on behalf of nominal defendant OSIS against certain officers and members of the Company's Board of Directors (the "Board").

2.     OSIS was founded in 1987 and designs and manufactures security and inspection systems including metal detectors and medical monitoring devices. The Company sells its products and provides related services internationally in diversified markets, including homeland security, healthcare, defense, and aerospace.

3.     In August 2013, OSIS was granted a concession agreement (the "Albania Concession") by the Government of Albania, pursuant to which, OSIS would provide Albania with turnkey cargo and vehicle scanning services for a period of fifteen years.

4.     On December 6, 2017, Muddy Waters Research ("Muddy Waters") published a damning report on OSIS entitled "OSIS: Rotten to the Core" (the "Muddy Waters Report"). Muddy Waters alleged that the Albania Concession was the result of a process replete with corruption and a lack of transparency. Muddy Waters claimed that while the Albania Concession "has an estimated top line lifetime value of $150 million to $250 million," the Company "likely bribed

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   somebody by giving half of it away for $4.50" since "[t]here was an unannounced

2   transfer of 49% of OSIS's project company, S2 Albania SHPK, to a holding

3   company owned by an Albanian doctor, for consideration of less than $5.00."

4        5.    The Muddy Waters Report also stated that a turnkey contract between

5   OSIS and the government of Mexico is also problematic.  Specifically, Muddy

6   Waters estimated that the contract is hugely overpriced, which could complicate

7   OSIS's ability to effectively renew or renegotiate the contract in the future.

8        6.    Muddy Waters also revealed that "investigators' interviews with

9   former employees yielded numerous anecdotes indicating OSIS is rotten to the

10  core," including "knowledge of improper sales, cash payments to government

11  officials, fraud in a significant contract, and that OSIS had narrowly avoided being

12  debarred from doing business with the U.S. government."

13       7.    The Company's market capitalization has declined significantly since

14  the publication of the Muddy Waters Report.  In November 2017, OSIS had a

15  market capitalization of $1.684 billion and it has since decreased to $1.264 billion

16  as of April 12, 2018.

17       8.    OSIS responded to the Muddy Waters Report in a December 6, 2017

18  press release, stating that the "turnkey security inspection programs in Mexico and

19  Albania were the result of public tenders" and that OSIS's partner in Albania

20  "made significant capital investments toward the implementation of the program in

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    a value well beyond the par value of shares."   With respect to the turnkey

2    agreement with Mexico, OSIS did not address allegations of its inflated value, but

3    merely defended the efficacy of the program thus far: "[t]he program has resulted

4    in significant seizures of high-value contraband."

5         9.    On January 31, 2018, Muddy Waters replied to OSIS's response by

6    emphasizing that it did not change Muddy Waters' "opinion that OSIS is rotten to

7    the core."   Muddy Waters rejected OSIS's assertions that its Albanian partnership

8    was legitimate or the result of an equitable, noncorrupt agreement, citing financial

9    statements of OSIS and its Albanian partner for support.

10        10.   The next day, on February 1, 2018, the Company disclosed that the

11   SEC had launched an investigation into OSIS's compliance with the Foreign

12   Corrupt Practices Act ("FCPA").   In the disclosure, the Company said the U.S.

13   Attorney's Office for the Central District of California (the "DOJ") also said it

14   would request information regarding OSIS's FCPA compliance.   The SEC and

15   DOJ are also investigating trading in OSIS's securities and have subpoenaed the

16   Company's executives, directors, and employees.

17        11.   Throughout the Relevant Period, the Individual Defendants made

18   materially false and/or misleading statements, as well as failed to disclose material

19   adverse facts about the Company's business, operations, and prospects.

20   Specifically, the Individual Defendants failed to disclose that: (1) OSIS acquired

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  the Albania Concession through bribery or other illicit means; (2) OSIS transferred
2  49% of its project company associated with the Albania Concession, S2 Albania
3  SHPK, an entity purportedly worth millions, for consideration of less than $5.00;
4  (3) OSIS engaged in other illegal acts, including improper sales and cash payments
5  to government officials; (4) these practices caused the Company to be vulnerable
6  to potential civil and criminal liability and adverse regulatory action; and (5) as a
7  result of the foregoing, the Individual Defendants' statements about OSIS's
8  business, operations, and prospects were materially false and/or misleading and/or
9  lacked a reasonable basis.

10       12.    The Individual Defendants breached their fiduciary duties of loyalty,
11  good faith, due care, oversight, and candor by willfully engaging in the deceptions
12  alleged herein.  In addition, defendants Chopra, Edrick, Ajay Mehra ("Mehra"),
13  Steven C. Good ("Good"), and William F. Ballhaus, Jr. ("Ballhaus") breached their
14  fiduciary duties of loyalty and good faith by selling shares of Company common
15  stock while in possession and control of material, adverse non-public information
16  that was a proprietary asset of the Company.

17       13.    As a direct and proximate result of the Individual Defendants'
18  breaches of their fiduciary duties, OSIS has sustained damages as described below.

19

20

## JURISDICTION AND VENUE

14.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides or maintains executives offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) Defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES

17.     Plaintiff was a stockholder of OSIS at the time of the wrongdoing alleged herein, and has been a stockholder of OSIS continuously since that time. Plaintiff is a citizen of North Carolina.

18.    Defendant OSIS is incorporated in Delaware and its principal executive offices are located at 12525 Chadron Avenue, Hawthorne, California. The Company's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "OSIS."

19.    Defendant Chopra was the President, Chief Executive Officer ("CEO"), and Chairman of OSIS at all relevant times.  Between September 25, 2014 and December 7, 2016, Defendant Chopra sold 309,944 shares at an incredible total value of $23,525,798, with insider information regarding OSIS's lack of internal controls and illegal activities, all of which resulted in OSIS stock trading at artificially inflated prices at the time of his stock sales.  Defendant Chopra is a citizen of California.

20.    Defendant Edrick was the Chief Financial Officer ("CFO") of OSI at all relevant times.  Between December 11, 2014 and March 14, 2017, defendant Edrick sold 103,594 shares at a total value of $8,185,397.13 with insider information regarding OSIS's lack of internal controls and illegal activities, all of which resulted in OSIS stock trading at artificially inflated prices at the time of his stock sales.  Defendant Edrick is a citizen of California.

21.    Defendant Mehra has been a member of the Company's Board since March 1996.  Mehra is Executive Vice President of the Company and President of OSI Solutions Business.  Mehra joined the Company as Controller in 1989 and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    served as Vice President and CFO from November 1992 until November 2002,

2    when he was named Executive Vice President.  Between October 29, 2014 and

3    December 13, 2016, Mehra sold 186,811 shares at a total value of $17,565,694.34

4    with insider information regarding the OSIS's lack of internal controls and illegal

5    activities, all of which resulted in OSIS stock trading at artificially inflated prices

6    at the time of his stock sales.  Defendant Mehra is a citizen of California.

7         22.    Defendant Good has been a member of the Company's Board since

8    September 1987.  Good was a member of the Board's Audit Committee and Risk

9    Management Committee throughout the Relevant Period.  Between September 9,

10   2014 and December 7, 2016, Good sold 19,650 shares at a total value of

11   $1,391,150 with insider information regarding OSIS's lack of internal controls and

12   illegal activities, all of which resulted in OSIS stock trading at artificially inflated

13   prices at the time of his stock sales.  Defendant Good is a citizen of California.

14        23.    Defendant Meyer Luskin ("Luskin") has been a member of the

15   Company's Board since February 1990.  Luskin was a member of the Board's

16   Audit Committee and Risk Management Committee throughout the Relevant

17   Period.  Defendant Luskin is a citizen of California.

18        24.    Defendant Ballhaus has been a member of the Company's Board since

19   May 2010.  Ballhaus was a member of the Board's Audit Committee and Risk

20   Management Committee throughout the Relevant Period.  On September 10, 2014

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   and December 15, 2016, Ballhaus sold a combined 1,750 shares at a total value of

2   $124,950 with insider information regarding OSIS's lack of internal controls and

3   illegal activities, all of which resulted in OSIS stock trading at artificially inflated

4   prices at the time of his stock sales.  Defendant Ballhaus is a citizen of California.

5       25.    Defendant James B. Hawkins ("Hawkins") has been a member of the

6   Company's Board since December 2015.   Hawkins has been a member of the

7   Board's Audit Committee since August 2016.  Defendant Hawkins is a citizen of

8   California.

9       26.    Defendant Gerald Chizever ("Chizever") has been a member of the

10   Company's Board since October 2016.   Chizever has been a member of the

11   Board's Risk Management Committee since its inception in August 2017.

12   Defendant Chizever is a citizen of California.

13       27.    David Todd Feinberg, M.D. ("Feinberg") was a member of the

14   Company's Board from 2010 until December 8, 2015.  Defendant Feinberg is a

15   citizen of Pennsylvania.

16       28.    Defendants   Chopra,  Edrick,  Mehra,  Good,  Luskin,  Ballhaus,

17   Hawkins, Chizever, Feinberg are referred to herein as the "Individual Defendants."

18       29.    Defendants Chopra, Mehra, Good, Luskin, Ballhaus, Hawkins, and

19   Chivezer are referred to herein as the "Director Defendants."

20

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

30.     Defendants Chopra, Edrick, Mehra, Good, and Ballhaus are referred to herein as the "Insider Selling Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each officer and director of the Company owes the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    management, policies, practices and controls of the Company.  By virtue of such

2    duties, the officers and directors of OSIS were required to, among other things:

3              a.    ensure that the Company complied with its legal obligations

4    and requirements, including acting only within the scope of its legal authority and

5    disseminating truthful and accurate statements to the SEC and the investing public;

6              b.    conduct the affairs of the Company in a lawful, efficient,

7    business-like manner so as to provide the highest quality performance of its

8    business, to avoid wasting the Company's assets, and to maximize the value of the

9    Company's stock;

10             c.    properly and accurately guide investors and analysts as to the

11   true financial condition of the Company at any given time, including making

12   accurate statements about the Company's financial results and prospects, and

13   ensuring that the Company maintained an adequate system of financial controls

14   such that the Company's financial reporting would be true and accurate at all

15   times;

16             d.    remain informed as to how the Company conducted its

17   operations, and, upon receipt of notice or information of imprudent or unsound

18   conditions or practices, make reasonable inquiry in connection therewith, and take

19   steps to correct such conditions or practices and make such disclosures as

20   necessary to comply with federal and state securities laws; and

1      e.  ensure that the Company was operated in a diligent, honest, and

2   prudent manner in compliance with all applicable federal, state, and local laws,

3   rules, and regulations.

4      34.  Each Individual Defendant, as an officer and/or director, owed to the

5   Company and its stockholders the fiduciary duties of loyalty, good faith, and

6   candor in the management and administration of the affairs of the Company, as

7   well as in the use and preservation of its property and assets.  The conduct of the

8   Individual Defendants involves a knowing and culpable violation of their

9   obligations as officers and directors of the Company, the absence of good faith on

10  their part, and a reckless disregard of their duties to the Company and its

11  stockholders that Individual Defendants were aware or should have been aware

12  posed a risk of serious injury to the Company.

13     35.  In addition, the Company has also adopted a Code of Ethics &

14  Conduct (the "Code").  The Code states in its Overview:

15    This Code of Ethics and Conduct ("Code") contains our company's

16    general guidelines and requirements for conducting business according to the highest ethical standards and best practices.

17    This Code applies to employees, officers, and directors of OSI Systems, Inc. ("OSI") and our subsidiaries worldwide.

18         *  *  *

19    Obeying the law is part of the foundation on which our ethical

20    standards are built.  You have an obligation to comply with every applicable local, regional, or national law or regulation in those jurisdictions in which we have a presence and operate our business.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Violations of these laws can be extremely costly to us and can subject us (or you) to civil and criminal penalties.

36. The Code goes on to state:

As a publicly traded company, we are obligated to comply with applicable securities laws, regulations, and reporting requirements. Our corporate policy and these rules and regulations mandate that we report financial transactions accurately, completely, fairly, and in a timely and understandable manner.

We will not tolerate inaccurate, incomplete, delayed, or falsified reporting. Employees who are involved with financial reporting are required to understand and comply with applicable accounting standards and laws.

\*      \*      \*

OSI is committed to compliance with U.S. and international government contracting.

\*      \*      \*

U.S. and international government employees are required to abide by strict ethical guidelines that restrict their ability to receive gifts, meals, and entertainment. OSI's policy requires that you avoid providing gifts, hospitality, or entertainment to government officials in order to avoid the appearance of improper influence.

\*      \*      \*

We are firmly committed to complying with international anti-corruption and anti-bribery laws including the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K. Bribery Act. OSI's Anti-Corruption Compliance (ACC) Policy strictly prohibits making, offering, promising, or authorizing a corrupt payment of money, or anything of value, to a government official or any other person in order to obtain or retain business, or to direct business, or to achieve any business-related objective.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

37.     As noted in the Company's October 23, 2017 Proxy Statement filed with the SEC on Form 14-A (the "2017 Proxy"):

> Our Board is responsible for our risk oversight. Risks we face include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, and other risks.  Risks are reported to our Board through our executive officers, who are responsible for the identification, assessment and management of our risks.  Our Board regularly discusses the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.
>
> To optimize its risk oversight capabilities and efficiently oversee our risks, the Board delegates to its committees oversight responsibility for particular areas of risk.  For example, the Audit Committee oversees management of major financial risks, including risks related to accounting, auditing, financial reporting, and maintaining effective internal control over financial reporting.  The Risk Management Committee, which was formed in August 2017, oversees management of key enterprise risks, including strategic, operational, legal, regulatory, and compliance.  The Nominating and Governance Committee oversees risks related to the effectiveness of the Board. The Compensation Committee oversees risks related to our executive compensation policies and practices.  The Technology Committee oversees risks related to technology matters.  During fiscal 2017, the Board also had an Executive Committee that oversaw risks related to strategic transactions.

38.     Furthermore, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

39.     Pursuant to the Charter:

**Responsibilities**

The Committee will assist the Board in fulfilling its oversight responsibilities with respect to (i) the annual and quarterly financial information to be provided to stockholders and the SEC; (ii) the system of internal controls that management has established; and (iii) the internal and external audit process.  In addition, the Committee provides an avenue for communication between internal auditor, the independent auditor, financial management and the Board.

\*       \*       \*

**Specific Duties**

In carrying out its oversight responsibilities, the Committee will:

1.      Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.  This should be done in compliance with applicable Nasdaq and SEC requirements.

2.      Review with the Company's management, internal auditor and independent auditor the Company's accounting and financial reporting controls.  Obtain annually in writing from the independent auditor its letter as to the effectiveness of such controls.

40.     In addition, the Board has a Risk Management Committee.[1]  The Risk Management Committee Charter states in pertinent part:

---

[1] The Risk Management Committee was formed in August 2017.  It appears that prior to the formation of the Risk Management Committee, its responsibilities fell to the Audit Committee.  As noted in the Company's 2016 Proxy Statement filed with the SEC on October 21, 2016:

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of major

15
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Purpose**

The purpose of the Risk Management Committee (the "Committee") of the Board of Directors (the "Board") of OSIS, Inc. (the "Company") will be to assist the Board in its oversight of the Company's management of key risks, including strategic, operational, legal, regulatory, compliance, security, reputational and other risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks.

*        *        *

**Responsibilities**

Outlined below are certain continuing responsibilities that the Committee is expected to fulfill in effecting its purpose as stated in this Charter.  This list of responsibilities is presented for illustrative purposes and is not intended to be exhaustive.  The Committee may conduct additional activities as appropriate in light of changing business, legislative, regulatory, legal or other conditions.   The Committee shall also fulfill other responsibilities delegated to it from time to time by the Board.

> 1.     Monitor all enterprise risks, with the understanding that certain specific responsibilities for risk oversight have been delegated to other Board committees.

> 2.     Coordinate   with   the   other   standing committees of the Board to assist such committees in their review of the Company's risks, the oversight of which has been delegated to them.

> 3.     Review with management, at least quarterly, (i) the Company's program for promoting and monitoring compliance with applicable legal and regulatory requirements, and (ii) the Company's major legal compliance risk exposures and the steps management has

financial and enterprise risks, including risks related to accounting, auditing, financial reporting, maintaining effective internal control over financial reporting, legal and compliance.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

> taken to monitor or mitigate such exposures, including
> the Company's procedures and any related policies with
> respect to risk assessment and risk management.

3       41.     The Individual Defendants failed to maintain the standards laid out by

4    both the law and the Company, resulting in the breaches of fiduciary duty

5    described herein.

6                              **SUBSTANTIVE ALLEGATIONS**

7       42.     OSIS designs and manufactures specialized electronic systems and

8    components.   The Company sells its products and provides related services in

9    diversified markets, including homeland security, healthcare, defense, and

10   aerospace.   The Company's Security division provides security screening products

11   and services internationally under the trade names "Rapiscan" and "AS&E."   The

12   products and services are used for cargo and vehicle inspection at ports of entry,

13   baggage and human screening at airports, and narcotics trace detection, among

14   other uses.

15   **I.   Materially False and Misleading Statements Issued During the
            Relevant Period**

16      43.     On August 21, 2013, the Company issued a press release entitled

17   "OSIS Receives Fifteen-Year Agreement to Provide Turnkey Screening Services

18   in Albania."   Therein, the Company stated, in relevant part:

19

20
> OSI Systems, Inc. (NASDAQ: OSIS), a vertically-integrated provider
> of specialized electronics and services, today announced that the
> Government of Albania has awarded its Security Division, Rapiscan

Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country.

OSI Systems' CEO, Deepak Chopra, stated, "This significant award from Albania to provide turnkey screening services builds upon similar long-term agreements awarded by the Puerto Rico ports authority and Mexico's tax and customs authority.  Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services continues to be well received in the marketplace.  Our experience and capability to develop and integrate leading edge inspection technologies coupled with our depth of operational expertise is unmatched in the industry and we believe makes us uniquely qualified to secure and manage such complex programs."

Under the program, Rapiscan Systems intends to provide a comprehensive X-ray screening program, which will incorporate technology, staffing, systems integration, and maintenance support at sites throughout Albania.  These operational capabilities are intended to enhance the Albanian government's capability to interdict contraband and undeclared materials.  The Company currently anticipates that total gross revenues may range from $150 million - $250 million over the term of the agreement.  Actual revenues could differ significantly from the range provided as the generation of revenue is based upon the volume of cargo and other factors.

Ajay Mehra, President of Rapiscan Systems, stated, "The Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud to have been selected to execute this critical program. Our selection reinforces the attractiveness and compelling value of our turnkey service model."

44.   On August 25, 2014, OSIS issued a press release entitled "OSI Systems Reports Fourth Quarter and Fiscal Year 2014 Financial Results."  Therein, the Company stated, in relevant part:

OSI Systems, Inc. (NASDAQ: OSIS) today announced financial results for its fourth quarter and fiscal year ended June 30, 2014.

Deepak Chopra, OSI Systems' President and CEO, stated, "We are pleased to report record results for our fourth quarter.  Led by our Security Division, we reported a 14% increase in sales with strong bookings highlighted by a significant Foreign Military Sales (FMS) contract from the U.S. Department of Defense. Our substantial backlog and pipeline of opportunities place us in a solid position heading into our new fiscal year."

The Company reported revenues of $260 million for the fourth quarter of fiscal 2014, an increase of 14% from the $228 million reported for the fourth quarter of fiscal 2013.  Net income for the fourth quarter of fiscal 2014 was $22.1 million, or $1.07 per diluted share, compared to net income of $11.8 million, or $0.58 per diluted share, for the fourth quarter of fiscal 2013.  Excluding the impact of impairment, restructuring and other charges and the impact of tax elections discussed below, net income for the fourth quarter of fiscal 2014 would have been $24.5 million, or $1.19 per diluted share, compared to net income of $20.9 million, or $1.02 per diluted share, for the fourth quarter of fiscal 2013. Adjusted EBITDA for the fourth quarter of fiscal 2014 was $51.1 million, an increase of 17% from $43.8 million for the fourth quarter of fiscal 2013.

For the fiscal year ended June 30, 2014, the Company reported revenues of $907 million, a 13% increase from the $802million reported for fiscal 2013. Net income for fiscal 2014 was $47.9 million, or $2.33 per diluted share, compared to net income of $44.1 million, or $2.15 per diluted share, in fiscal 2013.  Excluding the impact of impairment, restructuring and other charges and the impact of tax elections discussed below, net income for fiscal 2014 would have been $64.3 million, or $3.13 per diluted share, compared to net income of $56.8 million, or $2.76 per diluted share, for fiscal 2013. Adjusted EBITDA for fiscal 2014 was $164.6 million, an increase of 30% from $126.4 million for fiscal 2013.

As of June 30, 2014, the Company's backlog was approximately $0.8 billion, which was comparable to the backlog as of March 31, 2014. During fiscal 2014, the Company generated cash flow from operations of $129.2 million and capital expenditures were $54.6 million.

Mr. Chopra continued, "During the fourth quarter, our Security Division's sales growth was outstanding, increasing 45% over the prior year period.  This strength was seen across multiple sales channels and product lines.  With a record non-turnkey backlog, we believe we are well positioned for continued growth in this division."

Mr. Chopra further commented, "Our Healthcare Division finished a challenging year with a disappointing fourth quarter as revenues decreased 15% from the prior year period primarily due to uncertainties in the capital spending environment among North American hospitals.  Despite this setback, we are optimistic that our expanded product offering and an anticipated rebound in the North American market will lead to a return to revenue growth."

Mr. Chopra concluded, "Our Optoelectronics and Manufacturing Division had essentially a flat fourth fiscal quarter in terms of revenues but delivered lower profitability due primarily to an unfavorable product sales mix.  This division, however, continues to expand its customer base across several industries with OEMs that need a global manufacturing footprint.  As we enter fiscal 2015, we will continue to look for ways to increase productivity and efficiencies and improve the operating margin of our Optoelectronics and Manufacturing Division."

During the third quarter of fiscal 2014, the Company made certain tax elections related to the turnkey program in Mexico to accelerate depreciation and realize cash tax savings of approximately $21 million.  In doing so, the Company forfeited tax basis in certain fixed assets that resulted in a charge to income tax of $7.6 million.  The Company made a similar election during the fourth quarter of fiscal 2013 that resulted in a charge to income tax of $6.8 million.  These elections resulted in an effective tax rate of 36.9% and 36.4% for fiscal years 2014 and 2013, respectively, and 25.4% and 52.7% for the fourth quarters of fiscal 2014 and 2013, respectively.  Had these elections not been made, the effective tax rate would have been 26.8% and 26.6% for fiscal 2014 and 2013, respectively, and 25.4% for each of the fourth quarters of fiscal 2014 and 2013.  Such tax election is no longer available under Mexican tax law beginning January 1, 2014.

**Company Outlook - Guidance for Fiscal 2015**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

The Company announced that it anticipates fiscal 2015 sales to be between $960 million and $985 million.  In addition, the Company anticipates approximately 12% - 20% growth in earnings per diluted share to $3.50 to $3.75, excluding the impact of impairment, restructuring and other charges, and the impact of certain tax elections.

45.    On August 27, 2014, the Company filed its annual report on Form 10-K with the SEC for the year ended June 30, 2014.  The 10-K was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Good, Feinberg, and Luskin, and reaffirmed the Company's statements about its financial results contained in the press release issued on August 14, 2014.

46.    On August 20, 2015, OSIS issued a press release entitled "OSI Systems Reports Fourth Quarter and Fiscal Year 2015 Financial Results."  Therein, the Company stated, in relevant part:

OSI Systems, Inc. (NASDAQ: OSIS) today announced financial results for its fourth quarter and fiscal year ended June 30, 2015.

Deepak Chopra, OSI Systems' President and CEO, stated, "We are pleased to report our fourth quarter and full year operating results. We achieved record sales and earnings during the quarter and fiscal 2015. With a robust pipeline of opportunities across each of our divisions coupled with significant, recently implemented operational improvement initiatives, we are optimistic for the future."

The Company reported revenues of $267 million for the fourth quarter of fiscal 2015, an increase of 2% from the $260 million reported for the fourth quarter of fiscal 2014.  Net income for the fourth quarter of fiscal 2015 was $22.4 million, or $1.09 per diluted share, compared to net income of $22.1 million, or $1.07 per diluted share, for the fourth quarter of fiscal 2014.  Excluding the impact of restructuring and other charges, net income for the fourth quarter of fiscal 2015 would have been $25.0 million, or $1.22 per diluted share, compared to net

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

income of $24.5 million, or $1.19 per diluted share, for the fourth quarter of fiscal 2014.

For the fiscal year ended June 30, 2015, the Company reported revenues of $958 million, a 6% increase from the $907 million reported for fiscal 2014.  Net income for fiscal 2015 was $65.2 million, or $3.17 per diluted share, compared to net income of $47.9 million, or $2.33 per diluted share, in fiscal 2014.  Excluding the impact of restructuring and other charges, and the impact in fiscal 2014 of tax elections related to the Company's turnkey program in Mexico, net income for fiscal 2015 would have been $72.4 million, or $3.53 per diluted share, compared to net income of $64.3 million, or $3.13 per diluted share, for fiscal 2014.

During the quarter, the Company's book-to-bill ratio for equipment and related services (non-turnkey) was 1.2 and, as of June 30, 2015, the Company's backlog was $638 million.  During fiscal 2015, the Company generated cash flow from operations of $105.1 million.

Mr. Chopra further commented, "Sales in our Healthcare Division increased by 29% over the prior year fourth quarter driven by significant growth in our U.S. patient monitoring business and the impact of an acquisition completed in the first quarter.  New products have been well received, contributing to a very strong quarter providing nice momentum as we head into fiscal 2016."

Mr. Chopra continued, "Our Security Division's fourth quarter sales of $131 million were solid.  Due to the difficult comparison from the partial fulfillment of our Foreign Military Sale contract with the U.S. Department of Defense in the fourth quarter of the prior year, revenues were down 7%.  We are encouraged by the prospects of continued strong performance with the strength of the backlog, new cargo and vehicle inspection product orders, multiple wins for the recently introduced RTT™ 110 (Real Time Tomography) explosives detection systems, and a robust pipeline of opportunities throughout our product and turnkey portfolio."

Mr. Chopra concluded, "During the fourth quarter our Optoelectronics and Manufacturing Division realized solid operating margin improvement and completed a significant facility consolidation within our contract manufacturing business.  This initiative, as well as the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

recent deployment of other efficiency enhancements in our Healthcare and Security Divisions, will benefit our operations going forward."

**Company Outlook - Guidance for Fiscal 2016**

Subject to the risks described herein, the Company anticipates fiscal 2016 sales to be between $985 million and $1,020 million.  In addition, the Company anticipates earnings per diluted share of $3.75 to $4.00, excluding the impact of restructuring and other charges.

47.     On August 24, 2015, the Company filed its annual report on Form 10-K with the SEC for the year ended June 30, 2015.  The 10-K was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Good, Feinberg, and Luskin, and reaffirmed the Company's statements about its financial results contained in the press release issued on August 20, 2015.

48.     On August 16, 2016, OSIS issued a press release entitled "OSI Systems Reports Fourth Quarter and Fiscal Year 2016 Financial Results."  Therein, the Company stated, in relevant part:

OSI Systems, Inc. (NASDAQ: OSIS) today announced financial results for its fourth quarter and fiscal year ended June 30, 2016. Deepak Chopra, OSI Systems' President and CEO, stated, "While our fourth quarter and full year operating results, in part, reflect the challenges of fiscal 2016, we are optimistic about our prospects for fiscal 2017.  We are confident that our strengthened leadership team, enhanced product portfolios and robust pipeline of opportunities across each of our divisions position us well for top line growth and expanded profitability in fiscal 2017."

The Company reported revenues of $221 million for the fourth quarter of fiscal 2016, a decrease of 17% from the $267 million reported for the fourth quarter of fiscal 2015.  Net income for the fourth quarter of fiscal 2016 was $5.9 million, or $0.30 per diluted share, compared to net income of $22.4 million, or $1.09 per diluted share, for the fourth

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

quarter of fiscal 2015.  Excluding the impact of impairment, restructuring and other charges, net income for the fourth quarter of fiscal 2016 would have been $10.8 million, or $0.55 per diluted share, compared to net income of $25.0 million, or $1.22 per diluted share, for the fourth quarter of fiscal 2015.

For the fiscal year ended June 30, 2016, the Company reported revenues of $830 million, a 13% decrease from the $958 million reported for fiscal 2015.  Net income for fiscal 2016 was $26.2 million, or $1.30 per diluted share, compared to net income of $65.2 million, or $3.17 per diluted share, in fiscal 2015.  Excluding the impact of impairment, restructuring and other charges, net income for fiscal 2016 would have been $42.4 million, or $2.11 per diluted share, compared to net income of $72.4 million, or $3.53 per diluted share, for fiscal 2015.

During the quarter ended June 30, 2016, the Company's book-to-bill ratio for equipment and related services (non-turnkey) was 1.0 and, as of June 30, 2016, the Company's backlog was $623 million.  During fiscal 2016, the Company generated cash flow from operations of $59.2 million.

Mr. Chopra further commented, "Bookings were solid throughout fiscal 2016 in the Security Division.  The combination of various contract push-outs and slower conversion of backlog into revenues resulted in lighter sales during the fourth quarter in comparison with a very strong performance in the same period of the prior year.  We expect significant growth in fiscal 2017 driven across many product lines including the RTT™ 110 (Real Time Tomography) explosives detection systems.

Multiple significant wins during fiscal 2016 and continuing into fiscal 2017 are expected to lead to sizeable revenue growth in this product line in the coming year.  The future of the RTT™ 110 looks bright as it continues its trajectory towards a market leadership position in Europe and Middle East.  We are also very encouraged by the outstanding performance of our turnkey security screening services operations in fiscal 2016 and the pipeline of opportunities for further turnkey awards in fiscal 2017."  Mr. Chopra continued, "Operating efficiencies in the Optoelectronics and Manufacturing Division continued to drive year over year profit growth.  Though external

sales decreased by 1% during the fourth quarter from the prior year, we were able to achieve operating margin improvement on a lower revenue base in the fourth quarter as we have throughout fiscal 2016."

Mr. Chopra concluded, "As anticipated, sales in our Healthcare Division increased from the third quarter but were down year over year.  As we enter fiscal 2017, we are optimistic about our Healthcare business in general due to adjustments to our product portfolio and changes in the Division's leadership and, as a result, we expect to return to growth in fiscal 2017."

**Fiscal Year 2017 Outlook**

Subject to the risks described in this release, the Company anticipates fiscal 2017 sales to grow 4% - 8% to $865 million - $895 million.  In addition, the Company anticipates 23% - 37% growth in earnings per diluted share to $2.60 to $2.90, excluding the impact of impairment, restructuring and other charges and their related tax effects.  This guidance does not include the impact from any pending or potential acquisitions.  Actual sales and diluted earnings per share could vary from this guidance including as a result of the matters discussed under the "Forward-Looking Statements" section.  The Company's 2017 diluted earnings per share guidance is provided on a non-GAAP basis only, due primarily to the variability and difficulty in making accurate forecasts and projections of impairment, restructuring and other charges and their related tax effects.

49.    On August 19, 2016, the Company filed its annual report on Form 10-K with the SEC for the year ended June 30, 2016.  The 10-K was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Good, Hawkins, and Luskin, and reaffirmed the Company's statements about its financial results contained in the press release issued on August 16, 2016.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

50.    On August 24, 2017, OSIS issued a press release entitled "OSIS Reports Fourth Quarter and Fiscal Year 2017 Financial Results."  Therein, the Company stated, in relevant part:

OSI Systems, Inc. (the "Company" or "OSIS") (NASDAQ: OSIS) today announced financial results for the quarter and fiscal year ended June 30, 2017.

"We are pleased to announce outstanding fiscal fourth quarter results. Each of our three operating divisions contributed to the successful conclusion of a strong fiscal year.  Performance at the Security division, in particular, drove top-line growth and margin expansion," said Deepak Chopra, OSIS' Chairman and Chief Executive Officer.

The Company reported revenues of $252 million for the fourth quarter of fiscal 2017, an increase of 14% from the $221 million reported for the fourth quarter of fiscal 2016.  Net income for the fourth quarter of fiscal 2017 was $1.5 million, or $0.08 per diluted share, compared to net income of $5.9 million, or $0.30 per diluted share, for the fourth quarter of fiscal 2016. Non-GAAP net income for the fourth quarter of fiscal 2017 was $19.9 million, or $1.02 per diluted share, compared to non-GAAP net income for the fourth quarter of fiscal 2016 of $11.4 million, or $0.58 per diluted share.

For the fiscal year ended June 30, 2017, the Company reported revenues of $961 million, an increase of 16% as compared to the same period a year ago.  Net income for fiscal 2017 was $21.1 million, or $1.07 per diluted share, compared to net income of $26.2 million, or $1.30 per diluted share, in the same period a year ago.  Non-GAAP net income for the fiscal year ended June 30, 2017 was $58.8 million, or $2.99 per diluted share, compared to non-GAAP net income of $44.3 million, or $2.21 per diluted share, for the 2016 fiscal year.

During the three months ended June 30, 2017, the Company's book-to-bill ratio for equipment and related services (non-turnkey) was 1.4. As of June 30, 2017 the Company's backlog (measured as quantifiable purchase orders or contracts for which revenues are expected to be recognized within the next five years) was $738 million, compared to $623 million as of June 30, 2016.  During fiscal

2017, cash flow generated from operations was $62.8 million and capital expenditures were $17.1 million.

Mr. Chopra stated, "Our Security division had an outstanding finish to the year.  Fourth quarter revenues increased 33% to a record $147 million, $23 million of which was generated by our AS&E business, which we acquired in September 2016. Excluding the AS&E revenues, fourth quarter sales in our Security division increased 12% over sales in the same prior-year fiscal period.  We leveraged our growth and benefitted from synergies from the AS&E acquisition to significantly improve our fourth quarter year-over-year operating income excluding the impact of impairment, restructuring and other charges."

Mr. Chopra further commented, "Our Optoelectronics and Manufacturing division closed the year with an outstanding operating margin due to operational improvements, together with a more favorable product mix and a migration to more profitable customers."

Mr. Chopra concluded, "Our Healthcare business continued to emerge from previous operating difficulties and a challenging hospital spending environment.  During the fourth quarter, sales decreased by 3%; however, excluding the impact of a non-core healthcare business divestiture in February 2017, fourth quarter sales increased by 7% over the prior year.  We believe that we are well-positioned for top-line growth and margin expansion heading into fiscal 2018."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Fiscal Year 2018 Outlook**

Subject to risks described in this press release, the Company anticipates 8% to 12% growth in fiscal 2018 sales to $1,040,000,000 - $1,080,000,000.  In addition, the Company anticipates 12% to 20% growth in non-GAAP earnings per diluted share to $3.35 - $3.60, excluding the fiscal 2018 impact of impairment, restructuring and other charges, amortization of acquired intangible assets and non-cash interest expense, and their related tax effects.  As a result of the matters discussed under "Forward-Looking Statements," actual sales and non- GAAP diluted earnings per share could vary from this guidance.

The Company's fiscal 2018 diluted earnings per share guidance is provided on a non-GAAP basis only.  The Company does not provide a reconciliation of non-GAAP diluted EPS guidance on a forward looking basis to GAAP diluted EPS, the most directly comparable GAAP measure, because it is unable to provide a meaningful or accurate compilation of reconciling items and certain information is not available.

51.    On September 9, 2017, the Company filed its annual report on Form 10-K with the SEC for the year ended June 30, 2017.  The 10-K was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Chizever, Good, Hawkins, and Luskin, and reaffirmed the Company's statements about its financial results contained in the press release issued on August 24, 2017.

52.    The above statements identified in ¶¶40-48 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose that: (1) OSIS acquired the Albania Concession through bribery or other illicit means; (2) OSIS transferred 49% of its project

company associated with the Albania Concession, S2 Albania SHPK, an entity purportedly worth millions, for consideration of less than $5.00; (3) OSIS engaged in other illegal acts, including improper sales and cash payments to government officials; (4) these practices caused the Company to be vulnerable to potential civil and criminal liability, and adverse regulatory action; and (5) as a result of the foregoing, the Individual Defendants' statements about OSIS's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

## II.   The Truth Is Revealed

53.   On December 6, 2017, Muddy Waters published the Muddy Waters Report.  Muddy Waters alleged that the Albania Concession was granted as a result of corruption and bribery.  Muddy Waters claimed that while the concession "has an estimated top line lifetime value of $150 million to $250 million," OSIS "likely bribed somebody by giving half of it away for $4.50" since "[t]here was an unannounced transfer of 49% of OSIS' project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00."

54.   As part of the Albanian Concession, the government of Albania required OSIS to form an Albanian subsidiary, which would own the rights and obligations set forth under the concession.  OSIS's Albanian subsidiary was called

1  S2 Albania SHPK and was formed on March 19, 2013.  In connection with the

2  Albanian Concession, OSIS transferred 49% of its ownership in the subsidiary to

3  an Albanian company called Inspection Control & Measuring Systems, Sh.p.k.

4  ("ICMS") on September 19, 2013 for the nominal price of $4.50.  The sale

5  agreement was signed by an Albanian attorney who was granted power of attorney

6  by defendant Mehra.

7         55.    The Albanian Concession was approved and implemented just before

8  a change in Albanian leadership.  In fact, the approval of the transfer of shares

9  occurred on the day that the former finance minister left office.   The new

10 administration, ruled by a different party, refused to adhere to the agreement with

11 OSIS because it contained a provision imposing a scanning fee of roughly $50 for

12 every customs declaration independent of whether the goods in question were ever

13 scanned.  The Albanian media heavily criticized the Albania Concession, and the

14 fee provision in particular, claiming that it was a theft made by corrupt actors.

15        56.    OSIS entered into arbitration with the Albanian government and

16 though it disclosed this fact to investors, the Company did not reveal the specific

17 reasons behind Albania's challenge of the concession.

18        57.    In addition to the allegations levied against OSIS with respect to the

19 Albania Concession, the Muddy Waters Report questioned the value and the

20 viability of a turnkey contract between OSIS and the government of Mexico.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Muddy Waters stated that the contract is very likely overpriced, which could complicate OSIS's ability to renew the contract.  According to the Muddy Waters Report, given the amount of revenue generated by the contract, as reported by OSIS, if it were to be de-valued or not renewed in the future, the Company's financials would be significantly impacted.  Specifically, Muddy Waters estimated that the contract with Mexico generates about $65-70 million of EBITDA annually, an EBITDA margin of approximately 55-59%.

58.    The Muddy Waters Report included quotes from an interview with a former senior official who said that a key problem with the turnkey contract is that it promises services that cannot be accomplished by a machine alone, such as determining whether a scanned item is legal or compliant with state regulations.

59.    Muddy Waters also alleged that "investigators' interviews with former employees yielded numerous anecdotes indicating OSIS is rotten to the core," including "knowledge of improper sales, cash payments to government officials, fraud in a significant contract, and that OSIS had narrowly avoided being debarred from doing business with the U.S. government."  The summary contained in the Muddy Waters report stated:

> We are short OSI Systems, Inc. (OSIS.US) because we think it is rotten to the core.  We believe it obtained a major turnkey contract in Albania through corruption. It is likely that OSIS's accounts are misstated as a result.  We believe the pricing of its Mexico turnkey contract does not stand up to scrutiny. We estimate that the contract is so rich, it accounted for more than 50% of OSIS's FY2017 EBITDA,

despite being only 15% of revenue.  Put another way, we estimate the Mexico contract's EBITDA margin is approximately 55%, which would mean the rest of OSIS has an EBITDA margin of a paltry 7.5%.  This contract is up for renewal in 2018, and nonrenewal would seemingly have an enormous impact on OSIS's profits.  It also implies that there is significant room for price adjustment downward, which could have a material impact on profits. Former employees' statements support our view that OSIS is rotting from the inside.

Corruption in the 2013 award of OSIS's Albania concession is more obvious than a three-liter bottle of shampoo in your carryon luggage. The concession has an estimated top line lifetime value of $150 million to $250 million. However, OSIS either appears to value the total concession at $9.00 (yes, nine dollars), or they likely bribed somebody by giving half of it away for $4.50.   There was an unannounced transfer of 49% of OSIS's project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00.   To be clear, this company (S2 Albania SHPK) is the company to which all rights and obligations under the turnkey contract award belong, so 49% of the company is presumably worth many millions of dollars.   It appears to us that OSIS's accounts do not reflect the transfer – there are no deductions for non-controlling interests in the income statement, and February 2017 bond offering documents appear to show the subsidiary as 100% owned by OSIS.

There have been numerous news reports in Albania accusing OSIS of corruptly obtaining the concession, and a senior member of parliament has called the award corrupt on the record.  Amazingly, U.S. investors appear to have no inkling of these allegations.

Turnkey contracts seem particularly well-suited to corruption.  If a government is only purchasing scanning equipment, it is relatively easy for an internal auditor to spot an overpayment because the equipment is somewhat commoditized.  However, when bundling in various bespoke services, the pricing suddenly becomes much more opaque.  Given this reality, it is perhaps not surprising that the turnkey contracts to date are in jurisdictions not known for their strong governance.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Beyond the turnkey contracts, investigators' interviews with former employees yielded numerous anecdotes indicating OSIS is rotten to the core. Former employees alleged a list of rot they experienced at Rapiscan, including their concern about possibly going to prison, knowledge of improper sales, cash payments to government officials, fraud in a significant contract, and that OSIS had narrowly avoided being debarred from doing business with the U.S. government.

This corrupt behavior puts at significant risk OSIS's Security Division contracts with U.S. and European government agencies. The only former employee who, in our view, made unreservedly positive comments about OSIS's compliance admitted that OSIS could lose significant government business if it engaged in corruption. Although this senior executive was at OSIS when the transfer of 49% of S2 Albania occurred, he professed no knowledge of the transaction. Either way, his professed lack of knowledge is telling – he was kept out of the loop, which we would not have expected given his role; or, he was not responding truthfully to the question.

In addition, OSIS could face liability under the Foreign Corrupt Practices Act ("FCPA"), which could be in the many hundreds of millions of dollars. The U.S. Department of Justice has been aggressive in prosecuting FCPA violations in both Republican and Democratic administrations. (FCPA settlements generate meaningful revenue generators for the federal government.) In October 2015, we announced we were short Telia Company (TELIA SS) because we believed the corruption issues in its business were significantly larger than had been disclosed, and that it would likely settle at $1 billion or more. Just three months ago (September 2017), Telia agreed to settle with the DOJ and assisting regulators for $966 million. At these levels, there is room for a FCPA settlement that would equal a significant chunk of OSIS's market cap.

(Footnotes omitted.)

60.   The Company's market capitalization began to decline steeply after the Muddy Waters Report was published. In November 2017, OSIS had a market

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

capitalization of $1.684 billion and it has since decreased to $1.264 billion as of April 12, 2018.

61.   On December 6, 2017, the Company responded to the Muddy Waters report by stating:

> We begin by noting that our turnkey security inspection programs in Mexico and in Albania were the result of public tenders.  Both have resulted in enhanced security, increased seizures of contraband, and improved transparency in customs declarations, significantly benefiting both countries.

> Our Albania turnkey security inspection program is operated in partnership with ICMS, a local company with civil works construction capabilities in Albania, with a profit share in accordance with the terms of our agreement with ICMS. ICMS implemented all civil works construction for the program.  As such, both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares.

> Our Mexico turnkey security inspection program operates security inspection checkpoints at multiple critical sites across Mexico as designated by the government.  The program has resulted in significant seizures of high-value contraband.  The Company has previously stated that we are in discussions with the government towards the extension of the program under a reduced revenue rate.

62.   The Individual Defendants at no time actually addressed the allegations in the Muddy Water report.  As noted by Muddy Waters on January 31, 2018:

> OSIS's response to our December 6, 2017 report in no way changes our opinion that OSIS is rotten to the core.  We see the Albania issue as important for three reasons – first, it's illustrative of our view of the rot; second, it begs the question of how viable the turnkey model is without corruption, particularly in jurisdictions where corruption is a

major issue; and third, OSIS's response goes to what we see is a complete lack of management credibility.

In this update, we address OSIS's response to Albania.  OSIS's "partnership" with ICMS, a company purportedly "with civil works construction capabilities in Albania", appears to us a conduit for corruption for five additional reasons.

First, OSIS's statement that "…ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares" is greatly misleading because it appears from the various entities' financials that OSIS has provided virtually all funding to, and investment in, S2 Albania.

Second, OSIS appears to have sought to conceal its joint venture with ICMS from its investors, which we see no reason to do if this arrangement were legitimate.

Third, even if ICMS were the greatest construction company in the world, how would it be entitled to half of the economics of the concession for pouring concrete when OSIS is providing the key equipment, technology, knowhow, and financing?

Fourth, we are fairly certain that ICMS is not the greatest construction company in the world – or even in Albania. ICMS's construction affiliate was formed only eight months before OSIS was awarded the concession – its capitalization was only ~US$850, and it was then sold to ICMS's physician shareholder also for ~US$850. Moreover, it has virtually no tangible assets.  If it's really this easy and cheap to get a nine-figure construction contract, then we at Muddy Waters are wondering why we're in the relatively impoverished world of hedge funds.

Fifth, the timeline of this "partnership" is beyond suspicious – with the requisite approval of the transfer of shares taking place on the day the outgoing Minister of Finance left and the new one was seated.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

63.    The following day, on February 1, 2018, the Company disclosed in a filing with the SEC on Form 8-K that the SEC had launched an investigation into OSIS's compliance with the FCPA.  In the disclosure, the Company said the DOJ was also looking into OSIS's FCPA compliance.

64.    In addition, the February 1, 2018 Form 8-K stated that the SEC and DOJ are investigating "trading in the company's securities and have subpoenaed information regarding trading by executives, directors and employees, as well as company operations and disclosures in and around the time of certain trades."  In response to this investigation, OSIS said it "has taken action with respect to a senior-level employee."

## DAMAGES TO OSIS

65.    As a result of the Individual Defendants' wrongful conduct, OSIS disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated OSIS's credibility.  OSIS has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

66.    Indeed, the Individual Defendants' false and misleading statements as alleged above have subjected OSIS to three complaints for violations of the federal securities laws filed in the United States District Court for the Northern District of California.  The matters are captioned *Longo v. OSI Systems, Inc. et al.*, No. 17-cv-

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

08841, *Doyel v. OSI Systems, Inc. et al.*, No. 17-cv-08855, and *Kerbs v. OSI Systems, Inc. et al.*, No. 17-cv-08991 (collectively, the "Securities Class Actions").

67.     However, these were not the only damages to arise out the allegations. The Company has incurred, and will continue to incur, significant damage in the form of costs and expenses associated with the SEC investigation into the Company's compliance with the FCPA, the DOJ's request for information regarding OSIS's FCPA compliance, and the SEC and DOJ's investigations of trading in OSIS securities, which include the issuance of subpoenas for information regarding trading by executives, directors, and employees, as well as the Company's operations and disclosures in and around the time of certain trades.

68.     The Company may have to pay hundreds of millions of dollars in settlement costs or fines in connection with its liability for violations of the FCPA.

69.     As a direct and proximate result of the Individual Defendants' actions as alleged above, OSIS's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein. Before the release of the Muddy Waters Report, OSIS had a market capitalization of $1.684 billion.  The Company currently has a market capitalization of $1.264 billion.

70.     Moreover, these actions have irreparably damaged OSIS's corporate image and goodwill.  For the foreseeable future, OSIS will suffer from what is

1 known as the "liar's discount," a term applied to the stocks of companies who have

2 been implicated in illegal behavior and have misled the investing public, such that

3 OSIS's ability to raise equity capital or debt on favorable terms in the future is now

4 impaired.

5 **PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS**

6 71.    Plaintiff incorporates by reference and realleges each and every

7 allegation set forth above, as though fully set forth herein.

8 72.    Plaintiff brings this action derivatively in the right and for the benefit

9 of the Company to redress the Individual Defendants' breaches of fiduciary duties.

10 73.    Plaintiff is an owner of OSIS common stock and was an owner of

11 OSIS common stock at all times relevant hereto.

12 74.    Plaintiff will adequately and fairly represent the interests of the

13 Company and its stockholders in enforcing and prosecuting its rights.

14 75.    As a result of the facts set forth herein, Plaintiff has not made any

15 demand on the OSIS Board to institute this action against the Individual

16 Defendants.  Such a demand would be a futile and useless act because the Board is

17 incapable of making an independent and disinterested decision to institute and

18 vigorously prosecute this action.

19 76.    At the time this action was commenced, the Board consisted of seven

20 directors: defendants Chopra, Mehra, Ballhaus, Chizever, Good, Hawkins, and

Luskin.  All seven members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

## I.      Demand is Futile as to the Director Defendants Because They Each Face a Substantial Likelihood of Liability

77.      The Director Defendants all face a substantial likelihood of liability for their individual misconduct.   The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

78.      Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.   Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

79.     The Director Defendants are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above.  All of these defendants signed the false and misleading Forms 10-K filed with the SEC.

80.     The Director Defendants consciously and knowingly made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence in clear breach of their fiduciary duties of loyalty and good faith.  The Director Defendants face a substantial likelihood of liability for the aforementioned breaches.  If the Director Defendants were to bring a suit on behalf of OSIS to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

**II.     Defendant Chopra Lacks Independence**

81.     As an initial matter, OSIS has conceded in its SEC filings that Chopra is not an independent director of the Company.  In its 2017 Proxy, OSIS stated

1  that: "The Board has determined that each of the nominees for director, except

2  Mr. Chopra and Mr. Mehra, is independent . . . ."

3      82.    In addition to this lack of independence, Chopra is not disinterested

4  for purposes of demand futility because his principal occupation is President, CEO,

5  and Chairman of the Board of OSIS.  According to the Company's SEC filings, in

6  2015, 2016, and 2017, Chopra received total compensation of $8,477,921,

7  $6,888,699, and $7,078,479, respectively.  These amounts are material to him.

8      83.    Defendant Chopra is incapable of considering a demand to commence

9  and vigorously prosecute this action because he faces additional substantial

10  likelihood of liability as he is a named defendant in the Securities Class Actions.

11  **III.    Defendant Mehra Lacks Independence**

12      84.    As with defendant Chopra, defendant Mehra is an executive officer of

13  OSIS.  As noted in the 2017 Proxy for defendant Chopra, the Company concedes

14  that Mehra is not independent due to his executive officer position.

15      85.    In addition to this lack of independence, Mehra is not disinterested for

16  purposes of demand futility because his principal occupation is Executive Vice

17  President of the Company and President of OSI Solutions Business.  According to

18  the Company's SEC filings, in 2015, 2016, and 2017, Mehra received total

19  compensation of $2,756,527, $1,164,806, and $2,858,718, respectively.   These

20  amounts are material to him.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**IV.  Demand is Excused as to Defendants Good, Luskin, Ballhaus, Hawkins, and Chizever Because as Members of the Audit and/or Risk Management Committees They Face a Substantial Likelihood of Liability**

86.  Defendants Good, Luskin, Ballhaus, Hawkins, and Chizever, as members of the Audit and/or Risk Management Committees during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed defendants Chopra and Edrick to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit and/or Risk Management Committees, defendants Good, Luskin, Ballhaus, Hawkins, and Chizever were obligated to review the Company's annual and quarterly reports to ensure their accuracy and ensure the Company was acting legally.  Instead, defendants Good, Luskin, Ballhaus, Hawkins, and Chizever, as members of the Audit and/or Risk Management Committees, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, and failed to ensure the Company was acting legally, as required by the Audit and/or risk Management Committees Charters.  For this reason, demand is futile as to defendants Good, Luskin, Ballhaus, Hawkins, and Chizever.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**V.    Demand is Futile as to the Insider Selling Defendants Because They Financially Benefited from the Above-Referenced False and Misleading Statements**

87.    As noted above, defendants Chopra, Edrick, Mehra, Good, and Ballhaus personally benefited from the Individual Defendants' false and misleading statements by having the opportunity to sell shares of OSIS stock at artificially inflated prices, a benefit not shared by the rest of OSIS's stockholders.

**VI.   Demand is Futile as to the Director Defendants for the Following Additional Reasons**

88.    If OSIS's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by OSIS against the Individual Defendants, known as the "insured versus insured exclusion."

89.    As a result, if the Director Defendants were to sue themselves or certain of the officers of OSIS, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore,

the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

90.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting OSIS by prosecuting this action.  Therefore, demand on OSIS and its Board is futile and is excused.  OSIS has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

**COUNT I**

**AGAINST THE INDIVIDUAL DEFENDANTS**
**FOR BREACH OF FIDUCIARY DUTY**

91.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

92.     The Individual Defendants owed and owe OSIS fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe OSIS the highest obligation of loyalty, good faith, due care, oversight, and candor.

93.   All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

94.   Each of the Individual Defendants had actual or constructive knowledge of and failed to disclose that: (1) OSIS acquired the Albania Concession through bribery or other illicit means; (2) OSIS transferred 49% of its project company associated with the Albania Concession, S2 Albania SHPK, an entity purportedly worth millions, for consideration of less than $5.00; (3) OSIS engaged in other illegal acts, including improper sales and cash payments to government officials; (4) these practices caused the Company to be vulnerable to potential civil and criminal liability, and adverse regulatory action; and (5) as a result of the foregoing, the Individual Defendants' statements about OSIS's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.  These actions caused severe risks to the Company's financial viability and caused harm to the Company by subjecting the Company to the Securities Class Actions and the SEC and DOJ investigations.  The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.   The Individual Defendants consciously caused or allowed OSIS to lack requisite internal controls, and, as a result, the Company regularly made false

and misleading statements regarding the OSIS acquisition of the Albania Concession and the Company's internal controls.

96.    The Individual Defendants consciously failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

97.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, OSIS has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their fiduciary duties owed to OSIS and its stockholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee OSIS's business, rendering them personally liable to the Company.

**COUNT II**
**BREACH OF FIDUCIARY DUTY FOR INSIDER**
**SELLING AND MISAPPROPRIATION OF INFORMATION**
**AGAINST THE INSIDER SELLING DEFENDANTS**

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew of the information described above, and sold OSIS common stock on the basis of such information.

100.   The information described above was proprietary, non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold OSIS common stock.

101.   The Insider Selling Defendants' sales of Company common stock while in possession and control of this material, adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

102.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III
### UNJUST ENRICHMENT AGAINST
### THE INSIDER SELLING DEFENDANTS

103.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

104.   The Insider Selling Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of OSIS common stock, as alleged herein, and

1 | it would be unconscionable to allow them to retain the benefits of their illegal

2 | conduct.

3 | 105. To remedy the Insider Selling Defendants' unjust enrichment, the

4 | Court should order them to disgorge to the Company all proceeds derived from

5 | their illegal sales of OSIS common stock.

6 | **<u>PRAYER FOR RELIEF</u>**

7 | WHEREFORE, Plaintiff demands judgment as follows:

8 | A. Declaring that Plaintiff may maintain this derivative action on behalf

9 | of OSIS and that Plaintiff is a proper and adequate representative of the Company;

10 | B. Awarding the amount of damages sustained by the Company as a

11 | result of the Individual Defendants' breaches of fiduciary duties;

12 | C. Ordering the Insider Selling Defendants to disgorge the profits

13 | obtained as a result of their sale of OSIS stock while in possession of insider

14 | information as described herein;

15 | D. Granting appropriate equitable relief to remedy the Individual

16 | Defendants' breaches of fiduciary duties and other violations of law;

17 | E. Awarding to Plaintiff the costs and disbursements of the action,

18 | including reasonable attorneys' fees, accountants' and experts' fees and costs and

19 | expenses; and

20 |

1    F.    Granting such other and further relief as the Court deems just and

2  proper.

3                      **JURY TRIAL DEMANDED**

4    Plaintiff hereby demands a trial by jury.

5  Dated:  April 23, 2018                    Respectfully submitted,

6                                            WEISSLAW LLP

7

8                                            Joel E. Elkins (SBN 256020)
                                             jelkins@weisslawllp.com
                                             9107 Wilshire Blvd, Suite 450
9                                            Beverly Hills, CA 90210
                                             Telephone:  (310) 208-2800
10                                           Facsimile:  (310) 209-2348

11                                           *Liaison Counsel for Plaintiff*

12                                           BRAGAR EAGEL & SQUIRE, P.C.
                                             David J. Stone (SBN 208961)
13                                           stone@bespc.com
                                             Melissa A. Fortunato (SBN 319767)
14                                           fortunato@bespc.com
                                             Todd H. Henderson
15                                           henderson@bespc.com
                                             885 Third Avenue, Suite 3040
16                                           New York, New York 10022
                                             Telephone:  (212) 308-5858
17                                           Facsimile:   (212) 486-0462

18

19

20

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

HYNES KELLER & HERNANDEZ, LLC
Michael J. Hynes
mhynes@hkh-lawfirm.com
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone:  (484) 875-3116
Facsimile:    (914) 752-3041

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT