1  WEISSLAW LLP
   Joel E. Elkins (SBN 256020)
2  jelkins@weisslawllp.com
   9107 Wilshire Blvd, Suite 450
3  Beverly Hills, CA 90210
   Telephone:  (310) 208-2800
4  Facsimile:  (310) 209-2348

5  *Counsel for Plaintiff*

6  [*Additional Counsel in Signature Block*]

7                 **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
8                    **WESTERN DIVISION**

9  | MICHAEL RILEY, Derivatively on | Case   No.:   2-18-cv-03371-MWF- |
   | Behalf of OSI SYSTEMS, INC., | GJS |
10 | | |
   | | Hon. Virginia A. Phillips |
11 | Plaintiff, | |
   | | **VERIFIED AMENDED** |
12 | v. | **STOCKHOLDER DERIVATIVE** |
   | | **COMPLAINT** |
13 | DEEPAK CHOPRA, ALAN EDRICK, | |
   | AJAY MEHRA, JONATHAN FLEMING, | |
14 | CHRISTOPHER COOK, STEVEN C. | **DEMAND FOR JURY TRIAL** |
   | GOOD, MEYER LUSKIN, WILLIAM F. | |
15 | BALLHAUS, JR., JAMES B. HAWKINS, | Judge: Hon. Virginia A. Phillips |
   | GERALD CHIZEVER, and DAVID T. | |
16 | FEINBERG, M.D., | |
   | | |
17 | Defendants, | |
   | | |
18 | and | |
   | | |
19 | OSI SYSTEMS, INC., a Delaware | |
   | Corporation, | |
20 | | |
   | Nominal Defendant. | |

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1    Plaintiff Michael Riley ("Plaintiff"), by and through his counsel, derivatively

2    on behalf of Nominal Defendant OSI Systems, Inc. ("OSI" or the "Company"),

3    submits this Verified Amended Stockholder Derivative Complaint against the

4    Individual Defendants (defined herein) and alleges the following upon information

5    and belief, except as to those allegations concerning Plaintiff, which are alleged upon

6    personal knowledge.  Plaintiff's information and belief is based upon, among other

7    things, his counsel's investigation, which included, *inter alia*, review and analysis

8    of: (i) regulatory filings made by OSI with the U.S. Securities and Exchange

9    Commission ("SEC"); (ii) press releases issued and disseminated by OSI; (iii) a

10   consolidated class action lawsuit (the "Securities Class Action") filed in the United

11   States District Court for the Central District of California against OSI and defendants

12   Deepak Chopra ("Chopra"), Alan Edrick ("Edrick"), and Ajay Mehra ("Mehra")

13   alleging violations of the anti-fraud provisions of the federal securities laws based

14   on the alleged issuance of false and misleading statements of material fact, and the

15   alleged omission to state material facts necessary to make other statements made not

16   misleading, between August 21, 2013 and February 1, 2018 (the "Relevant Period")

17   with respect to, *inter alia,* OSI's acquisition of an Albanian contract through bribery

18   or other illicit means; and (iv) other publicly-available information, including media

19   and analyst reports, concerning OSI.

20

1

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1

**<u>NATURE OF THE ACTION</u>**

2      1.     This is a stockholder derivative action asserting claims for breaches of

3 fiduciary duty, violations of Section 14(a) of the Securities Exchange Act of 1934

4 (the "Exchange Act"), unjust enrichment, and waste of corporate assets brought on

5 behalf of nominal defendant OSI against certain current and former officers and

6 members of the Company's Board of Directors (the "Board").

7      2.     OSI was founded in 1987 and designs and manufactures security and

8 inspection systems including metal detectors and medical monitoring devices. The

9 Company sells its products and provides related services internationally in

10 diversified markets, including homeland security, healthcare, defense, and

11 aerospace.

12      3.     During the Relevant Period, OSI generated more than half its revenue

13 from its core security division, which was primarily operated through its Rapiscan

14 Systems, Inc. subsidiary ("Rapiscan"). Rapiscan sells and provides services for X-

15 ray security and inspection systems to detect explosives, drugs, and other illegal

16 goods. Historically, the U.S. government was Rapiscan's largest and most important

17 customer. Rapiscan had significant contracts with the Department of Homeland

18 Security ("DHS") and Transportation Security Administration ("TSA"). DHS and

19 TSA purchased OSI security and inspection systems for use at airports, border

20 crossings, shipping ports, and military installations.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1    4.    As a precursor to the wrongdoing that is the basis for this Complaint,

2    between 2011 and 2013, OSI had serious issues with its U.S. government contracts.

3    In November 2012, a U.S. Congressman Mike Rogers (then Chairman of the

4    Homeland Security Subcommittee on Transportation Security) sent a letter to TSA

5    stating that Rapiscan "may have attempted to defraud the Government" by

6    "knowingly manipulating" body scanner tests and concealing information relating

7    to its contracts with TSA.  These allegations led to the U.S. government's issuance

8    of a "show cause" letter and a "Notice of Proposed Debarment" of Rapiscan from

9    future DHS contracts.

10    5.    Next, OSI was accused of misleading the U.S. government from 2010

11    through 2013 regarding its checkpoint baggage and parcel scanners, including

12    concealing the use of unapproved Chinese components to repair and manufacture

13    scanners in violation of its contract with TSA.  OSI's actions resulted in the

14    termination of U.S. government contracts worth almost $500 million and an

15    "Administrative Agreement" with DHS concluding that, *inter alia*, Rapiscan had

16    "provided false or misleading information to the Government."  This conduct led to

17    a federal civil securities fraud lawsuit that ultimately settled for $15 million in 2015.

18    It also resulted in the effective ouster of defendant Mehra – who is defendant

19    Chopra's first cousin – from his role as President of Rapiscan.  Mehra had led

20    Rapiscan during the issues regarding U.S. government contracts.  Following his

3
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   dismissal from Rapiscan, Mehra was transferred to another division of OSI where

2   he was allowed to carry out further financial schemes.

3       6.      After having its U.S. government contracts severely curtailed, the

4   Individual Defendants needed to turn OSI around.  They sought to change the

5   Company's fortune by focusing on long-term service contracts with foreign

6   governments.  This new business model was called "turnkey security screening

7   solutions," and the Individual Defendants told the investing public that it would

8   "transform the Company" by providing future growth and more consistent streams

9   of revenue.

10      7.      This new "turnkey" model was sold through OSI's "S2 Global"

11  subsidiary, where defendant Mehra has been president since 2014.  The Individual

12  Defendants stated that the S2 Global turnkey model provided full turnkey services

13  to support foreign governments and customs officials with the installation,

14  maintenance, and operation of the Company's security inspection products – as well

15  as the construction, staffing, and long-term operation of security screening

16  checkpoints.  The turnkey model differed from OSI's traditional equipment sales

17  business in that the customer did not own the equipment but instead paid a

18  subscription or per-scan fee.

19      8.      Throughout the Relevant Period, the Individual Defendants repeatedly

20  caused OSI to make statements that its turnkey model was its most promising new

4

business segment and would provide higher profit margins, greater revenue visibility and consistency, and substantial growth opportunities in international markets.

9. In order to create some "facts" to back their intended narrative, the Individual Defendants needed to show that foreign governments were willing to pay exorbitant fees for long-term services contracts, as opposed to simply buying the equipment and running it themselves (which was far cheaper). This could only be possible with foreign governments that were extremely corrupt, dictatorial, and/or lacked oversight, like Albania. Prior to the a deal made with Albania, which is the primary subject of this Complaint, OSI had only booked two turnkey contracts, in Mexico and Puerto Rico, and had not had a new major turnkey deal since 2012. This gave the Individual Defendants motive to sign a new turnkey contract by any means necessary to back up their repeated statements of optimism.

10. On August 21, 2013, OSI's luck appeared to change. The Individual Defendants caused the Company to announce a new long-term turnkey contract with the Albanian government (the "Albanian Contract"), then controlled by Prime Minister Sali Berisha ("Berisha") and his Democratic Party. The Company claimed that the Albanian Contract was for a 15-year term and would provide $150 to $250 million in revenues. The press release announcing the deal quoted defendant Mehra saying, "our selection [for the Albanian Contract] reinforces the attractiveness and compelling value of our turnkey service model."

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

11.     Throughout the Relevant Period, the Individual Defendants caused OSI to continue to tout the turnkey business model and the Albanian Contract as evidence of its success and future viability.  One example was on January 28, 2014, when defendant Chopra stated, "[a]fter winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment and expect to continue to leverage our position for further growth."  Similar sentiment was put forth by the Company's Chief Financial Officer ("CFO"), defendant Edrick, when he stated on March 4, 2014, that the turnkey model provided the Company with a "first-mover advantage" over its competitors, as follows:

> [W]hat's been driving the growth over the past year has been largely dominated by our turnkey security solutions.  We pioneered this area. . . .  There's only been three contracts of this type awarded to the world.  And to date, well, we've won all three.  So today, we have 100% market share in that area.

12.     The Individual Defendants continued to represent that the turnkey model "has been extraordinarily successful for us" and "in just a few short years, this has gone from 0% of our Security business to about 30% today.  So it's been very, very exciting.  It's a nice revenue, higher margin business for us of a recurring nature."  The Individual Defendants also caused the Company to file a series of public filings with the SEC that falsely assured the Company's stockholders and the investing public that, *inter alia*: (i) the Company's financial disclosures were

6

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   accurate; (ii) the Company's SEC filings did not contain misstatements and "fairly

2   present[ed]" the Company's business condition "in all material respects;" and

3   (iii) OSI's internal compliance controls were adequate to prevent misstatements,

4   corruption, and impropriety, including under the U.S. Foreign Corrupt Practices Act

5   ("FCPA") and the federal securities laws.

6        13.   Unbeknownst to the Company's stockholders and the investing public,

7   these representations were materially false and misleading.   The Individual

8   Defendants withheld key facts about how the Albanian Contract came to be.  Instead

9   of being the product of an open bidding process, defendant Mehra – with the

10  acquiescence of the other Individual Defendants – entered into a secret and corrupt

11  arrangement to secure the contract.

12       14.   In order to secure the Albanian Contract, OSI set up an Albanian

13  business subsidiary, S2 Albania SHPK ("S2 Albania"), to service and own OSI's

14  rights and obligations under the $150-250 million Albanian Contract.  OSI then

15  transferred 49% of S2 Albania to an Albanian holding company, called Inspection

16  Control & Measuring Systems SHPK ("ICMS"), for a price of only 490 Albanian

17  Lekë – approximately $4.50.  ICMS was a shell entity owned by an Albanian dentist,

18  Olti Peçini ("Peçini"), with ties to Albania's corrupt outgoing Berisha-controlled

19  government, which had awarded OSI the large turnkey contract.  Defendant Mehra

20  personally executed this arrangement, as well as an undisclosed "profit shar[ing]"

7

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   agreement with ICMS relating to the Albanian Contract.  The 49% transfer to ICMS

2   was approved by the Albanian Minister of Finance just days before his party left

3   office.

4       15.    The entire process by which OSI secured the Albanian Contract

5   violated the FCPA, yet no part of the scheme was disclosed to the Company's

6   stockholders or the investing public.  Throughout the Relevant Period, the Individual

7   Defendants concealed the corrupt details behind the Albanian Contract and

8   repeatedly touted its significance as an example of widespread acceptance of the

9   "transformative" new turnkey business model.   For instance, in bond offering

10  documents issued in February 2017, the Individual Defendants falsely represented

11  that OSI owned "all of the issued and outstanding capital stock" of its subsidiaries,

12  including S2 Albania, even though it had transferred 49% of S2 Albania and

13  lucrative profit-sharing rights to ICMS years earlier for the equivalent of only $4.50.

14      16.    At the same time the Individual Defendants were concealing their

15  illegal acts regarding the Albanian Contract and pumping up OSI's stock price, they

16  were also selling off hundreds of thousands of shares of the Company's stock at

17  artificially-inflated prices for collective proceeds of over $52.6 million.  The sales

18  were coincidentally timed to maximize the value of their insider information.  For

19  instance, just two weeks after the Company disclosed that the new Albanian regime

20  had "halted further progress" on the Albanian Contract, the Company disclosed that,

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

on September 11, 2014, defendant Chopra had entered into a Rule 10b5-1 plan to immediately sell 48,000 shares for millions of dollars in inflated proceeds knowing that the full extent of the wrongdoing had not been disclosed. These trades were so suspicious that they are now being investigated by the Department of Justice ("DOJ") and the SEC.

17.    On December 6, 2017, Muddy Waters Research ("Muddy Waters") published a damning report on OSI entitled "OSIS:[1] Rotten to the Core" (the "Muddy Waters Report"). Muddy Waters alleged that the Albanian Contract was the result of a process replete with corruption and a lack of transparency. Muddy Waters claimed that while the Albanian Contract "has an estimated top line lifetime value of $150 million to $250 million," the Company "likely bribed somebody by giving half of it away for $4.50" since "[t]here was an unannounced transfer of 49% of OSIS's project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00." The Muddy Waters Report concluded that OSI was "rotten to the core" and had "obtained a major turnkey contract in Albania through corruption." It also included translations of Albanian reports calling the deal the "theft of the century" and a "Mafia of scanning concession." One Albanian report asked "how did the doctor Olti Peçini [buy] 49%

---

[1] OSI's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "OSIS."

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   of the shares of a concession worth 316 million USD for 490 lekë.  Who is hiding

2   behind the ICMS. . . ? !"

3          18.    Muddy Waters also revealed that "investigators' interviews with former

4   employees yielded numerous anecdotes indicating OSIS is rotten to the core,"

5   including "knowledge of improper sales, cash payments to government officials,

6   fraud in a significant contract, and that OSIS had narrowly avoided being debarred

7   from doing business with the U.S. government."

8          19.    Within hours of the Muddy Waters Report, the Individual Defendants

9   caused OSI to respond in a December 6, 2017 press release, admitting many of the

10  core facts alleged by Muddy Waters, while stating that the "turnkey security

11  inspection programs in Mexico and Albania were the result of public tenders" and

12  that OSI's partner in Albania "made significant capital investments toward the

13  implementation of the program in a value well beyond the par value of shares."

14  Despite these statements of comfort, OSI's stock price dropped by more than 29%,

15  representing a loss of over $443 million in market capitalization.

16          20.    On January 31, 2018, Muddy Waters replied to OSI's response by

17  emphasizing that it stood by its "opinion that OSIS is rotten to the core."  Muddy

18  Waters rejected OSI's assertions that its Albanian partnership was legitimate or the

19  result of an equitable, noncorrupt agreement.   Muddy Waters cited financial

20  statements of OSI and its Albanian partner to support its assertions.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1    21.    The next day, on February 1, 2018, OSI disclosed that the SEC and DOJ

2 had launched investigations into the Company's compliance with the FCPA.  The

3 same disclosure revealed that the SEC and DOJ are also investigating trading in

4 OSI's securities and have subpoenaed the Company's executives, directors, and

5 employees.  These disclosures caused the Company's stock price to drop another

6 18%, representing a decline of over $216 million in market capitalization.

7    22.    In total, the Company's market capitalization has declined significantly

8 following the publication of the Muddy Waters Report.  In November 2017, OSI had

9 a market capitalization of $1.687 billion and it has since decreased to $986.7 million

10 as of February 2, 2018.

11    23.    Throughout the Relevant Period, the Individual Defendants made

12 materially false and/or misleading statements, as well as failed to disclose material

13 adverse facts about the Company's business, operations, and prospects.  Specifically,

14 the Individual Defendants failed to disclose that: (1) OSI illegally acquired the

15 Albanian Contract through bribery or other illicit means; (2) OSI transferred 49% of

16 its project company associated with the Albanian Contract, S2 Albania, an entity

17 purportedly worth millions, for consideration worth $4.50; (3) OSI engaged in other

18 illegal acts, including improper sales and cash payments to government officials;

19 (4) these practices caused the Company to be vulnerable to potential civil and

20 criminal liability and adverse regulatory action; and (5) as a result of the foregoing,

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   the Individual Defendants' statements about OSI's business, operations, and

2   prospects were materially false and/or misleading and/or lacked a reasonable basis.

3       24.    The Individual Defendants breached their fiduciary duties of loyalty,

4   good faith, due care, oversight, and candor by willfully engaging in the deceptions

5   alleged herein.  In addition, defendants Chopra, Edrick, Mehra, Steven C. Good

6   ("Good"), and William F. Ballhaus, Jr. ("Ballhaus") breached their fiduciary duties

7   of loyalty and good faith by selling shares of Company common stock while in

8   possession and control of material, adverse non-public information that was a

9   proprietary asset of the Company.

10       25.    In addition, the Individual Defendants violated Section 14(a) of the

11   Exchange Act and SEC Rule 14a-9 by soliciting stockholder votes for director re-

12   election and approval of performance-based compensation, while simultaneously

13   misrepresenting and failing to disclose the Company's illegal activities described

14   herein.

15       26.    As a direct and proximate result of the Individual Defendants' breaches

16   of their fiduciary duties, OSI has sustained damages as described below.

17                      **JURISDICTION AND VENUE**

18       27.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the

19   Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and

20   SEC Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state

2   law claims form part of the same case or controversy.  This Court also has diversity

3   jurisdiction as conferred by 28 U.S.C. § 1332.  Plaintiff and the Individual

4   Defendants are citizens of different states and the amount in controversy exceeds the

5   sum or value of $75,000, exclusive of interest and costs.  This action is not a

6   collusive action designed to confer jurisdiction on a court of the United States that

7   it would not otherwise have.

8       28.   This Court has personal jurisdiction over each of the Defendants

9   because each defendant is either a corporation conducting business and maintaining

10  operations in this District, is an individual who is either present in this District for

11  jurisdictional purposes, or has sufficient minimum contacts with this District so as

12  to render the exercise of jurisdiction by this Court permissible under traditional

13  notions of fair play and substantial justice.

14      29.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because

15  (i) one or more of the Defendants either resides or maintains executives offices in

16  this District; (ii) a substantial portion of the transactions and wrongs complained of

17  herein occurred in this District; and (iii) Defendants have received substantial

18  compensation and other transfers of money in this District by doing business and

19  engaging in activities having an effect in this District.

20

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

# PARTIES

30.     Plaintiff was a stockholder of OSI at the time of the wrongdoing alleged herein, and has been a stockholder of OSI continuously since that time.  Plaintiff is a citizen of North Carolina.

31.     Defendant OSI is incorporated in Delaware and its principal executive offices are located at 12525 Chadron Avenue, Hawthorne, California 90250.

32.     Defendant Chopra is OSI's founder and has been its President, Chief Executive Officer ("CEO"), and Chairman since 1987.  Between September 25, 2014 and December 7, 2016, defendant Chopra sold 309,944 shares for a total value of $23,525,798, with knowledge of material non-public information regarding OSI's lack of internal controls and illegal activities, all of which resulted in OSI stock trading at artificially-inflated prices at the time of his stock sales.  Defendant Chopra is first cousins with defendant Mehra.  Defendant Chopra received $8,228,761, $8,477,921, $6,888,699, $7,078,479, and $7,310,240 in total compensation in 2014, 2015, 2016, 2017, and 2018, respectively.  He is also slated to receive an outlandish severance package should he ever be terminated.  Defendant Chopra is slated to receive a $13.5 million stay bonus, within 45 days of January 1, 2024 and will receive three times the average of his highest two years of compensation of the previous five years if he is fired without cause before then.  That would total approximately $25 million based on the compensation figures above.  Defendant

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Chopra is also named as a defendant in the Securities Class Action. He is a citizen of California.

33. Defendant Edrick has been the CFO and Executive Vice President of OSI since September 2006. Between December 11, 2014 and March 14, 2017, defendant Edrick sold 103,594 shares for total proceeds of $8,185,397.13 with knowledge of material non-public information regarding OSI's lack of internal controls and illegal activities, all of which resulted in OSI stock trading at artificially-inflated prices at the time of his stock sales. He received $3,160,140, $3,047,455, $2,508,632, $2,832,915, and $3,167,305 in total compensation in 2014, 2015, 2016, 2017, and 2018, respectively. Defendant Edrick is also named as a defendant in the Securities Class Action. He is a citizen of California.

34. Defendant Mehra has been a member of the Company's Board since March 1996. He is also Executive Vice President of the Company, President of OSI Solutions Business, and President of S2 Global. Defendant Mehra joined the Company as Controller in 1989 and was Vice President and CFO from November 1992 until November 2002, when he was named Executive Vice President. He was also the President of OSI's Rapiscan subsidiary from September 2007 until his removal in August 2014 for illegal schemes involving contracts with the U.S. government. He also directly effectuated the transfer of 49% plus a profit-sharing arrangement in the Albanian Contract to Peçini for consideration worth $4.50.

1    Defendant Mehra is first cousins with defendant Chopra.  Between October 29, 2014

2    and December 13, 2016, defendant Mehra sold 186,811 shares for total proceeds of

3    $14,789,690.63 with knowledge of material non-public information regarding OSI's

4    lack of internal controls and illegal activities, all of which resulted in OSI stock

5    trading at artificially-inflated prices at the time of his stock sales.  He received

6    $3,281,717,  $2,756,527,  $1,164,806,  $2,858,718,  and  $3,127,138  in  total

7    compensation in 2014, 2015, 2016, 2017, and 2018, respectively.  He is also named

8    as a defendant in the Securities Class Action.  Defendant Mehra is a citizen of

9    California.

10       35.    Defendant Jonathan Fleming ("Fleming") founded S2 Global in 2009

11   and helped lead its merger with OSI in 2010.  He was the President of S2 Global

12   until 2014, when Mehra was named President.  He is currently the Executive Vice

13   President of OSI's S2 Global subsidiary under defendant Mehra.  Since March 19,

14   2013,  defendant  Fleming  has  been  the  administrator  of  Rapiscan's  Albanian

15   subsidiary, S2 Albania.  He is a citizen of Florida.

16       36.    Defendant Christopher Cook ("Cook") has been OSI's Vice President

17   of Corporate Compliance since October 2013.  Prior to that he was the Company's

18   first Director of Corporate Compliance.  The Company was forced to create a

19   Director of Corporate Compliance as part of an administrative agreement with DHS

20   in June 2013 (the "Administrative Agreement").  Defendant Cook had no corporate

1  compliance experience prior to his appointment as Director of Corporate

2  Compliance in May 2013.  He is a citizen of California.

3       37.    Defendant Good has been a member of OSI's Board since September

4  1987.  Good was a member of the Board's Audit, Compensation & Benefits, and

5  Risk Management Committees during the Relevant Period.  Between September 9,

6  2014 and December 7, 2016, Good sold 19,650 shares for total proceeds of

7  $1,391,150 with knowledge of material non-public information regarding OSI's lack

8  of internal controls and illegal activities, all of which resulted in OSI stock trading

9  at artificially-inflated prices at the time of his stock sales.  Defendant Good is a

10  citizen of California.

11       38.    Defendant Meyer Luskin ("Luskin") has been a member of OSI's

12  Board since February 1990.   Luskin was a member of the Board's Audit,

13  Compensation & Benefits, and Risk Management Committees during the Relevant

14  Period.  Defendant Luskin is a citizen of California.

15       39.    Defendant Ballhaus has been a member of OSI's Board since May

16  2010.  He was a member of the Board's Audit, Compensation & Benefits, and Risk

17  Management Committees during the Relevant Period.  On September 10, 2014 and

18  December 15, 2016, Ballhaus sold a combined 1,750 shares for total proceeds of

19  $124,950 with knowledge of material non-public information regarding OSI's lack

20  of internal controls and illegal activities, all of which resulted in OSI stock trading

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

at artificially-inflated prices at the time of his stock sales.  Defendant Ballhaus is a citizen of California.

40.    Defendant James B. Hawkins ("Hawkins") has been a member of OSI's Board since December 2015.  He has been a member of the Board's Audit Committee since August 2016.  Defendant Hawkins is a citizen of California.

41.    Defendant Gerald Chizever ("Chizever") has been a member of OSI's Board since October 2016.  He has been a member of the Board's Risk Management Committee since its inception in August 2017.  Defendant Chizever is a citizen of California.

42.    David T. Feinberg, M.D. ("Feinberg") was a member of OSI's Board from 2010 until December 8, 2015.  Defendant Feinberg is a citizen of California.

43.    Defendants Chopra, Edrick, Mehra, Fleming, Cook, Good, Luskin, Ballhaus, Hawkins, Chizever, and Feinberg are referred to herein as the "Individual Defendants."

44.    Defendants Chopra, Mehra, Good, Luskin, Ballhaus, Hawkins, and Chivezer are referred to herein as the "Director Defendants."

45.    Defendants Chopra, Edrick, Mehra, Good, and Ballhaus are referred to herein as the "Insider Selling Defendants."

---

18
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

## DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each officer and director of the Company owes the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of OSI were required to, among other things:

1      a.     ensure that the Company complied with its legal obligations and

2 requirements, including acting only within the scope of its legal authority and

3 disseminating truthful and accurate statements to the SEC and the investing public;

4      b.     conduct the affairs of the Company in a lawful, efficient,

5 business-like manner to provide the highest quality performance of its business, to

6 avoid wasting the Company's assets, and to maximize the value of the Company's

7 stock;

8      c.     properly and accurately guide investors and analysts as to the true

9 financial condition of the Company at any given time, including making accurate

10 statements about the Company's financial results and prospects, and ensuring that

11 the Company maintained an adequate system of financial controls such that the

12 Company's financial reporting would be true and accurate at all times;

13      d.     remain informed as to how the Company conducted its

14 operations, and, upon receipt of notice or information of imprudent or unsound

15 conditions or practices, make reasonable inquiry in connection therewith, and take

16 steps to correct such conditions or practices and make such disclosures as necessary

17 to comply with federal and state securities laws; and

18      e.     ensure that the Company was operated in a diligent, honest, and

19 prudent manner in compliance with all applicable federal, state, and local laws, rules,

20 and regulations.

49.     Each of the Individual Defendants, as an officer and/or director of OSI, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, and a reckless disregard of their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

50.     In addition, the Company has also adopted a Code of Ethics & Conduct (the "Code").  The Code states in its Overview:

> This Code of Ethics and Conduct ("Code") contains our company's general guidelines and requirements for conducting business according to the highest ethical standards and best practices.
>
> This Code applies to employees, officers, and directors of OSI Systems, Inc. ("OSI") and our subsidiaries worldwide.
>
> *     *     *
>
> Obeying the law is part of the foundation on which our ethical standards are built.  You have an obligation to comply with every applicable local, regional, or national law or regulation in those jurisdictions in which we have a presence and operate our business.  Violations of these laws can be extremely costly to us and can subject us (or you) to civil and criminal penalties.

51.     The Code goes on to state:

As a publicly traded company, we are obligated to comply with applicable securities laws, regulations, and reporting requirements. Our corporate policy and these rules and regulations mandate that we report financial transactions accurately, completely, fairly, and in a timely and understandable manner.

We will not tolerate inaccurate, incomplete, delayed, or falsified reporting. Employees who are involved with financial reporting are required to understand and comply with applicable accounting standards and laws.

\*       \*       \*

OSI is committed to compliance with U.S. and international government contracting.

\*       \*       \*

U.S. and international government employees are required to abide by strict ethical guidelines that restrict their ability to receive gifts, meals, and entertainment. OSI's policy requires that you avoid providing gifts, hospitality, or entertainment to government officials in order to avoid the appearance of improper influence.

\*       \*       \*

We are firmly committed to complying with international anti-corruption and anti-bribery laws including the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K. Bribery Act. OSI's Anti-Corruption Compliance (ACC) Policy strictly prohibits making, offering, promising, or authorizing a corrupt payment of money, or anything of value, to a government official or any other person in order to obtain or retain business, or to direct business, or to achieve any business-related objective.

52.     As noted in the Company's October 23, 2017 Proxy Statement filed with the SEC on Form 14A (the "2017 Proxy"):

Our Board is responsible for our risk oversight. Risks we face include competitive, economic, operational, financial, accounting, liquidity, tax, regulatory, foreign country, safety, employment, political, and

22

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

other risks.  Risks are reported to our Board through our executive officers, who are responsible for the identification, assessment, and management of our risks.  Our Board regularly discusses the risks reported by our executive officers and reviews with management strategies and actions to mitigate the risks and the status and effectiveness of such strategies and actions.

To optimize its risk oversight capabilities and efficiently oversee our risks, the Board delegates to its committees oversight responsibility for particular areas of risk.  For example, the Audit Committee oversees management of major financial risks, including risks related to accounting, auditing, financial reporting, and maintaining effective internal control over financial reporting.  The Risk Management Committee oversees management of key enterprise risks, including strategic, operational, legal, regulatory, and compliance.  The Nominating and Governance Committee oversees risks related to the effectiveness of the Board.  The Compensation Committee oversees risks related to our executive compensation policies and practices.  The Technology Committee oversees risks related to technology matters.  During fiscal 2017, the Board also had an Executive Committee that oversaw risks related to strategic transactions.

53.    Furthermore, the Company's Audit Committee – defendants Good, Luskin, Ballhaus, and Hawkins – is specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit Committee is governed by the Audit Committee Charter.  Pursuant to the Audit Committee Charter:

**Responsibilities**

The Committee will assist the Board in fulfilling its oversight responsibilities with respect to (i) the annual and quarterly financial information to be provided to stockholders and the SEC; (ii) the system of internal controls that management has established; and (iii) the internal and external audit process.  In addition, the Committee provides an avenue for communication between internal auditor, the independent auditor, financial management and the Board.

*    *    *

23

**Specific Duties**

In carrying out its oversight responsibilities, the Committee will:

> 1. Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval. This should be done in compliance with applicable Nasdaq and SEC requirements.

> 2. Review with the Company's management, internal auditor and independent auditor the Company's accounting and financial reporting controls. Obtain annually in writing from the independent auditor its letter as to the effectiveness of such controls.

54. In addition, the Board has a Risk Management Committee – defendants Good, Luskin, Ballhaus, and Chizever.[2] The Risk Management Committee Charter states in pertinent part:

**Purpose**

The purpose of the Risk Management Committee (the "Committee") of the Board of Directors (the "Board") of OSI Systems, Inc. (the "Company") will be to assist the Board in its oversight of the Company's management of key risks, including strategic, operational,

---

[2] The Risk Management Committee was formed in August 2017. It appears that prior to the formation of the Risk Management Committee, its responsibilities fell to the Audit Committee. As noted in the Company's 2016 Proxy Statement filed with the SEC on October 21, 2016:

To optimize its risk oversight capabilities and efficiently oversee the Company's risks, the committees of the Board of Directors are delegated oversight responsibility for particular areas of risk. For example, the Audit Committee oversees management of major financial and enterprise risks, including risks related to accounting, auditing, financial reporting, maintaining effective internal control over financial reporting, legal and compliance.

24

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

legal, regulatory, compliance, security, reputational and other risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks.

*     *     *

**Responsibilities**

Outlined below are certain continuing responsibilities that the Committee is expected to fulfill in effecting its purpose as stated in this Charter.   This list of responsibilities is presented for illustrative purposes and is not intended to be exhaustive.  The Committee may conduct additional activities as appropriate in light of changing business, legislative, regulatory, legal or other conditions.   The Committee shall also fulfill other responsibilities delegated to it from time to time by the Board.

1.     Monitor all enterprise risks, with the understanding that certain specific responsibilities for risk oversight have been delegated to other Board committees.

2.     Coordinate with the other standing committees of the Board to assist such committees in their review of the Company's risks, the oversight of which has been delegated to them.

3.     Review with management, at least quarterly, (i) the Company's program for promoting and monitoring compliance with applicable legal and regulatory requirements, and (ii) the Company's major legal compliance risk exposures and the steps management has taken to monitor or mitigate such exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

55.     Additionally, the Board's Compensation & Benefits Committee ("Compensation Committee") – defendants Good, Luskin, and Ballhaus – "has overall responsibility for evaluating and approving the Company's compensation and benefits plans, policies and programs."   Pursuant to the Charter of the

25

Compensation & Benefits Committee, the Compensation Committee has the following responsibilities, among other things:

1.  Review and approve corporate goals and objectives relevant to the Chief Executive Officer's and other executive officers' compensation.

2.  Evaluate the performance of the Chief Executive Officer and other executive officers of the Company and, based on such evaluation, review and approve the annual salary, bonus, stock options and other benefits, direct and indirect, of the Chief Executive Officer and other executive officers.  The Chief Executive Officer may not be present during voting or deliberations on his compensation.

3.  In determining incentive compensation for relevant senior executives, the Committee will consider conduct in compliance with or in violation of the Company's Code of Ethics and Conduct.  The Vice President of Compliance will report this information to the Committee at least once per year.

4.  Review and recommend to the full Board of Directors compensation of directors, as well as director's and officer's indemnification and insurance matters.

5.  Review and make recommendations to the Board of Directors with respect to the Company's incentive-compensation plans and equity-based plans, and oversee the activities of the individuals responsible for administering those plans.

6.  Review and approve all equity compensation plans of the Company that are not otherwise subject to the approval of the Company's shareholders.

7.  Review and make recommendations to the Board of Directors with respect to the Company's benefit plans, and oversee the activities of the individuals responsible for administering those plans.

26

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

56.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty described herein.

## SUBSTANTIVE ALLEGATIONS

## I.     Company Background

57.     OSI operates three primary divisions to design and manufacture specialized electronic systems and components.  The Company sells products and provides related services in diversified markets, including homeland security, healthcare, defense, and aerospace.  The Company's Security division is the largest and most important, representing approximately 50% of the Company's net revenues between 2013 and 2017.  The Security division consists of two segments: (i) Rapiscan, which designs, manufactures, markets, and sells security inspection systems; and (ii) S2 Global, which provides what the Company calls "turnkey security screening solutions."  The products and services are used for cargo and vehicle inspection at ports of entry, baggage and human screening at airports, and narcotics trace detection, among other uses.  Historically, OSI focused on its Rapiscan equipment business.  However, with the Company's traditional business model faltering due to prior misconduct surrounding its U.S. government contracts, in early 2013, the Individual Defendants shifted OSI's focus to the turnkey business as the driving force of the Company's future success.

## II.    The Company's History of Issues with DHS and TSA Contracts in the United States

58.    Traditionally, OSI's "base business model" was the manufacture and sale of security equipment through Rapiscan.  These products include systems for baggage and parcel inspection, cargo and vehicle inspection, checked baggage screening, people screening, and radiation detection.  The products are used for security purposes at locations such as airports, border crossings, shipping ports, military and other government installations, and freight forwarding facilities.  In addition to equipment sales, Rapiscan also generated revenues by providing "aftermarket support," including the sale of spare parts and maintenance services.  Rapiscan's main customers were domestic and foreign government agencies, including TSA, DHS, U.S. Customs and Border Protection, Puerto Rico, Mexico, and Albania.

59.    Prior to the Relevant Period, Rapiscan's single largest customer was the U.S. government, which provided a substantial portion of the Company's revenue.  As OSI disclosed in Forms 10-K dating back to 2009, "[t]he U.S. government currently plays an important role in funding the development of certain of our security and inspection systems and sponsoring their deployment at airports, ports, military installations and border crossings."  Moreover, according to a December 9, 2013 *Bloomberg* article, titled "OSI Tumbles on Possible Contract Ban for Chinese Parts," between 2009 and December 2013, OSI received a total of $463 million in

28

1  U.S. government contracts – nearly a third of the Security division's total reported

2  net revenue for the same period.

3      60.    Defendant Mehra had been Rapiscan's President since at least 2005.

4  His leadership caused Rapiscan's relationship with the U.S. government to

5  deteriorate between 2009 and 2013, as Rapiscan was accused of two separate

6  schemes to mislead the government.  These scandals led to the cancellation of multi-

7  million-dollar contracts with the U.S. government, subjected the Company to

8  increased scrutiny, and caused Rapiscan to lose market share and revenue.

9      61.    The U.S. government accused Rapiscan of fraud in connection with a

10 $173 million contract awarded by TSA in 2009 for "whole-body imaging" scanners

11 to be used for security screening in U.S. airports (the "2009 Contract").   In

12 November 2012, TSA issued a show cause letter alleging that Rapiscan failed to

13 fully disclose issues it discovered during the development of body scanners under

14 the 2009 Contract.  Shortly thereafter, Congressman Mike Rogers – who was

15 Chairman of the Homeland Security Subcommittee on Transportation Security –

16 asserted that OSI "may have attempted to defraud the Government by knowingly

17 manipulating an operational test of [the] . . . software in the field in order to have a

18 successful outcome."

19     62.    On January 17, 2013, OSI announced that TSA had cancelled the $173

20 million 2009 Contract with Rapiscan.  Four months later, OSI announced that DHS

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   had issued a "Notice of Proposed Debarment" in connection with TSA's show cause

2   letter, which "allege[d] that Rapiscan failed to disclose a defect with the Products

3   and replaced hardware in the Products without being granted proper governmental

4   approval." The Notice of Debarment proposed prohibiting Rapiscan from doing any

5   future business with the U.S. government.

6          63.   The U.S. government next accused Rapiscan of fraud in connection

7   with a $325 million contract awarded in 2010 (before the first scandal was exposed)

8   by TSA for checkpoint baggage and parcel scanners (the "2010 Contract").   On

9   November 20, 2013, TSA issued Rapiscan another show cause letter regarding

10  Rapiscan's use of unapproved components for the scanners, concluding that

11  Rapiscan "provided false or misleading information to the Government," which

12  "was a sufficient independent basis for TSA to terminate" the contract.  As a result,

13  TSA cancelled an order for Advanced Technology X-Ray based systems valued at

14  approximately $60 million, as announced by the Company on December 5, 2013.

15  Thereafter on December 9, 2013, OSI issued a press release admitting that the

16  component change "did not meet the contractual requirement of obtaining TSA's

17  approval in advance."

18         64.   As part of the debarment proceedings, OSI entered into a detailed

19  Administrative Agreement which required the Company to design and implement

20  comprehensive policies, procedures and internal control systems, including for the

"monitoring and auditing of contracts" and "business ethics" to ensure that its Security business "operates in compliance with all applicable laws [and] regulations." The Administrative Agreement, which was executed on June 21, 2013, two months before the Relevant Period began, stated in relevant part:

> Rapiscan agrees to maintain a self-governance program that includes compliance programs for internal controls, designed for the effective monitoring and auditing of contracts and grants, and a business ethics program that covers all employees. The business ethics program shall be maintained with the goal that Rapiscan and each of its employees maintains the business honesty and integrity required of a government contractor and that Rapiscan operates in compliance with all applicable laws, regulations, and the terms of any contract. Rapiscan represents that the business ethics program includes the following components;

> A.      Rapiscan employees are subject to a Code of Ethics and Conduct (Code of Conduct). The Code of Conduct specifically addresses ethical business practices; securities laws; antitrust and competition; anticorruption; export control; political activities; conflict of interest; gifts and gratuities; employment laws; financial reporting; health and safety; and reporting suspected violations of law or the Code of Conduct. This Code of Conduct includes a non-retaliation policy, which prohibits retaliation against employees for reporting suspected violations of the Code. Rapiscan will provide to the DHS SDO a copy of the Code Ethics and Conduct within 30 days following the execution of this agreement.

65.     The Administrative Agreement also required the Individual Defendants to appoint a Director Corporate Compliance – defendant Cook – and maintain "robust" compliance, ethics, and monitoring programs that would be overseen by the Company's General Counsel under the direct supervision of defendant Chopra,

31

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

and would be in constant communication with the Board, specifically the Audit

Committee, as follows:

> Rapiscan has implemented and agrees to maintain a robust and functional program that includes business ethics, compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency.

> Both prior to and in response to TSA's Show Cause Letter, Rapiscan took and will maintain the following measures:

> *        *        *

> B.        Development of an OSI Systems ("OSI") wide corporate compliance program. Corporate Compliance directly reports to OSI's General Counsel, who has and will continue to directly report to the Chief Executive Officer of OSI. In accordance with the OSI Board Audit Committee Charter, the Audit Committee comprising independent directors are responsible for overseeing the OSI compliance functions and promoting communication with the other board members. OSI's Vice President, Internal Audit reports directly to OSI's Board, and is responsible for assessing the sufficiency and effectiveness of the company's compliance programs.

> C.        Created new position of Director, Corporate Compliance, with direct access to OSI's Board of Directors on compliance issues and related activities. Christopher Cook is Director of Corporate Compliance for OSI. . . . As Director of Corporate Compliance, Mr. Cook is responsible for, among other things;

>> 1.        Designing, implementing and monitoring the compliance program;

>> 2.        Reporting on a regular basis to the General Counsel;

>> 3.        Revising the compliance program periodically, as appropriate;

32

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

4. Developing, coordinating and participating in compliance training and education;

5. Ensuring that contractors and agents are aware of Company compliance requirements; and

6. Independently investigating and acting on compliance matters.

66. The Administrative Agreement also required the Individual Defendants to submit written reports to the federal government regarding the implementation of these changes, as follows:

Semi-annually, Rapiscan shall submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with this Agreement. The reports shall be submitted in time to be received by the DHS SDO within 20 days of the end of the semiannual period. The final report shall be presented to the DHS SDO no later than one month prior to the final day of this Agreement. The reports shall include the following:

A. Any standards of conduct, ethics, or compliance training conducted, subject matter covered, and the number and types of people that attended;

B. Information notifications or initiatives related to the business ethics program;

C. Information required by the terms of this Agreement;

D. The initiation of and status of any ongoing investigation or legal proceedings involving Rapiscan related to the facts described herein;

E. A statement by the Rapiscan verifying that the Code of Business Ethics and Conduct is being maintained; and

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1
2

    F.    A statement of any problems or weaknesses identified through the Ethics and Business conduct process, corrective action proposed or initiated, and the status of any corrected action.

3
4
5

    67.    As a result of the Administrative Agreement, the Individual Defendants were required to monitor OSI's contracts – including its all-important Albanian Contract – for any compliance, ethics, or legal issues.

6

### III.    The Individual Defendants Move Defendant Mehra to S2 Global After the U.S. Government Demands His Removal from Rapiscan

7
8
9
10
11
12
13

    68.    The Individual Defendants' repeated scandals with the U.S. government had serious implications for the Company. A debarment from DHS would have prevented OSI from contracting with the U.S. government in the future, jeopardizing hundreds of millions of dollars in key Company revenue. To avoid this outcome, OSI made several concessions to the U.S. government, including the removal of defendant Mehra as President of Rapiscan and the imposition of extensive compliance provisions discussed above.

14
15
16
17
18
19
20

    69.    Rapiscan employees have reported that TSA saw defendant Mehra as "slick," "not trustworthy," a "PNG" (*persona non grata*), and not willing to comply with government rules and regulations. TSA also felt that defendant Mehra would push non-compliance measures forward and did not want him involved in any TSA contracts after the threat of debarment. TSA also pushed to have him terminated, and the Company agreed to terminate Mehra, as President of Rapiscan as part of a consent decree. Because Mehra was Chopra's cousin, however, instead of removing

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1    him altogether, in 2014, OSI promoted Mehra to President of S2 Global.  In his new

2    position, defendant Mehra would oversee OSI's allegedly promising vision for the

3    future, its turnkey business – an area that defendant Edrick had described as "one of

4    the most exciting areas within our Security business[,]" an area that "really

5    significantly transformed our overall financial [situation]," the "number one"

6    "biggest growth opportunit[y] for us in Security[,]" and "a tremendous opportunity

7    for us."  Rather than holding Mehra accountable for spearheading multiple illegal

8    schemes that significantly harmed the Company's business prospects, OSI put him

9    in charge of one of the most important areas of business in the Company – one which

10   the Individual Defendants told investors was going to fill the revenue hole and

11   credibility gap created by Mehra's prior schemes.

12          70.    In addition to being forced to "remove" Mehra from Rapiscan, OSI was

13   subjected to additional compliance requirements and personnel changes – including

14   the appointment of defendant Cook as Director (and later Vice President) of

15   Corporate Compliance.

16   **IV.    Rapiscan's Traditional Business Model Struggles After U.S.
             Government Regulatory Issues**

17          71.    Despite narrowly avoiding total debarment, defendant Mehra's

18   misfeasance still took a serious toll on the Company's core Security business.  The

19   two suspended contracts cost the Company $498 million.   Moreover, as the

20   misconduct relating to the U.S. government was playing out, the Company's body

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   scanners were losing competitive edge and market share and becoming backlogged.

2   As defendant Edrick summarized, "So if you go back for our last four, five

3   conference calls, we've been telling everybody about body scanners we haven't sold

4   any units over the last two years.  So the great growth that we had in Security in

5   2011 and 2012 lot of people thought it came from body scanners.  It didn't, we didn't

6   sell any units in those periods.  And we said further that we don't expect to be selling

7   any body scanners to the TSA going forward."

8        72.    The problems with the U.S. government also threatened OSI's

9   reputation, sales, and future U.S. government contracts.  Further compounding the

10   fallout from the Company's efforts to mislead the U.S. government, Rapiscan's TSA

11   contracts had been procured under a temporary stimulus package set to expire.

12   Specifically, in the aftermath of the Great Recession in 2008-2009, Congress enacted

13   the American Recovery and Reinvestment Act of 2009 ("ARRA") to provide

14   temporary stimulus funding for government agencies, including DHS, who

15   purchased security equipment from Rapiscan.  Prior to the Company's issues with

16   the U.S. government, Rapiscan had received a "bump" in its sales due to the ARRA,

17   its expiration coincided with the loss of government contracts due to misconduct.

18   **V.    Trouble with Finding Turnkey Customers**

19        73.    In early 2013, as OSI's core Security business in the U.S. floundered,

20   the Individual Defendants shifted the Company's focus to a new business model in

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   the Security division – turnkey solutions.  Defendant Edrick described this shift at a

2   February 26, 2013 Morgan Stanley Technology, Media & Telecom Conference,

3   stating:  "One of the areas that we've really been trying to grow is our turnkey

4   business."  Likewise, at the June 4, 2013 Stephens Spring Investment Conference

5   (the "June 4, 2013 Conference"), defendant Edrick bragged that the Company's

6   Security business "has been growing significantly and we've been transforming our

7   business model . . . with some new turnkey services, which has led to some

8   significant operating margin expansion, not only within the Security division but all

9   of OSI."

10         74.    According to the Individual Defendants, the turnkey model differed

11  from OSI's traditional equipment sales business.  Under its turnkey model, OSI's

12  customer did not buy or own the security equipment but instead paid a subscription

13  or pay-as-you-go plan such as a per-scan fee.  By contrast, under OSI's traditional

14  model, OSI simply sold security equipment to a customer, who then owned the

15  equipment.  The turnkey model guaranteed continuing fees as opposed to the old

16  model of a one-time fee.

17         75.    According to the Individual Defendants, a standard turnkey contract

18  works as follows:  Rapiscan manufactures the requested product (*i.e.*, scanners,

19  equipment, installations) and sells it to S2 Global, which installs it at the customer's

20  location.  While OSI continues to own the equipment – *i.e.*, it still appears on OSI's

balance sheet – the customer has the right to use it.  OSI then presents the customer with several add-on services, including design and construction of the security checkpoint sites, installation of the equipment at the sites, selecting, training, and managing the personnel operating the sites, operation of the equipment, and maintenance and security of the sites.

76.    The Individual Defendants commonly hailed the turnkey model as the Company's most critical business opportunity.  As defendant Edrick stated at the March 11, 2014 ROTH Capital Partners Conference (the "March 11, 2014 Conference"), "Turnkey . . . we view it as perhaps our largest growth opportunity." Likewise, at a May 14, 2014 Oppenheimer Industrials Conference, defendant Edrick stated, "if you look at the Security business, I'd say the three biggest growth opportunities for us in Security would be, number one would be Turnkey.  That's a tremendous opportunity for us."

77.    The Individual Defendants repeatedly proclaimed that OSI was a "pioneer" in the turnkey industry – being the first of its competitors to offer the service and the only Company in the world to obtain three such contracts.  Indeed, throughout the Relevant Period, the Individual Defendants consistently boasted that the Company had "100% market share" of the turnkey security business.  As defendant Edrick explained at a March 4, 2014 Morgan Stanley Technology, Media and Telecom Conference:

1
2
3

    really, what's been driving the growth over the past year has been largely dominated by our turnkey security solutions.  We pioneered this area. . . .  There's only been three contracts of this type awarded in the world.  And to date, well, we've won all three.  So to date, we have a 100% market share in that area.

4
5
6
7

    78.    Similarly, at a Jefferies Global Industrials Conference on August 14, 2014, defendant Edrick stated:  "[T]here have been three contracts awarded in the world.  So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward."

8
9
10
11
12
13
14
15
16
17

    79.    In addition to assuring the market that the Company's turnkey business would drive growth, the Individual Defendants also boasted that the turnkey model had numerous purported advantages that would result in a strategic edge over OSI's competitors.  For example, the Individual Defendants repeatedly emphasized that turnkey contracts generate higher profit margins than standard equipment contracts for the Company and considered them "cash cows."  Although the Company deliberately refused to disclose the exact margins it was seeing on these contracts during the Relevant Period, the Individual Defendants repeatedly represented to OSI's stockholders and the investing public that OSI's turnkey margins were far superior to the Company's overall and Security division average.

18
19
20

    80.    Additionally, the Individual Defendants praised the turnkey contracts as providing a consistent long-term and recurring revenue stream.  As defendant Edrick stated during a February 8, 2017 conference, the turnkey model "has been

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

extraordinarily successful for us. . . .  It's a nice revenue, higher margin business for us of a recurring nature."  Similarly, at the March 11, 2014 Conference, defendant Edrick stated that, "The new turnkey revenues is really an exciting business model in order to have recurring revenues as substantially higher margins makes a big impact for us and gives us a great deal of visibility as we look forward."

81.     Before the Relevant Period, OSI had secured only two turnkey contracts – one in Puerto Rico in 2010 and another in Mexico in 2012.  Given the Individual Defendants' repeated representations that turnkey would drive future growth, analysts began pressing the Individual Defendants on new turnkey deals to demonstrate that the new model was sustainable.  The Individual Defendants insisted that new turnkey opportunities were on the horizon.

82.     For instance, a month after OSI lost a contract with TSA, at a February 26, 2013 conference, defendant Edrick stated:

> there is a customer set out there that is very interested in the turnkey. So we're pursuing additional turnkey opportunities.  They are generally longer sales cycles, but we're working through those, some of those we've been working on for some time and I think we're going to see some nice rewards and in the future.

## VI.  Key Details about the Turnkey Business have Never been Fully Disclosed

83.     As part of their scheme to mislead investors, the Individual Defendants created a business model that allowed them to conceal crucial details of their turnkey operations and their contracts in general.  Indeed, the Company worked in foreign

1    jurisdictions that had little oversight but had notoriously high corruption and
2    purposefully refused to provide crucial details regarding the turnkey business and
3    contracts.

4         84.    The turnkey business model existed exclusively in foreign jurisdictions
5    where oversight was minimal and corruption was rampant.    The Individual
6    Defendants specifically sought out foreign jurisdictions for OSI's turnkey business
7    that did not have the stringent reporting and ethics standards required in the U.S.
8    They also sought to do business with countries where a "fear of corruption" of
9    security procedures existed and the nation's government might be looking to lend
10   credibility to its programs.  Defendant Edrick explained the business model, at the
11   August 5, 2015 CFA Society of Minnesota's InvestMNt Conference, as follows:

12        So in dealing with governments and we're not generally dealing with
          the western world, so most of the turnkeys we're looking at are not in
13        the US or Western Europe, they're in places that have other unique
          challenges. . . .  others might have other concerns in their particular
14        country, such as fear of corruption and things like that, and being able
          to outsource it to another Company, could lend greater credibility to the
15        overall program.

16        85.    Even before the Albanian Contract with OSI, Albania had a notably
17   terrible record on transparency and corruption.  In 2013, when OSI secured its
18   Albanian Contract, "[c]orruption in all branches of government was pervasive," and
19   "officials frequently engaged in corrupt practices with impunity," according to the
20   U.S. State Department's Albania 2013 Human Rights Report.  Indeed, in 2013,

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   Albania ranked 116th on Transparency International's Corruption Transparency

2   Index.

3        86.    By any metric, the turnkey model was a terrible economic proposition

4   for the customer.  By keeping the turnkey business in foreign jurisdictions where

5   corruption was pervasive and the government lacked transparency, the Individual

6   Defendants were able to conceal OSI's corrupt arrangements.

7        87.    The Individual Defendants also worked to hide the financial details of

8   OSI's turnkey business.  While commonly touting the importance of the Company's

9   turnkey contracts, the Individual Defendants stonewalled requests for turnkey

10   focused financial details.  For example, they refused to disclose actual profit margins

11   from turnkey contracts or distinguish between non-turnkey and turnkey financial

12   results.  At a May 14, 2014 Oppenheimer Industrials Conference, defendant Edrick

13   plainly stated, "we don't break out the margin specifically between Turnkey and

14   non-Turnkey."  While in the next breath not hesitating to emphasize that "[t]he

15   overall margin improvement has been largely driven by the uptick in revenues

16   associated with the Turnkey business."

17        88.    The Individual Defendants also failed to disclose information regarding

18   turnkey revenues.  For example, on the Company's April 30, 2014 earnings

19   conference call, in response to questions from an analyst regarding "Security

20   bookings" and the "number for Security funded backlog," defendant Edrick

1    answered, "We don't break down our revenues precisely between turnkey and non-

2    turnkey, as a matter of course. . ."  When pressed for more information regarding the

3    turnkey business, defendant Edrick declined to provide any, stating:   "We don't

4    break out our turnkey revenues.  But I think you have a pretty good idea of the range

5    of what our turnkey revenues are.  But we don't break that out separately."

6        89.    Because the Individual Defendants did not specifically disclose turnkey

7    margins or revenues, they were able to conceal the financials associated with the

8    Albanian Contract, including the profits that S2 Albania shared with ICMS.

9    **VII.   The Albanian Turnkey Contract**

10       90.    The Individual Defendants began pursuing the Albanian Contract in

11   2011, when Albania was governed by the Democratic Party, led by then-Prime

12   Minister Berisha – a cardiologist and professor in the Faculty of Medicine at the

13   University of Tirana.[3]  Almost immediately, OSI received favorable treatment from

14   Albania's government.  As first reported in the December 6, 2017 Muddy Waters

15   Report exposing certain details surrounding the Albanian turnkey contract, on

16   November 11, 2011, a decision of the Council of Ministers of the Government of

17   Albania signed by Berisha awarded a "bonus of 8% [of the points] for the technical

18   and financial result in the procedure selective bidding (unsolicited proposal)" to OSI

19

20   [3]  Peçini, the Albanian dentist who owns ICMS, the entity that received 49% of the
     Albanian Contract and a profit-sharing agreement in exchange for consideration
     worth $4.50, founded a hospital in Tirana and Berisha spoke at its inauguration.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1  – thereby giving the Company a significant advantage against any potential

2  competitors.

3      91.    In 2012, the Albanian government issued a request for proposal for the

4  Albanian Contract, according to the May 10, 2013 Albanian *Official Gazette* ("May

5  10, 2013 Official Gazette").   However, several previously untranslated Albanian

6  reports – which were only reported in Albania, in Albanian, and remained unknown

7  to market analysts and investors until the December 6, 2017 Muddy Waters Report

8  – evidence clear signs of collusion.  For example, according to a September 19, 2014

9  *Monitor* (an Albanian language publication) article, titled "'Rapiscan' requires the

10  revocation of recommendations for scanning of containers, Competition revokes it,"

11  the Albanian Competition Authority concluded that the bid was not a public tender

12  where bidders were on the same footing.  Additionally, in a November 26, 2014,

13  *Gazeta Telegraf* article, titled "Brace:  Berisha laments, the energy price will not be

14  over 10 ALL," Erion Brace - a member of the Socialist Party in the Albanian

15  Parliament – argued that the proceeds of the Albanian Contract went into the pockets

16  of Berisha and the ministers who signed the contract.  Moreover, at a July 7, 2015

17  meeting of the Albanian Committee for Economy and Finances, Mr. Brace criticized

18  the contract because OSI's bid was the only offer.  As Muddy Waters later reported

19  on December 6, 2017, OSI originally proposed a $32 scanning fee, yet the

20  Democratic government inexplicably awarded the Company a contract with a

1  approximately $50 scanning fee and agreed to pay the scanning fee to OSI for all

2  customs declarations, even if OSI did not scan them.

3     92.    In June 2013, Berisha's party lost power and began transitioning to a

4  new administration.  On September 13, 2013, defendant Mehra approved the sale of

5  49% of S2 Albania to ICMS and the contract was signed on September 16, 2013 -

6  within days of the departure of the Berisha government.

7     93.    On August 21, 2013, the Individual Defendants caused OSI to

8  announce its highly anticipated third turnkey contract in Albania.  In an August 21,

9  2013 press release, titled "OSI Systems Receives Fifteen-Year Agreement to

10 Provide Turnkey Screening Services in Albania," the Individual Defendants caused

11 the Company to announce that "the Government of Albania has awarded its Security

12 division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and

13 vehicle security screening services at various sites throughout the country."  The

14 Individual Defendants touted that they expected total gross revenues from the

15 Albanian Contract to "range from $150 million - $250 million over the term of the

16 agreement."

17    94.    Immediately upon announcing the Albanian Contract, the Individual

18 Defendants hailed the deal as proof that the Company's turnkey model was a

19 success.  For instance, in the August 21, 2013 press release, defendant Chopra stated:

20        This significant award from Albania to provide turnkey screening
           services builds upon similar long-term agreements awarded by the

45

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services continues to be well received in the marketplace.

95.   In the same press release, defendant Mehra represented that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena.  We are proud to have been selected to execute this critical program.  Our selection reinforces the attractiveness and compelling value of our turnkey service model."

96.   In addition to how misleading the Individual Defendants statements were about the attractiveness of the turnkey business, they also concealed, *inter alia*, that:  (i) the Albanian Contract was subject to a secret arrangement whereby OSI sold 49% of its Albanian subsidiary that held the rights to the $150 to $250 million Albanian Contract to a suspicious holding company owned by an Albanian dentist for only $4.50; (ii) OSI was not entitled to all of the contracts profits, as it had entered into a secret "profit share" arrangement with the dentist's company; and (iii) the 49% transfer occurred under suspicious circumstances the same week that the outgoing Albanian government (which had given OSI extremely favorable terms on the contract) left office.

97.   According to the Albanian Government's May 10, 2013 Official Gazette, on April 10, 2013, Rapiscan officially entered into a turnkey contract with

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1  Albania's Ministry of Finance for the financing, establishment, and operation of

2  scanning services for containers and other vehicles.  The contract was signed by

3  then-President of S2 Global, defendant Fleming, and then-Albanian Minister of

4  Finance, Ridvan Bode ("Minister Bode"), a member of the Albanian Democratic

5  Party.  According to S2 Albania's Historical Register, on May 22, 2013, OSI,

6  through Rapiscan, registered an Albanian corporation, S2 Albania, to accept the

7  rights and obligations of the contract.  According to S2 Albania's "Articles of

8  Association" signed by defendant Fleming and dated March 19, 2013, the entity was

9  formed for the "Implementation of the Concession Agreement as well as any other

10  activity related to the matter or required to enforce the agreement."

11      98.     In secret, on August 30, 2013, Minister Bode approved a sale of 49%

12  of S2 Albania to an Albanian entity called ICMS.  Under the Albanian Contract, OSI

13  was required to obtain government approval for the transfer of more than 25% of S2

14  Albania and Minister Bode covertly provided this approval.  On September 6, 2013,

15  defendant Mehra – who also oversaw the earlier U.S. government contract-related

16  misconduct at Rapiscan – authorized the sale of 49% of S2 Albania to ICMS for only

17  $4.50 in total consideration.  More specifically, on September 6, 2013, defendant

18  Mehra signed a Power of Attorney in Los Angeles explicitly authorizing an Albanian

19  attorney named Endrit Shijaku ("Shijaku") to "carry out the [] sale" of S2 Albania

20  to ICMS "for 490 Albanian lekë" (the equivalent of $4.50), sign the contract

1  transferring 49% of S2 Albania to ICMS, and execute any necessary steps to

2  complete the sale.  Below are the relevant portions of the Power of Attorney:

| | |
|---|---|
| Mr. Endrit Shijaku, born on 6 June 1974, resident in Tirana, holder of the Albanian ID No. 032276700, (the "**Representative**") | Z. Endrit Shijaku, lindur me 6 Qershor 1974, ne Tirane banues ne Tirane mbajtes i Leternjoftimit ID me Nr. 032276700, "**Perfaqsuesi**"): |
| to represent the Company in relation to the sale to ICMS of 490 quotas (only) that the Company holds (amongst others) in S2 Albania shpk a company established under the laws of the Republic of Albania registered with the commercial register held by the National Registration Centre under NIPT: L31722010Q (the "Sale"). | te perfaqsoje Shoqerine ne lidhje me shitjen tek ICMS te 490 kuotave qe Shoeria zoteron ne shoqerine S2 Albania nje shoqeri e themeluar sipas se drejtes se Republikes se Shqiperise e regjistruar ne regjistrin tregtar te mbajtur nga Qendra Kombtare e Regjistrimit me NIPT: L31722010Q (me poshte referuar si "**Shitja**") |
| The Representative has the power to carry out the above mentioned Sale of quotas for a purchase price that is equal to 490 Albanian leke. | Perfaqesuesi k ate drejten qe te beje shitjen e kuotave te mesiperme per nje cmim te barabarte me 490 leke shqiptare. |
| The Representative shall have the power to conclude any contract and take and steps make any filings that may be required in order to complete the above described Sale and register it with the Albanian National Registration Centre. | Perfaqesuesi ka te drejte te lidhe cdo kontrate dhe te ndermarre cdo hap apo te beje cdo kerekse qe mund te jete e nevojshme per te perfunduar. Shitjen e pershkruar me larte dhe per ta regjistruar ate prane Qendres Kombtare te Regjistrimit ne Shqiperi. |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

| The representative has also the right to: | Perfaqsuesi ka gjithashtu te drejte te: |
|---|---|
| effect all such action as they deem necessary or useful for the above as well as receive declarations and documents including forms; the Representative is authorized and shall have the right to effect all payments and fees for such registrations. | kryeje te gjitha veprimet e nevojshme apo te dobishme lidhur me sa me siper si dhe te marre ne dorezim deklarata dhe dokumenta duke perfshire dhe formulare; Perfaqesuesi eshte I autorizuar dhe ka te drejten te kryeje te gjitha pagesat e likuidoje te gjitha detyrimet e tarifat per keto regjistrime. |
| All acts performed by the Representative pursuant to this power of attorney shall be considered valid and regular as if conducted by the Company itself. | Te gjitha veprimet e kryera nga perfaqsuesi sipas kesaj prokure konsiderohen te vlefshme dhe te rregullta si te ishin kryer nga vete Shoqeria. |
| For the Company: | Per Shoqerine |
| Ajay Mehra, Director Rapiscan Systems, Inc. | Ajay Mehra, Director Rapiscan Systems, Inc. |

99.    Pursuant to Defendant Mehra's instructions, on September 16, 2013, Shijaku secretly signed the formal contract for the sale of 49% of S2 Albania to ICMS for a value of approximately $4.50.    As the Individual Defendants later admitted following the Muddy Waters Report, S2 Albania also entered into an undisclosed "profit share" agreement with ICMS relating to the Albanian Contract. Below is a copy of the relevant portion of the sale contract reflecting the purchase price:

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

## QUOTA PURCHASE AND SALE CONTRACT

**THIS CONTRACT** (the "Contract") dated 16.09. 2013 is made among:

**Rapiscan Systems Inc**, with its registered seat at 2805 Columbia Street, Torrance, California 90503 (the "**Seller**"), represented through Power of Attorney by Endrit Shijaku; and

**Inspection Control & Measuring Systems Sh.p.k.**, a company organized under the laws of Albania with registration number K81902014E with offices located at R. Kongresi Lushnjes, Tirane, Albania ("**ICMS**") represented by its administrator _____ (the "**Purchaser**").

*[handwritten: Endrit 19/08/1977 Tirane mbajtes i leternjoftimit r. H70819t770]*

### ARTICLE I - DEFINITIONS

**Section 1.01.**     **Definitions**

Wherever used in this Contract, unless stated otherwise or the context otherwise requires, the following terms shall have the following meanings:

| | |
|---|---|
| "Quota" | means each of the quotas of the Company with a nominal value of ALL 1 each. |
| "Company" | means S2 Albania shpk a company established under the laws of the Republic of Albania registered with the commercial register held by the National Registration Centre under NIPT: L31722010Q. |
| "Leks" or "ALL" | means the lawful currency of the Republic of Albania. |
| "Purchase Price" | means ALL 490 (four hundred ninety leke). |

### ARTICLE II - PURCHASE AND SALE OF THE QUOTAS

**Section 2.01.**     **Purchase Price**

The Seller hereby sells to the Purchaser and the Purchaser hereby purchases from the Seller 490 Quota in the Company with a total nominal value of ALL 490 representing 49% of the entire registered capital of the Company in consideration for the Purchase Price ("**Target Quotas**").

For the avoidance of doubt, the Seller shall – upon registration of the above sale - continue to hold the 510 quotas in the Company with a nominal value of ALL 510 representing 51% of the Quotas of the Company.

100.   According to S2 Albania's Historical Register, on September 19, 2013, OSI completed the transfer of 49% ownership in S2 Albania.  Below is the relevant excerpt of S2 Albania's Historical Register, reflecting the 49% transfer:

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

**HISTORIKU I REGJISTRIMIT**

| Data e regjistrimit | Ndryshimi i te dhenave te regjistruara |
|---|---|
| 19/09/2013 | Numri i ceshtjes: CN-194966-09-13<br>Arsyet e hapjes se ceshtjes: Depozitimi i Kontrates se Shitjes se 49 % te kuotave nga shoqeria "Rapiscan Systems, Inc" ne favor te shoqerise "ICMS" sh.p.k , date 16.09.2013.<br><br>*Kane ndodhur ndryshimet e meposhtme tek ortaket juridik:*<br>*eshte shtuar ortaku:*        *("ICMS")            Numri i aksioneve "490,00*<br>*Perqindja ne kapital "49,00        Kontributi ne para "490,00*<br>*Kane ndryshuar te dhenat per        ("Rapiscan Systems, Inc")            , Vlera e Kontributit ishte        ("1.000,00")        u be        ("510,00")*<br>*Kane ndryshuar te dhenat per        ("Rapiscan Systems, Inc")            , Përqindja e Kapitalit ishte        ("100,00")        u be        ("51,00")*<br>*Kane ndryshuar te dhenat per        ("Rapiscan Systems, Inc")            , Numri i aksioneve ishte        ("1.000,00")        u be        ("510,00")* |

101.   According to ICMS's Historical Register, at the time of the transfer, ICMS's sole shareholder was Peçini.  Below is the relevant excerpt of ICMS's Historical Register:

| | | |
|---|---|---|
| | aktiviteti. | |
| 10. Administratori/ët | Olti Peçini | |
| 10.1 Afati i emërimit | Nga: 07/09/2010 | Deri: 31/12/2020 |
| 11. Procedura e emërimit nëse ndryshon nga parashikimet ligjore<br>11.1 Kufizimet e kompetencave (nëse ka) | | |
| 12. Ortakët | OltiPeçini | |
| 12.1  Vlera e kapitalit | Para: 70.000.000,00 | Natyre: |
| 12.2  Numri i pjesëve | 100,00 | |
| 12.3  Pjesëmarrja në përqindje (%) | 100,00 | |
| - Të përfaqësuarit, (Plotësohet vetëm nëse zotëron kuotën si përfaqësues) | | |

102.   Peçini is an Albanian dentist, according to a list published by "Rreth Shendetit Publik" (an Albanian public health organization).  He has owned several companies in Albania, including a cleaning service and an insurance brokerage, according to searches on Albania's National Business Center.  He also founded the

51

Salus Hospital in Tirana, Albania, according to the Salus Hospital website.  Peçini had no reported experience in providing security services on par with the Albanian Contract.  Indeed, his only ostensible connection to the Albanian Contract was his relationship with then-Prime Minister Berisha (a doctor himself), who – according to a January 14, 2012 press release by the Albanian Council of Ministers titled "PM Berisha attends inauguration of Italian-Albanian SALUS hospital" – attended and spoke at the inauguration of the Salus Hospital founded by Peçini.  At the time of the 49% transfer, records show that ICMS appears to have lacked any material assets aside from its ownership of S2 Albania.  According to ICMS's 2013 financial statements, ICMS had liabilities that exceeded its less than one million dollars in assets and was operating at a loss of over $100,000.

103.   Although Peçini only paid $4.50 for a 49% stake in the lucrative Albanian Contract, he used his stake in S2 Albania to immediately secure a €1.9 million loan.  According to a Pledge Agreement dated December 7, 2013, Peçini pledged 49% of ICMS's shares for a €1.9 million loan from the National Bank of Commerce sh.a.  According to a Decision of the General Assembly of ICMS issued on December 11, 2013, ICMS's credit agreement with the National Bank of Commerce sh.a. prohibited ICMS from selling its shares in S2 Albania without approval from the National Bank of Commerce sh.a.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

## VIII.  Trouble with the Albanian Turnkey Contract

104.   Immediately after the regime changed in Albania and Berisha departed his office, the newly-elected government denounced the Albanian Contract.  By June 2014, the Albanian Competition Authority recommended the revision of the contract.  A July 13, 2015 *Monitor* article, titled "New 'Tax' on Customs," reported that business opposition by this time was also considerable due to the extremely high service fee and, as a result of this opposition, the new government refused to implement the Albanian Contract and attempted to terminate it unilaterally.  Meanwhile, the Individual Defendants continued falsely to tout the progress of the Albanian Contract and kept any facts about it being in jeopardy concealed from OSI's stockholders and the investing public, commonly making statements that the Albanian Contract was progressing as planned.

105.   Eventually, the Individual Defendants allowed OSI to disclose that the Albanian government was "halting further progress" on the turnkey contract in late-August 2014, while continuing to conceal the true reasons why – *i.e.*, the corrupt history of the deal's signing and the 49% transfer and profit share arrangement with ICMS.  The Individual Defendants' actions to procure the Albanian Contract were clear violations of the FCPA, yet they failed to disclose these illegal acts for another three years.

106.   After being unable to get the Albanian Contract restarted by other means, OSI brought an action against the government of Albania before the International Court of Arbitration.  The matter settled on April 28, 2015 for far less favorable contract terms, to be effective October 31, 2015, according to Law No. 75/2015 of the Assembly of the Republic of Albania.

107.   Under the renegotiated contract, OSI's payment terms were contingent on the amount of each customs declaration.   For example, for all customs declarations over 1,000 euro, OSI would be paid a scanning fee of 22 euros – *i.e.*, 17 euro or approximately 44% less than the fee in the original contract.  Moreover, for customs declarations under 1,000 euro, Albania would charge a fee of 5 euro.  On June 5, 2015, the Council of Ministers of Albania submitted the renegotiated concession to the Albanian Assembly and stated that the value of the contract had been reduced from approximately 316 million euro to 210 million euro – a difference of 106 million euro.

IX.   **The Individual Defendants' Misconduct Subjected OSI to Prosecution for FCPA Violations**

108.   The Individual Defendants' misconduct in connection with the Albanian Contract and their related misstatements and omissions created the significant and foreseeable risk that OSI would be investigated for violations of and found to have violated the FCPA.

109.   The U.S. Congress enacted the FCPA in 1977 after revelations of widespread global corruption, including the SEC's discovery that more than 400 companies had paid hundreds of millions of dollars in bribes to foreign officials to secure business overseas.  The FCPA seeks to address the problem of international corruption through anti-bribery and accounting provisions.

110.   The FCPA's anti-bribery provisions prohibit U.S. persons and businesses from offering to pay, paying, promising to pay, or making or authorizing a payment of money or anything else of value to a foreign official in order to influence any act or decision in his or her official capacity or to secure any other improper advantage for the purpose of obtaining or retaining business.  Many FCPA enforcement actions involve bribes to obtain or retain government contracts.

111.   The FCPA's accounting provisions require companies to:  (i) make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect an issuer's transactions and dispositions of an issuer's assets ("Books and Records"); and (ii) devise and maintain a system of internal accounting controls sufficient to assure management's control, authority, and responsibility over the firm's assets.  The FCPA's internal control provisions address the fact that the payment of bribes often occurs in companies that have weak internal control environments.  The FCPA's Books and Records provisions address the concern that bribes are often mischaracterized in companies' Books and Records, with companies

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   utilizing things like commissions, consulting fees, sales and marketing fees, and

2   rebates or discounts to conceal corrupt payments.  Additionally, given that bribes

3   may be paid in small amounts or installments over several years or across a number

4   of recipients, there are no materiality thresholds for enforcing the FCPA's

5   accounting provisions.

6       112.   The DOJ and SEC both have authority to enforce compliance with the

7   FCPA.  Failure to comply with any of the FCPA's provisions can result in civil or

8   criminal penalties, including substantial fines, prohibitions on operations in an

9   industry or country, or disbarment from doing business with the federal government.

10  These penalties also cause material damage to a company's brand, business, and

11  operating results, and often involve costly investigations and remediation efforts.

12      113.   Throughout the Relevant Period, the Individual Defendants'

13  misconduct subjected OSI to an investigation and potential criminal and civil

14  penalties – which could prohibit the Company from doing business with the U.S.

15  and foreign governments – due to FCPA violations.  The Individual Defendants also

16  knew that the risk of repercussions for FCPA violations was material and yet

17  continued to tout the Company's "international operations as providing an important

18  strategic advantage over competitors" and "significant growth opportunities," as

19  well as putting forth the turnkey business as the future, when it relied almost entirely

20  on violations of the FCPA to be successful.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

114.    Additionally, throughout the Relevant Period, the Individual Defendants made and/or caused the Company to make statements regarding OSI's specific policies and protocols aimed at complying with the FCPA.  For example, in the Company's Forms 10-K filed with the SEC on August 24, 2015, August 19, 2016, and September 7, 2017, the Individual Defendants caused the Company to state:

> We are required to comply with the U.S. Foreign Corrupt Practices Act, which prohibits United States companies from engaging in bribery or making other prohibited payments to foreign officials for the purpose of obtaining or retaining business.  It also requires us to maintain specific record-keeping standards and adequate internal accounting controls.  In addition, we are subject to similar requirements in other countries.  Bribery, corruption, and trade laws and regulations, and the enforcement thereof, are increasing in frequency, complexity and severity on a global basis.  Although we have internal policies and procedures with the intention of assuring compliance with these laws and regulations, our employees, distributors, resellers and contractors involved in our international sales may take actions in violations of such policies.  If our internal controls and compliance program do not adequately prevent or deter our employees, distributors, resellers, contractors and/or other third parties with whom we do business from violating anti-bribery, anti-corruption or similar laws and regulations, we may incur severe fines, penalties and reputational damage.

115.    As quoted above, the Company had similar statements and requirements in its Code of Ethics.

116.    The arrangement that OSI had with the Berisha regime in Albania very likely included bribes that violated the FCPA.  The most obvious results of which were the 8% bump given to OSI in its bid for the contract, followed by the $4.50

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

consideration paid by ICMS in exchange for 49% and a profit-sharing arrangement of the Albanian Contract.  This deal was made by OSI's S2 Global turnkey subsidiary and its newly formed S2 Albania division.  S2 Global is an extremely secretive entity overseen by a small and close-knit group of only three OSI executives, including defendants Mehra and Fleming.  This group monitored and oversaw the negotiations and execution the OSI's turnkey contracts, including the Albanian Contract.

117.   The Albanian Contract was a key contract for OSI and part of the core operation of the Company during the Relevant Period – its turnkey business.  The Individual Defendants, as officers and directors, were knowledgeable about OSI's core business operations – including its Security division and that division's highly-touted turnkey business.  The Security division was the core of OSI's business during the Relevant Period and accounted for 49%, 50%, 50%, and 58% of OSI's total revenues for fiscal years 2014, 2015, 2016, and 2017, respectively.

118.   Throughout the Relevant Period, as set forth below, the Individual Defendants repeatedly caused the Company to represent that the success of its key Security division was being driven by its turnkey business.  As a result, both the Individual Defendants and the investing public were keenly focused on the Company's turnkey business and its three long-term turnkey contracts, including the Albanian Contract.  Indeed, the Individual Defendants consistently reported that

1    turnkey service revenues were driving the Security division's growth and comprised

2    a material portion of its backlog.

3          119.   According to OSI's most recent Form 10-Q, filed with the SEC on

4    January 28, 2019, the SEC and DOJ investigations of FCPA violations are ongoing.

5    The SEC has subpoenaed documents from OSI, and OSI has provided those

6    documents to both the SEC and DOJ.

7    **X.    Materially False and Misleading Statements Issued During the Relevant
         Period**

8

9          120.   On August 21, 2013, the Individual Defendants caused the Company to

10   issue a press release, titled "OSIS Receives Fifteen-Year Agreement to Provide

11   Turnkey Screening Services in Albania."  Therein, the Company stated, in relevant

12   part:

13        OSI Systems, Inc. (NASDAQ: OSIS), a vertically-integrated provider
          of specialized electronics and services, today announced that the
          Government of Albania has awarded its Security Division, Rapiscan
14        Systems, a fifteen-year contract to provide turnkey cargo and vehicle
          security screening services at various sites throughout the country.

15        OSI Systems' CEO, Deepak Chopra, stated, "This significant award
16        from Albania to provide turnkey screening services builds upon similar
          long-term agreements awarded by the Puerto Rico ports authority and
17        Mexico's tax and customs authority.  Our strategy of expanding our
          security offerings beyond the manufacture and sale of screening and
18        detection equipment by providing comprehensive turnkey screening
          services continues to be well received in the marketplace.  Our
19        experience and capability to develop and integrate leading edge
          inspection technologies coupled with our depth of operational expertise
20        is unmatched in the industry and we believe makes us uniquely
          qualified to secure and manage such complex programs."

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Under the program, Rapiscan Systems intends to provide a comprehensive X-ray screening program, which will incorporate technology, staffing, systems integration, and maintenance support at sites throughout Albania. These operational capabilities are intended to enhance the Albanian government's capability to interdict contraband and undeclared materials. The Company currently anticipates that total gross revenues may range from $150 million - $250 million over the term of the agreement. Actual revenues could differ significantly from the range provided as the generation of revenue is based upon the volume of cargo and other factors.

Ajay Mehra, President of Rapiscan Systems, stated, "The Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud to have been selected to execute this critical program. Our selection reinforces the attractiveness and compelling value of our turnkey service model."

121. Throughout the Relevant Period, the Individual Defendants made statements and/or caused OSI to state that the Albanian Contract was proof of the sustainability of the turnkey model. They repeatedly painted a picture that the Albanian Contract faced no impediments and would soon generate considerable revenues. For example, during the Company's January 28, 2014 earnings conference call, defendant Edrick stated: "we have been busy preparing to go live before fiscal year end for our latest turnkey contract award in Albania" and, on the same call, defendant Chopra stated: "I should mention here that the build-out phase for the Albanian turnkey services project is well underway, and we're happy to announce that it'll start generating revenues before the end of the fiscal year."

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

122.   Defendant Edrick confirmed the progress of the Albanian Contract at the March 11, 2014 Conference, stating "most recently earlier in our fiscal year, we sold our third deal in Albania, which we're ramping up right now.  So very, very exciting for us.  It's really changed our profile significantly."  Likewise, on the Company's April 30, 2014 earnings conference call, defendant Chopra made the point:  "[r]egarding Albania, we are making progress and we are on track.  But I don't think so there will be any contribution in revenue in Q4.  But we are moving on target.  We're working diligently with it and looking forward to 2015."

123.   On the same call, defendant Edrick continued to emphasize that "[d]uring the past few years, we have built a strong foundation for growth.  The investments we have made enabled us to become the leader in turnkey screening solutions, and to continue to innovate to bring new products and services to market."

124.   During the June 3, 2014 Stephens Spring Conference, defendant Edrick responded to a question by further emphasizing the Company's turnkey solutions, as follows:

> <Q - Timothy J. Quillin>: . . . In the Security business, I think over the past, let's say, three years or so, one of the big changes has been that you've won some big and small turnkey services, outsource services contract where you own the equipment.  Your employees run the equipment and you get paid on a per site or per scan basis.  Why has that business model proved to be popular?  What's the pipeline look like of additional opportunities?

> <A - Alan I. Edrick>: . . . You talk about the pipeline of opportunities, we are working on a number of deals.  We're very excited about those

opportunities.  It's a long sales cycle.  As we've gone through these other contracts, they generally ranged from the time we started talking to the time we executed the contract, anywhere between a couple of years to maybe as much as four years.  I would say initially, it was a missionary sale, and we had to talk about a concept or a theory.  And now hopefully, we're moving a little bit beyond that as we're able to take potential future customers, we can take into Puerto Rico, we can take into Mexico, and they can see for themselves just how seamless an operation it is.

It really works extremely efficiently and it's a very, very sophisticated operation.  So we're encouraged by that and we're looking forward to winning new turnkeys in the future, while today we've been successful on winning all turnkeys awarded today, 100%, we're not saying in the future, we'll always win 100% but we think our first-mover advantage is significant and is going to allow us to win perhaps more than our fair share of deals going forward.

125.   At the same conference, in response to specific questions from Mr. Quillin about the "ramp-up process of each" turnkey contract, defendant Edrick stated, "[I]n Albania, similarly, the construction is ongoing, which is our latest deal, as well as the equipment. And again, we're waiting on the customer."

126.   During this time, there was fear among analysts that OSI would not be able to right its compliance procedures and internal controls following the 2013 issues with TSA.  At the Stephens Conference, defendant Edrick reassured investors that, "we do think that we've established strong procedures, processes that will enable us to hopefully avoid such issues in the future.  Our management has been strengthened significantly.   Our compliance function has been upgraded significantly, and the oversight function overall as well.  So we're hopeful that, that

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1  will take care of it."  In truth, little, if any, had been done to improve the procedures

2  as the Company had used nefarious means to secure the Albanian Contract and

3  backroom dealing was key to landing any turnkey contract.

4      127.  The next day, June 4, 2014, the Company participated in the Jefferies

5  LLC Healthcare Conference where defendant Edrick touted the turnkey model, as

6  follows:

> Let's start talking about maybe one of the most exciting areas within
> our Security business, and that's turnkey.  I started off the conversation
> telling you a little bit about this.  But really the value proposition is for
> customers that either don't have the capital or the money to spend
> upfront or perhaps don't have the operational expertise to do it, we
> provide a full turnkey solution.  And what we mean is we manufacture
> the equipment, we place it at the customer location, but we still own it,
> it's on our balance sheet.  We staff it up with our people and then we
> charge a fee per scan or a fee per site per month.  We determine what
> might be right for the customer.

> We sort of pioneered this model.  And to-date we've won all contracts
> in the turnkey arena.  While we think we have a nice first-mover
> advantage and hopefully we'll win more than our fair share in the
> future, clearly we're not going to win 100% going forward.  But we
> really like our position.

   128.  Defendant Edrick also responded to a question by hyping the margins

resulting from turnkey:

> Q: What are the return on capital ROI metrics for these turnkey
> projects?  How much do you have to invest per dollar of revenues down
> the road when you reach breakeven?  Thanks.

> Edrick:  Yeah, it's a great question and one that we have refrained from
> answering for a number of reasons.  As you can well imagine, we're
> getting margins that are well above our corporate averages.  So for a

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

competitive reasons as well as potential prospects in the future, we've refrained from giving out our margins on those. But what we can tell you is that the payback is extremely attractive, the return on invested capital is extremely attractive and we'd be happy to sign these type [sic] of contracts any day of the week.

129. On August 12, 2014, defendant Edrick appeared at another Oppenheimer Conference – the Technology, Internet & Communications Conference and again touted the Company's turnkey operations: "And we won our first contract in Puerto Rico, followed that up with a win in Mexico and then Albania. And this recurring revenue at higher margin has really been a key to our success." He also put forth the false picture that the Company had adequate internal controls, by stating, "We, as a company overall, I think our controls are actually quite strong." Defendant Edrick also responded to a question from an Oppenheimer analyst by stating that turnkey contracts drive growth, as follows:

Turnkey, so this is the area that we might consider maybe our most exciting opportunity for growth. These are the three contracts I referred to you earlier in Puerto Rico, Mexico and Albania. Very exciting area for us. It really has changed the landscape not only for our Security business but for OSI Systems overall. It's higher margin and recurring revenue.

This is as much an IP project as it is an equipment project. The stuff we're doing is highly sophisticated. We think we have a nice first-mover advantage.

Today we've won a 100% of the turnkey projects that have been awarded in the world. And while we don't profess to be able to maintain 100%, we think our first-mover advantage will allow us to win hopefully more than our fair share of future turnkey awards.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

130.   Two days later, on August 14, 2014, defendant Edrick spoke at the Jefferies Global Industrials Conference and again touted the Company's turnkey contracts and "first mover" advantage:

> [W]e challenged ourselves to say, how can we expand our revenues, and how can we expand our margins.  And we said, well, what if there is a customer segment out there that maybe doesn't have the capital to buy the equipment upfront, or if they do, perhaps they don't have the operational expertise to run the equipment.  Or if they have that, maybe there's a third reason that they'd like to outsource the operation altogether.  And to that end, we set up a business specifically focused on this a few years back, and we've won three contracts now in Puerto Rico, Mexico and Albania.  And there have been three contracts awarded in the world.  So, right now, we're batting a thousand, and we think that first mover advantage is going to lead to substantial capturing of future business going forward, though we don't expect to win 100% going forward all the time.

131.   Next, on August 25, 2014, on the Company's fourth quarter 2014 earnings conference call, defendant Chopra disclosed that the Albanian Contract had been halted, but failed to disclose the detrimental effect it would have on OSI or the reason why the contract had come under scrutiny, as follows:

> Last year, we announced a 15-year contract that we received from the government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country of Albania.

> Unfortunately, we recently learned that the customer, the Albanian newly elected government, has halted further progress on the contract and put into doubt the continuation of the program.

> The program had been proceeding smoothly and ahead of schedule.  We intend to strongly enforce our contractual rights and hope to reach an amicable outcome.  I would also note here that no revenues from Albania are included from this contract in the revenue guidance we are

65

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

providing for fiscal 2015.   You can understand that, under the circumstances, we cannot comment further at this time.

132.   That same day, on August 25, 2014, the Individual Defendants caused OSI to issue a press release entitled "OSI Systems Reports Fourth Quarter and Fiscal Year 2014 Financial Results."  The press release reported the Company's financial results, but omitted the key fact of the suspension of the Albanian Contract.

133.   This was followed by the Company's 2014 Form 10-K, filed with the SEC on August 27, 2014 (the "2014 10-K").  It was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Feinberg, Good, and Luskin and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Chopra and Edrick.  The 2014 10-K continued to withhold the full extent of the recent events regarding the Albanian Contract, as follows:

> The loss or termination of a contract by such an institution, even if for reasons unrelated to the quality of our products or services, could therefore have a more wide-spread and potentially material adverse effect on our business, financial condition and results of operations.  For example, in August 2013, we announced a 15-year contract award from the Government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country.  We were recently notified that the Government of Albania has halted further progress on the contract.  We have begun proceedings to protect our legal rights.

134.   The 2014 10-K listed S2 Albania as a wholly-owned subsidiary of OSI – without any mention of the 49% portion owned by ICMS or the profit-sharing agreement.

66
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

135.   These statements led the Company's stockholders and the investing public to believe that the Albanian Contract had only been halted due a change in political party in power, not as a result of widespread corruption in the procurement of the contract and the secret arrangement with ICMS and Peçini.  Although they told the world that the contract had been halted, the Individual Defendants continued to conceal, *inter alia*:   (i) their 49% transfer of S2 Albania to Peçini who was associated with the outgoing Albanian administration for a value worth $4.50; (ii) the Company's joint venture and profit-sharing agreement with ICMS; (iii) the 8% bonus and more favorable contract terms that Berisha inexplicably awarded the Company during its bid; (iv) accusations reported in Albania that the Company's bid had been collusive; and (v) the undisclosed opposition to the deal due to allegations of corruption.  Moreover, because all of these facts and accusations were reported only in Albania (and in Albanian), OSI's investors remained completely in the dark.

136.   On October 24, 2014 and January 27, 2015, the Individual Defendants caused OSI to file quarterly reports with the SEC.  Each was signed by defendants Chopra and Edrick and continued to tout the Company's turnkey segment, as follows:

> We believe that our wide-ranging product portfolio together with our ability to provide turnkey screening solutions position us to competitively pursue security and inspection opportunities as they arise throughout the world.

1    137.   On March 3, 2015, defendant Edrick appeared at Morgan Stanley's

2 Technology Media & Telecom Conference and provided a detailed – and materially

3 misleading – explanation of the Company's turnkey business:

4        The security business has been growing the fastest for us.  And then
         most the areas that we've been in, we tend to be number one or number
5        two.  And when we look at it and sort of break it down, we might break
         it down into cargo products, baggage and parcel inspection products,
6        maybe some people screening and turnkey.  And what turnkey is in the
         technology world is sort of equivalent to a SaaS model.  Rather than
7        software as a service, its security screening as a service.  And we're
         clearly the number one in this market.  And it's rapidly growing for us.
8        And it's a high margin area.

9    138.   Defendant Edrick also responded to a question by an analyst:

10       <Q – David Chen>: Okay.  So you've announced two so far? Mexico
         and Puerto Rico.
11
         <A – Alan I. Edrick>:  Correct.  We had won a third one as well, called
12       Albania.   Shortly  after  winning  that,  there  was  a  change  in  the
         administration.  So we've cautioned the Street to exclude that from
13       future prospects in terms of what we're looking at, but there is always
         an opportunity to rekindle that.
14
15   139.   On March 10, 2015, defendant Chopra represented the Company at the

16 ROTH Growth Stock Conference and stated the following regarding the turnkey

   business:
17
         One of the other growing opportunity for us is, as I mentioned, we
18       consider ourselves to be a pioneer in that, is the turnkey screening
         solutions.
19
                              *      *      *
20

                                      68

Turnkey screening solutions gaining increased visibility.  And we are well positioned to further revenue, earnings and EBITDA growth; market share gains and a very strong pipeline of new products driven by R&D . . . Significant growth in service revenues.  As I've mentioned, one of the fastest growing segments and with high gross margins, operating margins is a service business consists of both our turnkey operations and the service we provide after sale of the equipment both in healthcare and in the security. . . .  In the security, the large addressable market for turnkey security solutions catching on. We would consider ourselves from the pioneers in developing this marketplace.

140.   On June 3, 2015, defendant Edrick spoke on behalf of the Company at the Jefferies Global Healthcare Conference and stated:

This slide talks about our turnkey screening solutions, what we're talking a little bit about at the outset. . . .  This represents one of our biggest growth opportunities.  In addition to the few contracts that we've won, we have a nice funnel of opportunities.  They're generally along our sales cycle.  Some of these potential customers we've been working with for quite some time and are very optimistic about winning some deals here in the not too distant future.  It's really had a major impact on improving our overall operating margins both through Rapiscan Systems and for OSI Systems overall.  So quite excited about this, and we'll consider this one of our top growth opportunities.

141.   Then, on August 5, 2015, defendant Edrick spoke on behalf of the Company at the CFA Society of Minnesota's InvestMNt Conference and stated the following regarding being able to secure deals with governments that face "unique challenges" to grow the turnkey business:

Turnkey.  So we talked a little bit about this earlier. . . .  When we think about what are our three biggest growth opportunities in security, one I would say would be turnkey, which we just talked about.

*        *        *

69

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Yes, so the question, what's the advantage of the turnkey,  why would a customer buy that as opposed to buying the equipment outright?  And our customers are governments, so we're not talking about commercial concerns whose primary motivation is profit.

So in dealing with governments, and we are not generally dealing with the western world, so most of the turnkeys we're looking at are not in the US or Western Europe.  They are in places that have other unique challenges.

So, one could be capital; they might not have the cash in order to layout, so that's a real advantage for them.  Two, many of them really don't have the expertise to do it themselves, the operational expertise.  Third, others might have other concerns in their particular country such as [] fear of corruption and things like that, and being able to outsource it to another Company could, lend greater credibility to the overall program.

Four, not having to worry about the upkeep of the equipment throughout the life of it because we are taking all that responsibility.  So most of our customers on the turnkey are not necessarily motivated by a profit, because they are a government entity, who's  really motivated by making sure that they have a complete screening.  So, we continue to believe most customers, to the point of your question, will buy equipment, but there's a nice set of customers out there that are very, very interested in the turnkey, and we're pursuing that.  So we sort of pursue it on a parallel path.

142.   On August 20, 2015, the Individual Defendants caused OSI to issue a press release, titled "OSI Systems Reports Fourth Quarter and Fiscal Year 2015 Financial Results."  Therein, they stated, in relevant part:

OSI Systems, Inc. (NASDAQ: OSIS) today announced financial results for its fourth quarter and fiscal year ended June 30, 2015.

Deepak Chopra, OSI Systems' President and CEO, stated, "We are pleased to report our fourth quarter and full year operating results.  We achieved record sales and earnings during the quarter and fiscal 2015. With a robust pipeline of opportunities across each of our divisions

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

coupled with significant, recently implemented operational improvement initiatives, we are optimistic for the future."

The Company reported revenues of $267 million for the fourth quarter of fiscal 2015, an increase of 2% from the $260 million reported for the fourth quarter of fiscal 2014. Net income for the fourth quarter of fiscal 2015 was $22.4 million, or $1.09 per diluted share, compared to net income of $22.1 million, or $1.07 per diluted share, for the fourth quarter of fiscal 2014. Excluding the impact of restructuring and other charges, net income for the fourth quarter of fiscal 2015 would have been $25.0 million, or $1.22 per diluted share, compared to net income of $24.5 million, or $1.19 per diluted share, for the fourth quarter of fiscal 2014.

For the fiscal year ended June 30, 2015, the Company reported revenues of $958 million, a 6% increase from the $907 million reported for fiscal 2014. Net income for fiscal 2015 was $65.2 million, or $3.17 per diluted share, compared to net income of $47.9 million, or $2.33 per diluted share, in fiscal 2014. Excluding the impact of restructuring and other charges, and the impact in fiscal 2014 of tax elections related to the Company's turnkey program in Mexico, net income for fiscal 2015 would have been $72.4 million, or $3.53 per diluted share, compared to net income of $64.3 million, or $3.13 per diluted share, for fiscal 2014.

During the quarter, the Company's book-to-bill ratio for equipment and related services (non-turnkey) was 1.2 and, as of June 30, 2015, the Company's backlog was $638 million. During fiscal 2015, the Company generated cash flow from operations of $105.1 million.

Mr. Chopra further commented, "Sales in our Healthcare Division increased by 29% over the prior year fourth quarter driven by significant growth in our U.S. patient monitoring business and the impact of an acquisition completed in the first quarter. New products have been well received, contributing to a very strong quarter providing nice momentum as we head into fiscal 2016."

Mr. Chopra continued, "Our Security Division's fourth quarter sales of $131 million were solid. Due to the difficult comparison from the partial fulfillment of our Foreign Military Sale contract with the U.S. Department of Defense in the fourth quarter of the prior year, revenues were down 7%. We are encouraged by the prospects of continued

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

strong performance with the strength of the backlog, new cargo and vehicle inspection product orders, multiple wins for the recently introduced RTT™ 110 (Real Time Tomography) explosives detection systems, and a robust pipeline of opportunities throughout our product and turnkey portfolio."

Mr. Chopra concluded, "During the fourth quarter our Optoelectronics and Manufacturing Division realized solid operating margin improvement and completed a significant facility consolidation within our contract manufacturing business.  This initiative, as well as the recent deployment of other efficiency enhancements in our Healthcare and Security Divisions, will benefit our operations going forward."

**Company Outlook - Guidance for Fiscal 2016**

Subject to the risks described herein, the Company anticipates fiscal 2016 sales to be between $985 million and $1,020 million.  In addition, the Company anticipates earnings per diluted share of $3.75 to $4.00, excluding the impact of restructuring and other charges.

143.   On August 24, 2015, the Company filed its annual report on Form 10-K with the SEC for the year ended June 30, 2015.  The annual report was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Good, Feinberg, and Luskin and certified pursuant to SOX by defendants Chopra and Edrick.  It reaffirmed the Company's statements about its financial results contained in the press release issued on August 20, 2015.

144.   After the Albanian Contract had been renegotiated pursuant to arbitration on April 28, 2015 and the less-lucrative version was set to go into effect on October 31, 2015, the Individual Defendants caused OSI to issue a press release on October 13, 2015 announcing that "the Company has commenced the operations phase with the Government of Albania to provide turnkey cargo and vehicle security

screening services at multiple sites throughout the country.  The Company currently anticipates total revenues to be approximately €200 million over the multi-year term of the agreement."  Defendant Chopra stated in the press release that, "With Albania now operational, along with the Puerto Rico and Mexico turnkey programs, we continue to innovate and differentiate ourselves in the turnkey solutions space where we expect to experience additional growth."

145.   On October 29, 2015, the Individual Defendants caused the Company to issue a press release, which included a quote from defendant Chopra about the Albanian Contract, "Bookings in our Security division were outstanding, highlighted by the recently announced $19 million order under a $293 million IDIQ (indefinite delivery/indefinite quantity) contract with the U.S. Customs and Border Protection agency and the commencement of the turnkey security screening program in Albania, our third such turnkey program."

146.   That same day, the Company held its quarterly earnings call for the first quarter of 2016 and defendant Edrick bragged about the commencement of the Albanian Contract, as follows:

> We were pleased to reach agreement with the Government of Albania on certain contract changes, which led to the commencement of activities.  We expect to ramp up to our full run rate this fiscal year.
>
> This 15-year contract for turnkey cargo and vehicle security screening services at various checkpoints throughout the country is valued at approximately EUR200 million.  Initial site operations are going

73

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1
2

smoothly and we look forward to increasing revenues from this contract throughout this fiscal year as new sites come online.

Following Puerto Rico and Mexico, this is the third major turnkey services program now in operation. Similar to that in Mexico, Albania's service cost is based on a fixed amount per site per month.

3
4

147. Defendant Edrick also responded to a question about the Albanian

5

Contract in the following fashion:

6
7
8

[Millward] Alan, given your strong bookings during the quarter, how should we think about the overall growth of your security business this year? And in terms of seasonality, if you can talk about seasonality and when do you expect Albania to be fully operational?

9
10
11

[Edrick] Sure, Josephine. Good questions, I'll maybe take them in inverse order. Albania we expect to be fully ramped during the course of this fiscal year. It's moving up at a nice pace and we think will enter fiscal 2017 at a full ramp rate. So we are very pleased with the progress that we are making in Albania.

12

148. On January 27, 2016, the Individual Defendants caused OSI to issue a

13

press release announcing the Company's second quarter 2016 financial results. It

14

was attached to a Form 8-K, signed by defendant Edrick, and filed with the SEC that

15

same day. The press release contained a boastful quote from defendant Chopra, as

16

follows:

17
18
19

Security division bookings in the first half were up 272% over the prior year. These bookings, together with the ramp up of our turnkey program in Albania and a solid pipeline of opportunities, position the division well for a strong second half weighted to the fourth quarter based upon the anticipated timing of converting our backlog and opportunities into revenue.

20

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

149.   That same day, the Company held an earnings conference call, where defendant Edrick had the following telling exchange with an analyst:

> Josephine Millward of the Benchmark Company:  What do you have in your backlog for Albania Alan?  It's not the $200 million, right?  You don't have all of it in there?
>
> Edrick:  That's correct.  We only include five years' worth of revenues on Albania in our backlog, so that's in the neighborhood of $60 million, plus or minus.

150.   Later in the same call, defendant Edrick stated that, "The Albania turnkey contract has been ramping up nicely and is expected to be fully operational in Q3."  He also touted the growth opportunity of OSI's turnkey services and the performance of the Albanian Contract, by stating:

> In turnkey services, another major growth opportunity for us with a long sales cycle, we continue to see a strong pipeline.  We are optimistic of landing new turnkey deals and have added additional resources to support these opportunities.  However, the timing of these deals has been and will continue to be influenced by the macroeconomic factors discussed earlier.  Our most recent turnkey contract in Albania is performing well, and we expect to be fully operational within this quarter.  In addition, our other turnkey programs continue to perform well.
>
> We are well situated for growth in products and services including turnkey programs and have a strong balance sheet that can easily absorb the capital requirements from longer lead time builds or turnkey opportunities that often require significant initial capital outlay. . . . The strength in our backlog and bookings trend and continued strength in foreseeable demand for our products globally gives us confidence in the second half and delivering a very strong Q4 in security.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1    151.   At the March 15, 2016 ROTH Conference, defendant Chopra touted

2  OSI's turnkey business and the Albanian Contract to investors, as follows:

3         One of the big growth opportunities for us is in the large-scale turnkey
          screening solutions with significant global expansion opportunities. . . .
4         [T]he latest win was Albania.   So that in this space, this is a new
          evolving market because you're trying to get to be a service provider in
5         the security field to your customer  and a site – to have a site to show is
          a big win for us. . . .   Margins tend to be very good compared to selling
6         just the equipment.

7         152.   On April 27, 2016, OSI held its third quarter 2016 earnings conference

8  call, during which defendant Edrick had the following exchange with an analyst:

9         Brian W. Ruttenbur of Drexel Hamilton LLC:   And then Albania
          started, you said in the third quarter, how much revenue did that
10        contribute?

11        Chopra:  No we don't generally talk about revenues by project, but as
          you know, Albania at full run rate is in the neighborhood of the $12
12        million to $13 million a year, increasing on an annual basis.

13        153.   On the same call, defendant Edrick raved about the performance of

14  OSI's Security division, which included revenues from the Albanian Contract, as

15  follows:

16        Excluding this FMS contract, sales were up by 5% for the quarter due
          to the performance of our security division, which included revenues
17        associated with a large Middle East contract and Albania, our latest
          turnkey program, where all sites became fully operational during Q3.
18        Strong Security Division sales were offset by significantly weaker-
          than-expected sales in our Healthcare division.

19        154.   On the call, defendant Chopra added praise for OSI's turnkey business

20  and boasted that all three turnkey contracts were performing well, as follows:

76
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

On the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service contracts continue to perform well and we continue to add new opportunities to the turnkey pipeline. We are pleased that the ramp-up in Albania went as expected and by quarter end, all sites are fully operational. . . . Our overall long-term pipeline for Rapiscan products and screening services continues to be strong.

155.   The next day, on April 28, 2016, the Individual Defendants caused OSI to file its quarterly report for the third quarter of 2016 with the SEC on Form 10-Q. It was signed by defendants Chopra and Edrick and stated that Security division revenues were increased due to the implementation of the Albanian Contract, among other things, as follows:

Revenues for the Security Division for the three months ended March 31, 2016 increased primarily as a result of a $23 million equipment sale to a Middle East customer and the implementation of our turn-key screening operations in Albania.

156.   Next, on June 7, 2016, defendant Edrick highlighted the benefits of OSI's turnkey business to the Jefferies Healthcare Conference, as follows:

We are a leader in cargo. And in cargo turnkey is really the fastest-growing area for us. As mentioned a bit earlier, the difference between selling equipment and turnkey, turnkey is our version really of a SaaS model rather than software as a service, turnkey is security as a service. We own the equipment and then we charge a fee per scan or we charge a fee for site per month and then turn long-term contracts. The first three that we have gotten are six years, 10 years and 15 years in duration. They are substantially higher margin than our corporate averages and has really enabled a lot of the EPS and EBITDA growth that we have seen over the last several years.

Our opportunity pipeline for turnkey remains robust. It is a longer sales cycle as there is quite a bit of education that needs to take place. We are hopeful now that we have three up and running and three up and

77

running that are very successful.  We can shorten that new win process by a little bit.

157.   On August 16, 2016, the Individual Defendants caused OSI to issue a press release announcing its fourth quarter and annual 2016 results.  The press release was attached as an exhibit to a Form 8-K signed by defendant Edrick and filed with the SEC that same day.  In the press release, defendant Chopra gave the following outlook on the performance of the Company's turnkey contracts: "We are also very encouraged by the outstanding performance of our turnkey security screening services operations in fiscal 2016 and the pipeline of opportunities for further turnkey awards in fiscal 2017."

158.   That same day, the Company held an earnings conference call, on which defendant Chopra continued the narrative of turnkey being a "key growth driver" and misleadingly highlighted the performance of OSI's turnkey contracts, including the Albanian Contract, as follows:

> In turnkey services, our current programs in Albania, Mexico and Puerto Rico continue to perform well, and contribute significantly to our overall performance.  This market represents a key growth driver for us. Going forward, as the potential turnkey pipeline continues to grow; we believe we are in excellent position to capture additional turnkey services opportunities.

159.   Defendant Chopra also used the call as an opportunity to reassure analysts about OSI's turnkey pipeline, as follows:

> Larry Solow of CJS Securities:  Okay.  And then on turnkey, it sounds like, without getting into the real specific details, it sounds like that

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

queue of opportunities is big as it has been in some time.  And hopefully things start—it's just a matter of when you can close some deals.  Is that a good assessment?

Chopra:  That's a good assessment and again I want to emphasize that most of these deals, most of the deals are cargo-based.  So even at the end it becomes a sale of equipment or it turns into a turnkey now our pipeline is very robust and strong.  And we also, what we feel is, we have demonstrated that this can work.  So, we have a big head start from our competitors.

160.   Defendant Chopra also responded to questions about the effect of the new Albanian government on the Albanian Contract, as follows:

Jeff Martin of ROTH Capital Partners, LLC:  I was wondering if you could give us a little more detail on the turnkey pipeline.  I mean, it's understandable that timing is always unpredictable.  If I'm recalling correctly, Albania was your last win, which was approximately three years ago.

Just curious if you have specific visibility on near-term projects that could close?  Or if this is just a long lead cycle that there isn't a ton of visibility on?

Chopra:  Jeff, the way you're saying it is right.  These are tough things to predict.  All we can tell you is, with the successes we've had—and keep in mind, Albania is a good example.  Although it's been three years, it also got sort of stopped when the election happened, and then it got rejuvenated.  We are working for most of these turnkey projects in areas where there is some unpredictability, both volatility in the economy, volatility in their requirements, volatility in just the need for protecting the infrastructure.

161.   On August 19, 2016, the Individual Defendants caused OSI to file its annual report for 2016 on Form 10-K with the SEC.  It was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Good, Hawkins, and Luskin and certified pursuant

to SOX by defendants Chopra and Edrick.  The 2016 annual report highlighted the Albanian Contract's contribution to the Security division's revenues, as follows:

> ***Fiscal 2016 Compared with Fiscal 2015.***  Revenues for the Security division decreased 15% primarily as a result of a $66.4 million reduction in revenues associated with a Foreign Military Sale contract with the U.S. Department of Defense. . . .  This decrease was partially offset by revenues from the commencement of our turnkey scanning operation in Albania during the year.

162.   The Individual Defendants followed this up by including the "[S]ignificant 15-year booking and successful rollout of our turnkey screening solutions program in Albania" as a "key achievement" upon which performance-based executive compensation was based in OSI's 2016 Proxy Statement, filed with the SEC on Form DEF 14A on October 21, 2016.

163.   Then, on October 27, 2016, OSI held its first quarter 2017 earnings call, where defendant Edrick stressed the Company's "leadership role" in turnkey solutions:

> Over the past decade, we have demonstrated a strong track record of producing sales and earnings growth with strong cash flow generation while simultaneously investing in product development and innovation for the future and making strategic acquisitions that serve us well.  Our investments have enabled us to continue our leadership role of the turnkey screening solutions market space and have allowed us to introduce innovative products and solutions to the market across our various industries.

164.   On the same call, defendant Chopra stated, "The turnkey services pipeline continues to be strong. . ."

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

165.   On October 31, 2016, the Individual Defendants caused OSI to file its quarterly report for the first quarter of 2017 on Form 10-Q with the SEC.  It was signed by defendants Chopra and Edrick and continued to highlight how the Albanian Contract had increased revenues for the Security division, as follows:

> Revenues for the Security division for the three months ended September 30, 2016 increased primarily as a result of the following: (i) $14.2 million from sales of our newly acquired subsidiary, AS&E; (ii) a significant increase in sales of our RTT product to European customers; and (iii) increased turnkey screening services revenues primarily as a result of our contract with the Albanian government.

166.   Then, on December 21, 2016, the Individual Defendants caused OSI to attach the Fifth Amendment to Credit Agreement as an exhibit to a Form 8-K.  It misrepresented that OSI had "no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interest of [OSI] or any Subsidiary, except as contemplated in connection with the Credit Documents."  The Form 8-K failed to mention the 49% interest and profit-sharing agreement for its subsidiary, S2 Albania, with ICMS.

167.   On January 26, 2017, OSI held its earnings conference call for the second quarter of 2017.  On the call, defendant Edrick again stated that the Security division's increased revenue was due to an increase in revenue from the Albanian Contract, as follows:

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

As mentioned previously, revenues in Q2 increased by 23% on a year-over-year basis.  Revenues in the Security division increased by 49% primarily as a result of the inclusion of $29 million of revenues from the AS&E acquisition, a significant increase in sales of our RTT Checked Baggage Systems to international customers, and an increase in turnkey screening services revenue as a result of the program in Albania, which ramped up in fiscal 2016.

168.   Defendant Chopra also stated on the call that "[i]n turnkey services, our programs in Puerto Rico, Mexico and Albania continue to perform well.  Overall, we see the pipeline staying robust and we remain optimistic that OSI will capture new turnkey programs in the near future."

169.   On the February 1, 2017, the Individual Defendants caused OSI to file its quarterly report for the second quarter of 2017 on Form 10-Q with the SEC.  It was signed by defendants Edrick and Chopra and continued to highlight that the strength of the Security division's performance was due to the Albanian Contract, as follows:

Revenues for the Security division for the three months ended December 31, 2016 increased primarily as a result of (i) $29.1 million from sales of our newly acquired subsidiary, AS&E; (ii) significantly increased sales of our RTT product to international customers; and (iii) increased turnkey screening services revenues as a result of our contract with the Albanian government.

*       *       *

Revenues for the Security division for the six months ended December 31, 2016 increased primarily as a result of (i) $43.2 million from sales of our newly acquired subsidiary, AS&E; (ii) significantly increased sales of our RTT product to international customers; and (iii) increased

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

turnkey screening services revenues as a result of our contract with the Albanian government.

170.   On February 8, 2017, defendant Edrick made the following remarks at the Cowen Aerospace/Defense & Industrials Conference:

One of the really interesting areas of our Security business is what we call turnkey.  So our basic business model in the past for Security had always been, we sell equipment and then we get some recurring revenue through service, spare parts, and maintenance.  And we challenged ourselves a few years ago, to say, how can we expand that revenue potential and how can we expand those margins?

And we thought there might be a customer set out there that either didn't have the capital or cash to buy the equipment upfront, or if they did, maybe they don't have the operational expertise to run it.

And we formed this turnkey unit.  And what we mean by that is we manufacture the equipment.  We place it at the customer's site.  We staff it up with our people, and then we charge a fee per scan or a fee per site per month.  And we enter into a long, multiyear contracts with these customers.  And this has been extraordinarily successful for us. In just a few short years, this has gone from 0% of our Security business to about 30% today.  So it's been very, very exciting.  It's a nice revenue, higher margin business for us of a recurring nature.

We have a strong first-mover advantage.  Up to this point, we're really the only company out there with any significant contract wins in turnkey, and we're looking forward to continuing to maintain our leadership in this area.

171.   Defendant Edrick continued this theme in responses to conference attendee questions:

So we're talking about number being one or two in that area.  Within turnkey, we're a clear number one.  Where we have the lion's share of that marketplace.

\*   \*   \*

83

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Yeah. So, the turnkey business is growing a little bit organically as Albania became fully ramped up and now it's waiting for our next turnkey wins.

172. On February 15, 2017, the Individual Defendants caused OSI to enter into a purchase agreement (the "Purchase Agreement") for the issuance and sale of $250 million of OSI Bonds. On February 22, 2017, the Company closed the offering. On the same day, OSI filed a Form 8-K explaining the transaction and attaching a copy of the Purchase Agreement and indenture. According to the February 22, 2017 Form 8-K, the Initial Purchasers anticipated selling the OSI Bonds to qualified institutional buyers. In the Purchase Agreement, the Individual Defendants continued to lie to conceal the joint venture with ICMS. The Purchase Agreement represented the following regarding OSI's subsidiaries:

(ix)   Good Standing of Subsidiaries. Each "significant subsidiary" of the Company (as such term is defined in Rule 1-02 of Regulation S-X) (each, a "Subsidiary" and, collectively, the "Subsidiaries") has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its incorporation or organization, has corporate or similar power and authority to own, lease and operate its properties and to conduct its business as described in the General Disclosure Package and the Final Offering Memorandum and is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure to so qualify or to be in good standing would not result in a Material Adverse Effect. ***Except as otherwise disclosed in the General Disclosure Package and the Final Offering Memorandum, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable and is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or***

84

> ***equity.   None of the outstanding shares of capital stock of any
> Subsidiary was issued in violation of the preemptive or similar rights
> of any security holder of such Subsidiary.***   The Company does not own
> or control, directly or indirectly, any corporation, association or other
> entity other than the subsidiaries listed in Exhibit 21 to the Company's
> Annual Report on Form 10-K for the fiscal year ended June 30, 2016,
> except as disclosed in the General Disclosure Package and the Final
> Offering Memorandum and such other subsidiaries none of which, in
> the aggregate, would constitute a "significant subsidiary" of the
> Company under Rule 1-02 of Regulation S-X.   ***The only Subsidiaries
> of the Company are the subsidiaries listed on Schedule D hereto.***

(Emphasis added).   Schedule D of the Purchase agreement listed S2 Albania as a

wholly-owned "Subsidiary."   Nowhere in the Purchase Agreement did the Individual

Defendants disclose anything about the secret arrangement with ICMS or its 49%

interest and profit share in S2 Albania.

173.   The Purchase Agreement also assured the investing public that the

Company had adequate internal controls, as follows:

> The Company and each of its subsidiaries maintain effective internal
> control over financial reporting (as defined under Rule 13-a15 and 15d-
> 15 under the 1934 Act Regulations) and a system of internal accounting
> controls   sufficient   to   provide   reasonable   assurances   that
> (A) transactions   are   executed   in   accordance   with   management's
> general or specific authorization; (B) transactions are recorded as
> necessary to permit preparation of financial statements in conformity
> with GAAP and to maintain accountability for assets; (C) access to
> assets is permitted only in accordance with management's general or
> specific authorization; (D) the recorded accountability for assets is
> compared with the existing assets at reasonable intervals and
> appropriate action is taken with respect to any differences; and (E) the
> interactive data in eXtensible Business Reporting Language or
> incorporated by reference in the General Disclosure Package and the
> Final Offering Memorandum fairly presents the information called for
> in all material respects and is prepared in accordance with the

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Commission's rules and guidelines applicable thereto.  Except as described in the General Disclosure Package and the Final Offering Memorandum, since the end of the Company's most recent audited fiscal year, there has been (1) no material weakness in the Company's internal control over financial reporting (whether or not remediated) and (2) no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.  The Company and each of its subsidiaries maintain an effective system of disclosure controls and procedures (as defined in Rule 13a-15 and Rule 15d-15 under the 1934 Act Regulations) that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and is accumulated and communicated to the Company's management, including its principal executive officer or officers and principal financial officer or officers, as appropriate, to allow timely decisions regarding disclosure.

174.   The Form 8-K, filed with the SEC on February 22, 2017, attaching the Purchase Agreement, also certified that the Individual Defendants had caused the Company to comply with SOX, as follows:

There is and has been no failure on the part of the Company or any of the Company's directors or officers, in their capacities as such, to comply in all material respects with any provision of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith, including Section 402 related to loans and Sections 302 and 906 related to certifications.

175.   On April 26, 2017, OSI held its third quarter 2017 earnings conference call.  On the call, defendant Edrick stated:

Over most of the past decade, we've demonstrated a strong track record of sales and earnings growth with strong cash flow generation while simultaneously investing in the future, our investments have enabled us to continue our leadership role in the turnkey screening solutions

market space and have allowed us to introduce innovative products and services to the market across our industries.

176.   Then, on May 24, 2017, defendant Edrick glowingly described the benefits of turnkey contracts to the B. Riley & Co. Institutional Investor Conference, as follows:

> And to that end, we've landed three significant contracts in Mexico, Puerto Rico, and Albania.  These are long-term contracts ranging from 6 to 15 years, and it really provides a nice recurring revenue at a nice margin for us.  We're the clear leaders in the turnkey.  We think we have a significant first-mover advantage, so we won 100% of the deals today.  While that might not always be the case, we think we'll continue to win a disproportionate share, given our strong leadership position in this area.

177.   Also, on June 7, 2017 defendant Edrick told the Jefferies Global Healthcare Conference turnkey contracts were the future, as follows:

> A full turnkey solution, whereby, instead of selling them the equipment, we manufacture the equipment, we place it at the customer site, we own it, it sits on our balance sheet.  We staff it up with our people, we enter into a long-term contract with the customer.  And then we charge them a fee per scan or a fee per site per month.  We call that turnkey, and it has been an extremely successful opportunity for us.  We've landed major contracts in Mexico, Puerto Rico and Albania, we're the clear number one leader in this market space and we're looking to continue to expand it.  So very exciting, the primary focus of this has been at borders and at ports, but can easily be expanded into other venues as well.

178.   Next, defendant Edrick told the Jefferies Global Industrials Conference on August 9, 2017 that:

> So the question about momentum in turnkey.  Yeah, we would love to be signing turnkey deals at a faster rate than we are.  The reality is we're

the only ones who have won a turnkey deal.  So, it's not that we're losing any turnkey deals to others, but it just takes a long time to get them over the finish line.

Each of these contracts, we probably worked on for three to four years before we ultimately signed a contract with them.

*     *     *

Our first contract that we won was in Puerto Rico, a nice 10-year contract whereby we are screening all the containers that come into the port, into the Puerto Rico Ports Authority in San Juan.  And we follow that up with a much larger contract in Mexico and a third contract in Albania.

And, in just a short period of time, this has already become a significant part of our overall business.  We're excited about it.  We're – in addition to pure turnkeys, we're looking at hybrid models as well where maybe we don't take on the full context of everything that's going on, maybe the customer might continue with some of those responsibilities.  But a great area for us, providing excellent recurring revenue at higher margins than our regular business.

179.   On August 24, 2017, the Individual Defendants caused OSI to issue a press release, titled "OSIS Reports Fourth Quarter and Fiscal Year 2017 Financial Results."  Therein, they stated, in relevant part:

OSI Systems, Inc. (the "Company" or "OSIS") (NASDAQ: OSIS) today announced financial results for the quarter and fiscal year ended June 30, 2017.

"We are pleased to announce outstanding fiscal fourth quarter results. Each of our three operating divisions contributed to the successful conclusion of a strong fiscal year.  Performance at the Security division, in particular, drove top-line growth and margin expansion," said Deepak Chopra, OSIS' Chairman and Chief Executive Officer.

The Company reported revenues of $252 million for the fourth quarter of fiscal 2017, an increase of 14% from the $221 million reported for

88

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

the fourth quarter of fiscal 2016.  Net income for the fourth quarter of fiscal 2017 was $1.5 million, or $0.08 per diluted share, compared to net income of $5.9 million, or $0.30 per diluted share, for the fourth quarter of fiscal 2016. Non-GAAP net income for the fourth quarter of fiscal 2017 was $19.9 million, or $1.02 per diluted share, compared to non-GAAP net income for the fourth quarter of fiscal 2016 of $11.4 million, or $0.58 per diluted share.

For the fiscal year ended June 30, 2017, the Company reported revenues of $961 million, an increase of 16% as compared to the same period a year ago.  Net income for fiscal 2017 was $21.1 million, or $1.07 per diluted share, compared to net income of $26.2 million, or $1.30 per diluted share, in the same period a year ago.  Non-GAAP net income for the fiscal year ended June 30, 2017 was $58.8 million, or $2.99 per diluted share, compared to non-GAAP net income of $44.3 million, or $2.21 per diluted share, for the 2016 fiscal year.

During the three months ended June 30, 2017, the Company's book-to-bill ratio for equipment and related services (non-turnkey) was 1.4.  As of June 30, 2017 the Company's backlog (measured as quantifiable purchase orders or contracts for which revenues are expected to be recognized within the next five years) was $738 million, compared to $623 million as of June 30, 2016.  During fiscal 2017, cash flow generated from operations was $62.8 million and capital expenditures were $17.1 million.

Mr. Chopra stated, "Our Security division had an outstanding finish to the year.  Fourth quarter revenues increased 33% to a record $147 million, $23 million of which was generated by our AS&E business, which we acquired in September 2016.  Excluding the AS&E revenues, fourth quarter sales in our Security division increased 12% over sales in the same prior-year fiscal period.  We leveraged our growth and benefitted from synergies from the AS&E acquisition to significantly improve our fourth quarter year-over-year operating income excluding the impact of impairment, restructuring and other charges."

Mr. Chopra further commented, "Our Optoelectronics and Manufacturing division closed the year with an outstanding operating margin due to operational improvements, together with a more favorable product mix and a migration to more profitable customers."

89
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Mr. Chopra concluded, "Our Healthcare business continued to emerge from previous operating difficulties and a challenging hospital spending environment. During the fourth quarter, sales decreased by 3%; however, excluding the impact of a non-core healthcare business divestiture in February 2017, fourth quarter sales increased by 7% over the prior year. We believe that we are well-positioned for top-line growth and margin expansion heading into fiscal 2018."

**Fiscal Year 2018 Outlook**

Subject to risks described in this press release, the Company anticipates 8% to 12% growth in fiscal 2018 sales to $1,040,000,000 - $1,080,000,000. In addition, the Company anticipates 12% to 20% growth in non-GAAP earnings per diluted share to $3.35 - $3.60, excluding the fiscal 2018 impact of impairment, restructuring and other charges, amortization of acquired intangible assets and non-cash interest expense, and their related tax effects. As a result of the matters discussed under "Forward-Looking Statements," actual sales and non-GAAP diluted earnings per share could vary from this guidance.

180.  That same day, on August 24, 2017, OSI held its earnings conference call for the fourth quarter and full year 2017. On the call, defendant Chopra continued to tout the Albanian Contract, as follows:

Turning to turnkey services. Our current programs in Albania, Mexico and Puerto Rico continue to perform well. As we have mentioned in the past, the potential customers that are seeking to buy cargo product or turnkey service model options are increasingly overall and we continue to look at moving from one to the other.

181.  On September 7, 2017, the Individual Defendants caused OSI to file its annual report for 2017 on Form 10-K with the SEC. The 10-K was signed by defendants Chopra, Edrick, Mehra, Ballhaus, Chizever, Good, Hawkins, and Luskin, and again represented that the Albanian Contract would drive Security division

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1  performance and compensate for poor performance in other OSI segments, as

2  follows:

3      Fiscal 2017 Compared with Fiscal 2016.  Revenues for the Security
       division increased primarily as a result of increased sales of cargo and
4      vehicle inspection systems . . . and increased revenue from turnkey
       scanning operations as a result of a full year of operations in our
5      Albanian program, which commenced in the second quarter of fiscal
       2016, and our expanded operations within our Mexican program, which
6      added several sites in the fourth quarter of the current year.

7                              *      *      *

8      Fiscal 2016 Compared with Fiscal 2015.  Revenues for the Security
       division decreased primarily as a result of a $66.4 million reduction in
9      revenues associated with a Foreign Military Sale contract with the U.S.
       Department of Defense. . . .   This decrease was partially offset by
10     revenues from the commencement of our turnkey scanning operation in
       Albania during the year.

11     182.   On October 26, 2017, OSI held its earnings conference call for the first

12 quarter of 2018.  On the call, defendant Edrick again raved about the Company's

13 leadership in turnkey contracts, as follows:

14     Over time, we have demonstrated a strong track record of sales and
       earnings growth with strong cash flow generation, while
15     simultaneously investing in product development and innovation for
       the future and making strategic acquisitions that have served us well.
16     Our investments have enabled us to continue our leadership role in the
       turnkey screening solutions market space and have allowed us to
17     introduce innovative products and solutions to the market across our
       different industries.

18

19

20

                                    91

183.   Defendant Chopra also chimed in on the call to tout the success of OSI's turnkey contracts, stating, "Our turnkey solutions contracts in Mexico, Puerto Rico and Albania continue to perform well."

184.   The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose that: (1) OSI illegally acquired the Albanian Contract through bribery or other illicit means; (2) OSI transferred 49% of its project company associated with the Albanian Contract, S2 Albania, an entity purportedly worth millions, for consideration of $4.50 to ICMS, a company owned by an Albanian dentist with ties to its Prime Minister who had approved the Albanian Contract; (3) OSI engaged in other illegal acts, including improper sales and cash payments to government officials; (4) these practices caused the Company to be vulnerable to potential civil and criminal liability, and adverse regulatory action; and (5) as a result of the foregoing, the Individual Defendants' statements about OSI's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

185.   The Individual Defendants also repeatedly boasted about the performance of OSI's turnkey business overall.  For example, during the Company's April 27, 2016 earnings conference call, defendant Chopra proclaimed that "[o]n the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service

1   contracts continue to perform well and we continue to add new opportunities to the

2   turnkey pipeline."   Similarly, on the Company's August 16, 2016 earnings

3   conference call, defendant Chopra emphasized that the turnkey "market represents

4   a key growth driver for us going forward . . . we believe we are in excellent position

5   to capture additional turnkey services opportunities."

6   **XI.   The Director Defendants Caused OSI to Issue a Materially False and Misleading Proxy Statement**

7       186.   Certain of the Individual Defendants also caused the Company to issue

8   a false and misleading proxy statement, which sought stockholder votes for, *inter*

9   *alia*, the election of directors and approval of a performance-based compensation

10  plan.

11      187.   On October 23, 2017, defendants Chopra, Mehra, Good, Luskin,

12  Ballhaus, Hawkins, and Chizever caused the Company to file with the SEC and

13  disseminate to stockholders the 2017 Proxy in connection with the Company's

14  annual stockholder meeting.   The Director Defendants drafted, approved, and/or

15  signed the 2017 Proxy before it was filed with the SEC and disseminated to OSI's

16  stockholders.   These Individual Defendants negligently issued materially misleading

17  statements and omitted material information in the 2017 Proxy.   The 2017 Proxy

18  allegations are based solely on negligence, they are not based on any allegations of

19  recklessness or knowing conduct by or on behalf of the Individual Defendants, and

20  they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   allegations of, reliance upon any allegation of, or reference to any allegation of fraud,

2   scienter, or recklessness with regard to the 2017 Proxy allegations and related

3   claims.

4       188.   Among other things, the 2017 Proxy provided information about the

5   director nominees up for election, which included the re-election of all seven

6   Director Defendants.  In addition, the 2017 Proxy described director responsibilities;

7   the duties of each committee; general Board risk oversight; oversight of the

8   Company's financial statements; the accuracy of the Company's 2016 financial

9   statements; and explicitly referenced the Code, which includes special ethical

10   obligations regarding financial reporting such that all SEC filing are to be accurate.

11      189.   The 2017 Proxy also made false and misleading statements in support

12   of the stockholder vote to approve the Company's Amended and Restated 2012

13   Incentive Award Plan, stating that the plan's compensation awards were subject to

14   performance goals and objectives that encouraged and rewarded the Individual

15   Defendants' misconduct as described herein.  Specifically, the 2017 Proxy stated, in

16   relevant part:

17      *Performance Awards*.   Performance awards include any of the
        foregoing awards that are granted subject to vesting and/or payment
18      based on the attainment of specified performance goals.   The plan
        administrator will determine whether performance awards are intended
19      to qualify as "performance-based" compensation ("QPBC") within the
        meaning of Section 162(m), in which case the applicable performance
20      criteria will be selected from the list below in accordance with the
        requirements of Section 162(m).

94
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

In order to constitute QPBC under Section 162(m), in addition to certain other requirements, the relevant amounts must be payable only upon the attainment of pre-established, objective performance goals set by the Compensation Committee and linked to stockholder-approved performance criteria. For purposes of the Amended Plan, one or more of the following performance criteria will be used in setting performance goals applicable to QPBC, and may be used in setting performance goals applicable to other performance awards: (i) net earnings (either before or after one or more of the following: (a) interest, (b) taxes, (c) depreciation, (d) amortization and (e) non-cash equity-based compensation); (ii) gross or net sales or revenue; (iii) net income (either before or after taxes); (iv) adjusted net income; (v) operating earnings or profit; (vi) cash flow (including, but not limited to, operating cash flow and free cash flow); (vii) return on assets; (viii) return on capital; (ix) return on stockholders' equity; (x) total stockholder return; (xi) return on sales; (xii) gross or net profit or operating margin; (xiii) costs; (xiv) funds from operations; (xv) expenses; (xvi) working capital; (xvii) earnings per share; (xviii) adjusted earnings per share; (xix) price per share of Common Stock; (xx) regulatory body approval for commercialization of a product; (xxi) implementation or completion of critical projects; (xxii) market share; (xxiii) economic value; (xxiv) customer retention; and (xxv) sales-related goals, any of which may be measured either in absolute terms for our Company or any of our operating units or as compared to any incremental increase or decrease or as compared to results of a peer group or to market performance indicators or indices. The Amended Plan also permits the plan administrator to provide for objectively determinable adjustments to the applicable performance criteria in setting performance goals for QPBC awards.

190. The 2017 Proxy was false and misleading because it solicited OSI stockholder votes for director re-election even though the Director Defendants were aware, but had failed to disclose that: (1) OSI illegally acquired the Albanian Contract through bribery or other illicit means; (2) OSI transferred 49% of its project company associated with the Albanian Contract, S2 Albania, an entity purportedly

worth millions, for consideration worth $4.50 to ICMS, a company owned by an Albanian dentist with ties to its Prime Minister who had approved the Albanian Contract; (3) OSI engaged in other illegal acts, including improper sales and cash payments to government officials; (4) these practices caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action; and (5) as a result of the foregoing, the Individual Defendants' statements about OSI's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

## XII.   An Investigative Report Reveals the Truth

191.   On December 6, 2017, Muddy Waters published a report titled "OSIS: Rotten to the Core."  Muddy Waters alleged that the Albanian Contract was granted as a result of corruption and bribery and claimed that while the concession "has an estimated top line lifetime value of $150 million to $250 million," OSI "likely bribed somebody by giving half of it away for $4.50" since "[t]here was an unannounced transfer of 49% of OSIS' project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00."

192.   The Muddy Waters Report also revealed previously untranslated Albanian reports pointing to OSI's Albanian Contract as evidence of collusion and corruption with the former Albanian government and highlighted the exorbitant fees to be imposed under the contract.  A July 7, 2015, *Pamfleti Online* article called the

1  Albanian contract a "Mafia of scanning concession," and *Ora News* published an

2  Albanian television news program called "Rapiscan, Theft of the Century."

3     193.   Prior to Muddy Waters' comprehensive investigation – which included

4  hiring investigators, obtaining documents directly from Albania, translating

5  previously undisclosed Albanian reports, and piecing together the ties between these

6  many scattered and obscure pieces of information – the true corrupt nature of the

7  Albanian Contract was not publicly known.

8     194.   Muddy Waters reported that these facts demonstrated that the Albanian

9  Contract had been obtained "through corruption" and had put OSI's Security

10  division "at significant risk" of losing and failing to gain future contracts with the

11  U.S. and European governments.  Muddy Waters also reported that the Company

12  "could face liability under the Foreign Corrupt Practices Act ('FCPA'), which could

13  be in the many hundreds of millions of dollars."

14     195.   In addition to the allegations levied against OSI with respect to the

15  Albanian Contract, the Muddy Waters Report questioned the value and the viability

16  of a turnkey contract between OSI and the Mexican government.  Muddy Waters

17  stated that the contract is very likely overpriced, which could complicate OSI's

18  ability to renew the contract.  Also, given the amount of revenue generated by the

19  contract, as reported by OSI, if it were to be de-valued or not renewed in the future,

20  the Company's financials would be significantly impacted.  Specifically, Muddy

1  Waters estimated that the contract with Mexico generates about $65-70 million of

2  EBITDA annually, an EBITDA margin of approximately 55-59%.

3      196.   The Muddy Waters Report included quotes from an interview with a

4  former senior official who said that a key problem with the Mexican turnkey contract

5  is that it promises services that cannot be accomplished by a machine alone, such as

6  determining whether a scanned item is legal or compliant with state regulations.

7      197.   Muddy Waters also alleged that "investigators' interviews with former

8  employees yielded numerous anecdotes indicating OSIS is rotten to the core,"

9  including "knowledge of improper sales, cash payments to government officials,

10  fraud in a significant contract, and that OSIS had narrowly avoided being debarred

11  from doing business with the U.S. government."   The summary contained in the

12  Muddy Waters report stated:

13      We are short OSI Systems, Inc. (OSIS.US) because we think it is rotten
       to the core.  We believe it obtained a major turnkey contract in Albania
14      through corruption.  It is likely that OSIS's accounts are misstated as a
       result.  We believe the pricing of its Mexico turnkey contract does not
15      stand up to scrutiny.  We estimate that the contract is so rich, it
       accounted for more than 50% of OSIS's FY2017 EBITDA, despite
16      being only 15% of revenue.  Put another way, we estimate the Mexico
       contract's EBITDA margin is approximately 55%, which would mean
17      the rest of OSIS has an EBITDA margin of a paltry 7.5%.  This contract
       is up for renewal in 2018, and nonrenewal would seemingly have an
18      enormous impact on OSIS's profits.  It also implies that there is
       significant room for price adjustment downward, which could have a
19      material impact on profits.  Former employees' statements support our
       view that OSIS is rotting from the inside.

20

98

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Corruption in the 2013 award of OSIS's Albania concession is more obvious than a three-liter bottle of shampoo in your carryon luggage. The concession has an estimated top line lifetime value of $150 million to $250 million. However, OSIS either appears to value the total concession at $9.00 (yes, nine dollars), or they likely bribed somebody by giving half of it away for $4.50. There was an unannounced transfer of 49% of OSIS's project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00. To be clear, this company (S2 Albania SHPK) is the company to which all rights and obligations under the turnkey contract award belong, so 49% of the company is presumably worth many millions of dollars. It appears to us that OSIS's accounts do not reflect the transfer – there are no deductions for non-controlling interests in the income statement, and February 2017 bond offering documents appear to show the subsidiary as 100% owned by OSIS.

There have been numerous news reports in Albania accusing OSIS of corruptly obtaining the concession, and a senior member of parliament has called the award corrupt on the record. Amazingly, U.S. investors appear to have no inkling of these allegations.

Turnkey contracts seem particularly well-suited to corruption. If a government is only purchasing scanning equipment, it is relatively easy for an internal auditor to spot an overpayment because the equipment is somewhat commoditized. However, when bundling in various bespoke services, the pricing suddenly becomes much more opaque. Given this reality, it is perhaps not surprising that the turnkey contracts to date are in jurisdictions not known for their strong governance.

Beyond the turnkey contracts, investigators' interviews with former employees yielded numerous anecdotes indicating OSIS is rotten to the core. Former employees alleged a list of rot they experienced at Rapiscan, including their concern about possibly going to prison, knowledge of improper sales, cash payments to government officials, fraud in a significant contract, and that OSIS had narrowly avoided being debarred from doing business with the U.S. government.

This corrupt behavior puts at significant risk OSIS's Security Division contracts with U.S. and European government agencies. The only former employee who, in our view, made unreservedly positive comments about OSIS's compliance admitted that OSIS could lose

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

significant government business if it engaged in corruption.  Although this senior executive was at OSIS when the transfer of 49% of S2 Albania occurred, he professed no knowledge of the transaction.  Either way, his professed lack of knowledge is telling – he was kept out of the loop, which we would not have expected given his role; or, he was not responding truthfully to the question.

In addition, OSIS could face liability under the Foreign Corrupt Practices Act ("FCPA"), which could be in the many hundreds of millions of dollars.  The U.S. Department of Justice has been aggressive in prosecuting FCPA violations in both Republican and Democratic administrations.   (FCPA settlements generate meaningful revenue generators for the federal government.)   In October 2015, we announced we were short Telia Company (TELIA SS) because we believed the corruption issues in its business were significantly larger than had been disclosed, and that it would likely settle at $1 billion or more.  Just three months ago (September 2017), Telia agreed to settle with the DOJ and assisting regulators for $966 million.  At these levels, there is room for a FCPA settlement that would equal a significant chunk of OSIS's market cap.

(Footnotes omitted.)

198.   The Company's market capitalization drastically declined following the Muddy Waters Report.  It dropped nearly 30% in a single day on December 6, 2017 and has continued on a steady decline, from over $1.68 billion to a position under $1 billion on February 2, 2018.

199.   Before the close of business on the day the Muddy Waters Report was released, December 6, 2017, the Individual Defendants caused the Company to respond in a statement.  The Company's statement was short and confirmed some facts in the Muddy Waters report, such as ICMS's ownership and profit-sharing agreement with S2 Albania, but denied any wrongdoing, as follows:

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

We begin by noting that our turnkey security inspection programs in Mexico and in Albania were the result of public tenders.  Both have resulted in enhanced security, increased seizures of contraband, and improved transparency in customs declarations, significantly benefiting both countries.

4

5

6

7

Our Albania turnkey security inspection program is operated in partnership with ICMS, a local company with civil works construction capabilities in Albania, with a profit share in accordance with the terms of our agreement with ICMS.  ICMS implemented all civil works construction for the program.  As such, both we and ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares.

8

9

10

Our Mexico turnkey security inspection program operates security inspection checkpoints at multiple critical sites across Mexico as designated by the government.  The program has resulted in significant seizures of high-value contraband.  The Company has previously stated that we are in discussions with the government towards the extension of the program under a reduced revenue rate.

11

12

200.   The Individual Defendants' response called Muddy Waters' claims "misleading allegations," but never directly addressed them.

13

14

15

16

17

18

201.   Days later, according to a December 9, 2017 article, the head of Albania's Parliamentary Group of the Socialist Party, Taulant Balla, issued a series of accusations against former Prime Minister Berisha regarding OSI's Albanian Contract and asked for Berisha's prosecution.   The article further noted that, according to Balla, Berisha engaged in a $122.5 million corruption – 49% of the value of the Albanian Contract.

19

20

202.   Muddy Waters responded to OSI's semi-denial on January 31, 2018, by backing up its claims that OSI is "rotten to the core" with additional facts, as follows:

101

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

OSIS's response to our December 6, 2017 report in no way changes our opinion that OSIS is rotten to the core. We see the Albania issue as important for three reasons – first, it's illustrative of our view of the rot; second, it begs the question of how viable the turnkey model is without corruption, particularly in jurisdictions where corruption is a major issue; and third, OSIS's response goes to what we see is a complete lack of management credibility.

In this update, we address OSIS's response to Albania. OSIS's "partnership" with ICMS, a company purportedly "with civil works construction capabilities in Albania", appears to us a conduit for corruption for five additional reasons.

- First, OSIS's statement that ". . . ICMS made significant capital investments toward the implementation of the program in a value well beyond the par value of shares" is greatly misleading because it appears from the various entities' financials that OSIS has provided virtually all funding to, and investment in, S2 Albania.

- Second, OSIS appears to have sought to conceal its joint venture with ICMS from its investors, which we see no reason to do if this arrangement were legitimate.

- Third, even if ICMS were the greatest construction company in the world, how would it be entitled to half of the economics of the concession for pouring concrete when OSIS is providing the key equipment, technology, knowhow, and financing?

- Fourth, we are fairly certain that ICMS is not the greatest construction company in the world – or even in Albania. ICMS's construction affiliate was formed only eight months before OSIS was awarded the concession – its capitalization was only ~US$850, and it was then sold to ICMS's physician shareholder also for ~US$850. Moreover, it has virtually no tangible assets. If it's really this easy and cheap to get a nine-figure construction contract, then we at Muddy Waters are wondering why we're in the relatively impoverished world of hedge funds.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

• Fifth, the timeline of this "partnership" is beyond suspicious – with the requisite approval of the transfer of shares taking place on the day the outgoing Minister of Finance left and the new one was seated.

203.   Muddy Waters' response also attacked OSI's claim that "ICMS made significant capital contributions" that were on par with those of OSI by pointing out the facts that ICMS was not an established construction company, had virtually no tangible assets, and was capitalized for only approximately $850.  Muddy Water also pointed out that OSI provided virtually all of the funding to S2 Albania.  These relevant portions of Muddy Waters' response read as follows:

• **We see no S2 Albania assets to which ICMS could conceivably have contributed**.  As of December 31, 2015, S2 Albania had total assets of US$10.8 million.  Virtually all of the assets – US$9.6 million – were PP&E.  According to the footnotes, 98.5% of PP&E (US$9.6 million) were machines (i.e., likely equipment from OSIS) – with no construction or buildings disclosed at all.

• **We see no financial contribution from ICMS to S2 Albania**. S2 Albania's December 31, 2015 liabilities confirm that substantially all of S2 Albania's capitalization came from OSIS. The financials show US$11.7 million in payables to OSIS. (Note that S2 Albania had negative shareholders' equity of US$-1.1 million.)

• **We see no account evidencing investment in S2 Albania by ICMS or ICMS Construction**.  We see nothing on ICMS's CY2016 balance sheet that could resemble a meaningful investment in S2 Albania.  Of its US$3.06 million in assets as of December 31, 2016, US$2.97 million are current assets. (US$1.8 million – 59.6% – is prepaid expenses; the balance is

substantially all cash and receivables.)  Of the US$80,000 of non-current assets, 99.99% is PP&E.

We also see nothing on the CY2016 balance sheet of ICMS Construction, which is an affiliate of ICMS, that evidences investment in S2 Albania.  (Note that ICMS Construction does not own the equity in S2 Albania.)  ICMS Construction has a total of US$704,000 of assets, of which US$647,000 are receivables.  There is no meaningful PP&E or investments. ICMS Construction had $627 million of revenue in 2015, which means it undertook no significant construction prior to 2016.

OSIS appears to have taken pains to keep its "partnership" hidden from investors.  We see this as affirmation that the relationship is a conduit for corruption.  When OSIS trumpeted the award of the Albania concession as potentially worth $150 million to $250 million, it would have been an opportune time to mention that it would only be entitled to half of the profits.  When Ajay Mehra patted OSIS management on the back by saying the deal "reinforces the attractiveness and compelling value of our turnkey service model", the lack of any mention of the supposedly critical role their construction company was playing would seem a material omission.  When the new government sought to renegotiate the concession agreement against a backdrop of news stories calling the concession award and the transfer of S2 Albania shares corrupt, OSIS chose not to publicly discuss this controversy or its partner.  When OSIS investor relations was asked before the publication of our initial report to provide details on turnkey contract partnerships in Puerto Rico and Albania, OSIS refused to provide any information.  A former key executive of OSIS told our investigators he was unaware that OSIS had sold half of S2 Albania for $4.50. Regardless of whether he was telling the truth, his professed lack of awareness is telling.  ICMS clearly seems to be a joint venture partner OSIS wanted to keep hidden.

We struggle to understand how OSIS can justify a construction contractor having half of the concession economics.  Note that the approximately $1.55 million in revenue at an at least 46.3% operating margin ICMS recorded in 2016 **could mean that ICMS's economics even exceed half the concession value.**

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1

\*   \*   \*

2   ICMS was not an established construction company in Albania, and its construction affiliate, ICMS Construction (100% owned by the doctor who owns ICMS) was formed by a single shareholder on January 29, 2013, only eight months before the award of the concession. When formed, it was called Bledi Construction and had capital of $850. Approximately one and one-half months after formation (March 11, 2013), it changed its registration status from "active" to "suspended", during which time it would not have been permitted to conduct business. On June 21, 2013, Bledi changed its status back to "active". The next day – only two months before the award of the concession – it was sold to ICMS . . . for $850. A few days after that, the name was changed to ICMS Construction. (In 2016, the shares were transferred from ICMS to Dr. Olti Peçini again for $850.)

9   (Footnotes omitted).

10   204.   Muddy Waters' response also reported that ICMS was not a legitimate

11   company because, at the end of 2015, it had "$1,300 cash," "zero inventory,"

12   "$20,000 in plant and machinery," and "office equipment of just $514."

13   205.   The following day, on February 1, 2018, the Company disclosed in a

14   filing with the SEC on Form 8-K that the SEC had launched an investigation into

15   OSI's compliance with the FCPA. In the disclosure, the Company said the DOJ was

16   also looking into its FCPA compliance and that the SEC and DOJ were investigating

17   "trading in the company's securities and have subpoenaed information regarding

18   trading by executives, directors and employees, as well as company operations and

19   disclosures in and around the time of certain trades."   In response to this

20   investigation, OSI said it "has taken action with respect to a senior-level employee."

206.   Following this news, OSI's share price took another severe hit.   The Company lost 18% of its market capitalization overnight.

207.   Further, even though the Individual Defendants repeatedly touted the Albanian Contract as validation of its turnkey business model, over five years later the Company has still not signed another turnkey contract.

**XIII.   Defendants Chopra, Edrick, Mehra, Ballhaus, and Good Unlawfully Profited at OSI's Expense by Selling Shares at Artificially-Inflated Prices**

208.   While in possession of knowledge that OSI had obtained the Albanian Contract through illegal means and violated the FCPA, Chopra, Edrick, Mehra, Ballhaus, and Good sold large quantities of their personal holdings of OSI at inflated prices totaling over $52.6 million.

209.   Defendant Chopra is OSI's founder, President, CEO, and Chairman. Chopra was aware of material, adverse, and non-public information regarding OSI's internal controls and illegal activities and the Company's statements related thereto. While in possession of this information, Chopra sold 309,944 shares, at artificially-inflated prices, for total proceeds of over $25.2 million.  This represented 46% of his total reported holdings as of October 1, 2013 and 56% of his average year-end stock holdings during the Relevant Period.  Additionally, only weeks after OSI announced that the Albanian government "halted further progress" on the turnkey contract but failed to disclose the full extent of the issues, the Company abruptly disclosed that

Case 2:18-cv-03371-VAP-SK   Document 15   Filed 04/17/19   Page 108 of 131   Page ID #:201

Chopra had entered into a "Rule 10b5-1 trading plan" on September 11, 2014 to immediately sell 48,000 shares of OSI common stock for over $3 million in illicit proceeds knowing that the full extent of the wrongdoing had not been disclosed. The execution of this trading plan while knowingly concealing material adverse information surrounding the Company's turnkey operations and the corrupt arrangement with ICMS reinforces the highly unusual and suspicious nature of Chopra's trading.

210.  Defendant Edrick is OSI's CFO and Executive Vice President and held those positions throughout the Relevant Period.  Edrick was aware of material, adverse, and non-public information regarding OSI's internal controls and illegal activities and the Company's statements related thereto.  While in possession of this information, Edrick sold 103,594 shares, at artificially-inflated prices, for total proceeds of over $8.1 million.  These shares represented 28% of his total reported holdings as of October 10, 2013 and 30% of his average year-end stock holdings during the Relevant Period.

211.  Defendant Mehra is a member of OSI's Board, as well as Executive Vice President of OSI, President of OSI Solutions Business, and President of S2 Global.  Mehra was aware of material, adverse, and non-public information regarding OSI's internal controls and illegal activities and the Company's statements related thereto.  While in possession of this information, Mehra sold 186,811 shares,

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

at artificially-inflated prices, for total proceeds of over $14.7 million.  These shares represented 69% of his total reported holdings as of October 10, 2013 and 88% of his average year-end stock holdings during the Relevant Period.

212.   Defendant Ballhaus is a member of OSI's Board and Audit Committee. He held those positions throughout the Relevant Period.  Ballhaus was aware of material, adverse, and non-public information regarding OSI's internal controls and illegal activities and the Company's statements related thereto.  While in possession of this information, Ballhaus sold 1,750 shares, at artificially-inflated prices, for total proceeds of $124,950.

213.   Defendant Good is a member of OSI's Board and Audit and Risk Management Committees.  He held those positions throughout the Relevant Period. Good was aware of material, adverse, and non-public information regarding OSI's internal controls and illegal activities and the Company's statements related thereto. While in possession of this information, Good sold 19,650 shares, at artificially-inflated prices, for total proceeds of $1,391,150.

214.   These insider sales total over $52.6 million in proceeds and were all executed while OSI's stock price was artificially inflated due to the unlawful conduct alleged herein.

## XIV.  Excessive Compensation

215.   Certain of the Individual Defendants further breached their fiduciary duties in awarding excessive compensation resulting in unjust enrichment and waste of corporate assets.   Defendants Good, Luskin, and Ballhaus all served on the Compensation Committee during the Relevant Period.

216.   Specifically, as executives, defendants Chopra, Edrick, and Mehra were awarded salaries and stock-based compensation that were not justified given the state of affairs at the Company.

217.   OSI's executive compensation was highly contingent on the Company's financial metrics.   The Individual Defendants regularly stated in the Company's proxy statements that OSI placed an "emphasis on pay-for-performance principles" and believed "that executive compensation should be tied to the performance of the Company on both a short-term and long-term basis." Accordingly, during the Relevant Period, OSI's executives' fixed compensation - *i.e.*, base salary – was a small percentage of the total compensation, while "variable" compensation – *i.e.*, annual cash incentive bonuses or performance-based equity incentive awards – comprised the majority of total compensation.

218.   Under the Company's Annual Incentive Bonus Program, as set forth in the Company's proxy statement, filed with the SEC on Form 14A on October 17, 2014, "[t]he Company grants annual incentive bonuses based in part on each

executive's contribution to enhancing long-term stockholder value."  To that end, certain executives received annual incentive bonuses based on the Company's "annual operating achievement and near-term success," and quantitative factors such as "contributions to stockholder value" and "earnings per share and internal metrics."

219.   Under this Annual Incentive Bonus Program, defendant Chopra earned $1,323,000 in 2013, $353,000 in 2014, and $700,000 in 2015; Edrick earned $340,000 in 2013, $160,000 in 2014, and $300,000 in 2015; and Mehra earned $325,000 in 2013, $125,000 in 2015, and $245,000 in 2017 in performance-based compensation that was based upon artificially-inflated performance metrics.

220.   Further, in addition to the Annual Incentive Bonus Program, in 2015 the Compensation Committee established a separate incentive program tied to the annual performance of the Company's turnkey business.  The goal of this new program was to underscore turnkey's importance and to focus defendant Mehra's attention on developing turnkey opportunities.   Incentives under the turnkey incentive program were conditioned on the achievement of certain metrics based on the operating income and bookings of the Company's turnkey business.  Further, this all took place as the Individual Defendants refused to provide clear turnkey-specific financial results to stockholders and the investing public.

221.   As a result of this turnkey incentive program, defendant Mehra vested 23,800 restricted stock units ("RSUs") for achieving a bookings target of $225 million.   In 2017, Mehra received $705,000 for exceeding the operating income target of $10 million in the turnkey segment.

222.   Additionally,   in   2017,   while   the   Individual   Defendants   had "determined not to adjust any base salary levels" for any OSI executive officers, they made an exception for defendant Mehra, "whose salary was increased by approximately 14% to $400,000 to compensate him for taking on significantly greater responsibility for the oversight and management of the cargo and vehicle inspection and turnkey business lines within our Security division."

## DAMAGES TO OSI

223.   As a result of the Individual Defendants' wrongful conduct, OSI carried out a series of illegal actions and disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated OSI's credibility.   OSI has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

224.   Indeed, the Individual Defendants' false and misleading statements as alleged above have subjected OSI to a consolidated securities fraud class action pending in this District.   The matter is captioned *Arkansas Teacher Retirement*

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1   *System, et al. v. OSI Systems, Inc., et al.*, Case No. 17-cv-08841 (the "Securities

2   Class Action").

3       225.   However, the costs and expenses incurred in connection with the

4   Securities Class Action are not the only damages to arise out of the allegations.  The

5   Company has incurred, and will continue to incur, significant damage in the form of

6   costs and expenses associated with the SEC investigation into the Company's

7   compliance with the FCPA, the DOJ's request for information regarding OSI's

8   FCPA compliance, and the SEC's and DOJ's investigations of trading in OSI

9   securities, which include the issuance of subpoenas for information regarding

10  trading by executives, directors, and employees, as well as the Company's

11  operations and disclosures in and around the time of certain trades.

12      226.   The Company may have to pay hundreds of millions of dollars in

13  settlement costs or fines in connection with its liability for violations of the FCPA.

14      227.   As a direct and proximate result of the Individual Defendants' actions

15  as alleged above, OSI's market capitalization has been substantially damaged, losing

16  hundreds of millions of dollars in value as a result of the conduct described herein.

17  Before the release of the Muddy Waters Report, OSI had a market capitalization of

18  $1.684 billion, which quickly dropped below one billion dollars.

19      228.   Moreover, these actions have irreparably damaged OSI's corporate

20  image and goodwill.  For the foreseeable future, OSI will suffer from what is known

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that OSI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS**

229.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

230.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

231.   Plaintiff is an owner of OSI common stock and was an owner of OSI common stock at all times relevant hereto.

232.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

233.   As a result of the facts set forth herein, Plaintiff has not made any demand on the OSI Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

234.   At the time this action was commenced, the Board consisted of seven directors:   defendants Chopra, Mehra, Ballhaus, Chizever, Good, Hawkins, and

Luskin.  All seven members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

## I.    Demand is Futile as to the Director Defendants Because They Each Face a Substantial Likelihood of Liability

235.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout Relevant Period, and as such had a fiduciary duty to make sure that the Company's actions were in accordance with the law and to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

236.    Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously engaged in the illegal actions that violated the FCPA, including the procurement of the Albanian Contract, and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially-inflated prices.

237.   The Director Defendants are not disinterested because they each face a substantial likelihood of liability in light of their role in the false and misleading statements as outlined above.  Each of the Director Defendants signed the false and misleading Forms 10-K filed with the SEC.

238.   The Director Defendants consciously and knowingly made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence in clear breach of their fiduciary duties of loyalty and good faith.  The Director Defendants face a substantial likelihood of liability for the aforementioned breaches. If the Director Defendants were to bring a suit on behalf of OSI to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

## II.    Defendant Chopra Lacks Independence

239.   As an initial matter, OSI has conceded in its SEC filings that Chopra is not an independent director of the Company.  In its 2017 Proxy, OSI stated that:

1  "The Board has determined that each of the nominees for director, except

2  Mr. Chopra and Mr. Mehra, is independent. . . ."

3      240.   In addition to this lack of independence, Chopra is not disinterested for

4  purposes of demand futility because his principal occupation is President, CEO, and

5  Chairman of the Board of OSI.  According to the Company's SEC filings, in 2015,

6  2016, and 2017, Chopra received total compensation of $8,477,921, $6,888,699, and

7  $7,078,479, respectively.  These amounts are material to him.  These amounts were

8  also excessive because portions of them were performance-based and approved by

9  the Compensation Committee – defendants Good, Luskin, and Ballhaus – and, as

10  such, defendant Chopra cannot consider a demand against these defendants.

11      241.   Defendant Chopra is incapable of considering a demand to commence

12  and vigorously prosecute this action because he faces additional substantial

13  likelihood of liability as he is a named defendant in the Securities Class Action.

14      242.   Defendant Chopra is first cousins with defendant Mehra and therefore

15  could never disinterestedly consider a demand against him.

16      243.   He is also slated to receive a gigantic severance package should he ever

17  be terminated.  He stands to receive a $12.5 million retirement bonus if he retires

18  after January 1, 2020 and would receive three times his pay should he be fired

19  without cause before then.  That would total approximately $22 million based on his

20  current compensation.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1       244.   For these reasons, demand upon defendant Chopra is futile.

2 **III.    Defendant Mehra Lacks Independence**

3       245.   In the 2017 Proxy, the Individual Defendants concede that Mehra is not

4 independent due to his executive officer position.

5       246.   In addition to this lack of independence, Mehra is not disinterested for

6 purposes of demand futility because his principal occupation is Executive Vice

7 President of the Company and President of OSI Solutions Business.  According to

8 the Company's SEC filings, in 2015, 2016, and 2017, Mehra received total

9 compensation of $2,756,527, $1,164,806, and $2,858,718, respectively.  These

10 amounts are material to him.  These amounts were also excessive because portions

11 of them were performance-based and approved by the Compensation Committee –

12 defendants Good, Luskin, and Ballhaus – and, as such, defendant Mehra cannot

13 consider a demand against these defendants.

14       247.   Defendant Mehra is incapable of considering a demand to commence

15 and vigorously prosecute this action because he faces additional substantial

16 likelihood of liability as he is a named defendant in the Securities Class Action.

17       248.   During the Relevant Period, defendant Mehra oversaw the Company's

18 turnkey solutions.  He directly participated in the illegal actions behind obtaining the

19 Albanian Contract and directly made several of the false and misleading statements

20

described herein.   Due to these involvements, he is likely to face liability and prosecution as a result of the SEC and DOJ investigations.

249.   Defendant Mehra is first cousins with defendant Chopra and therefore could never disinterestedly consider a demand against him.

250.   For these reason, demand upon defendant Mehra is futile.

**IV.   Demand is Excused as to Defendants Good, Luskin, Ballhaus, Hawkins, and Chizever Because as Members of the Audit and/or Risk Management Committees They Face a Substantial Likelihood of Liability**

251.   Defendants Good, Luskin, Ballhaus, Hawkins, and Chizever, as members of the Audit and/or Risk Management Committees during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed defendants Chopra and Edrick to repeatedly make other false and misleading statements to the investing public.   More specifically, as members of the Audit and/or Risk Management Committees, defendants Good, Luskin, Ballhaus, Hawkins, and Chizever were obligated to review the Company's annual and quarterly reports to ensure their accuracy and ensure the Company was acting legally.   Instead, defendants Good, Luskin, Ballhaus, Hawkins, and Chizever, as members of the Audit and/or Risk Management Committees, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company and failed to ensure the Company was acting

legally, as required by the Audit and/or risk Management Committees Charters.  For this reason, demand is futile as to defendants Good, Luskin, Ballhaus, Hawkins, and Chizever.

**V.   Demand is Futile as to Defendants Chopra, Mehra, Good, and Ballhaus Because They Financially Benefited from the Above-Referenced False and Misleading Statements**

252.   As noted above, defendants Chopra, Mehra, Good, and Ballhaus personally benefited from the Individual Defendants' false and misleading statements by having the opportunity to sell shares of OSI stock at artificially-inflated prices, a benefit not shared by the rest of OSI's stockholders.

253.   Defendants Chopra, Mehra, Good, and Ballhaus would not bring a derivative action against themselves for improper insider selling.  Therefore, demand as to them is futile.

**VI.   Demand is Futile as to Defendants Good, Luskin, and Ballhaus Because as Members of the Compensation Committee They Face a Substantial Likelihood of Liability**

254.   Defendants Good, Luskin, and Ballhaus served on the Compensation Committee during the Relevant Period.  In that role, they were in charge of approving performance metrics and amounts of performance-based compensation for the Company's executive officers.  In that role, they wrongfully approved the excessive compensation described herein.  As such, they face a substantial likelihood of liability and demand as to them is futile.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

## VII.   Demand is Futile as to the Director Defendants for the Following Additional Reasons

255.   If OSI's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this Complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by OSI against the Individual Defendants, known as the "insured versus insured exclusion."

256.   As a result, if the Director Defendants were to sue themselves or certain of the officers of OSI, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

257.   Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting OSI by prosecuting this action.  Therefore, demand on OSI and its Board is futile

120

and is excused.  OSI has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

<div align="center">

**COUNT I**

**<u>AGAINST THE INDIVIDUAL DEFENDANTS</u>**
**<u>FOR BREACH OF FIDUCIARY DUTY</u>**

</div>

258.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

259.   The Individual Defendants owed and owe OSI fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe OSI the highest obligation of loyalty, good faith, due care, oversight, and candor.

260.   All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

261.   Each of the Individual Defendants had actual or constructive knowledge of and failed to disclose that:  (1) OSI illegally acquired the Albanian Contract through bribery or other illicit means; (2) OSI transferred 49% of its project company associated with the Albanian Contract, S2 Albania, an entity purportedly worth millions, for consideration worth $4.50 to a Company with ties to Albania's

<div align="center">

121

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

</div>

1    Prime Minister; (3) OSI engaged in other illegal acts, including improper sales and

2    cash payments to government officials; (4) these practices caused the Company to

3    be vulnerable to potential civil and criminal liability, and adverse regulatory action;

4    and (5) as a result of the foregoing, the Individual Defendants' statements about

5    OSI's business, operations, and prospects, were materially false and/or misleading

6    and/or lacked a reasonable basis.   These actions caused severe risks to the

7    Company's financial viability and caused harm to the Company by subjecting the

8    Company to the Securities Class Action and the SEC and DOJ investigations.   The

9    Individual Defendants' actions (and inactions) could not have been a good faith

10   exercise of prudent business judgment to protect and promote the Company's

11   corporate interests.

12        262.   The Individual Defendants consciously caused or allowed OSI to lack

13   requisite internal controls, and, as a result, the Company procured the Albanian

14   Contract through illegal means and regularly made false and misleading statements

15   regarding the Albanian Contract and the Company's internal controls.

16        263.   The Individual Defendants consciously failed to supervise, and to exert

17   internal controls over, and consciously disregarded their responsibilities involving

18   the Company.

19        264.   As a direct and proximate result of the Individual Defendants'

20   conscious failure to perform their fiduciary obligations, OSI has sustained

significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their fiduciary duties owed to OSI and its stockholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee OSI's business, rendering them personally liable to the Company.

## COUNT II

### BREACH OF FIDUCIARY DUTY FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION AGAINST THE INSIDER SELLING DEFENDANTS

265.   Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

266.   At the time of the stock sales set forth herein, the defendants Chopra, Edrick, Mehra, Ballhaus, and Good knew of the information described above, and sold OSI common stock on the basis of such information.

267.   The information described above was proprietary, non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold OSI common stock.

268.   The Insider Selling Defendants' sales of Company common stock while in possession and control of this material, adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

123

269.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III
### UNJUST ENRICHMENT AGAINST
### THE INSIDER SELLING DEFENDANTS

270.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

271.   Defendants Chopra, Edrick, Mehra, Ballhaus, and Good were unjustly enriched by their receipt of proceeds from their illegal sales of OSI common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

272.   To remedy the Insider Selling Defendants' unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of OSI common stock.

## COUNT IV
### VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT
### AND SEC RULE 14a-9 AGAINST THE DIRECTOR DEFENDANTS

273.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

274.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants named on this Count.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

275.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

276.   Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary

1   in order to make the statements therein not false or misleading."   17 C.F.R.

2   § 240.14a-9.

3        277.   The 2017 Proxy violated Section 14(a) and Rule 14a-9 because it

4   solicited OSI stockholders' votes for director re-election and the approval of

5   performance-based compensation while simultaneously misrepresenting and/or

6   failing to disclose that:  (1) OSI illegally acquired the Albanian Contract through

7   bribery or other illicit means; (2) OSI transferred 49% of its project company

8   associated with the Albanian Contract, S2 Albania, an entity purportedly worth

9   millions, for consideration worth $4.50; (3) OSI engaged in other illegal acts,

10  including improper sales and cash payments to government officials; (4) these

11  practices caused the Company to be vulnerable to potential civil and criminal

12  liability and adverse regulatory action; and (5) as a result of the foregoing, the

13  Individual Defendants' statements about OSI's business, operations, and prospects

14  were materially false and/or misleading and/or lacked a reasonable basis.

15       278.   As alleged herein, in the 2017 Proxy, the Director Defendants

16  negligently issued, caused the Company to issue, and participated in the issuance of

17  untrue statements of material facts and omitted material facts necessary to make the

18  issued statements not misleading in violation of Section 14(a) or the Exchange Act

19  and SEC Rule 14a-9.

20

---

126

279.   In the exercise of reasonable care, defendants Chopra, Mehra, Good, Luskin, Ballhaus, Hawkins, and Chizever should have known that the statements contained in the 2017 Proxy were materially false and misleading.

280.   The false and misleading statements and omissions in the 2017 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors and approval of executive compensation.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and in other information reasonably available to stockholders.

281.   As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy the Director Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant OSI suffered damage and actual economic losses (*i.e.*, wrongful re-election and election of directors) in an amount to be determined at trial.

**COUNT V**
**WASTE OF CORPORATE ASSETS**
**AGAINST THE INDIVIDUAL DEFENDANTS**

282.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

283.   The Individual Defendants owed OSI the obligation to avoid wasting OSI's assets.

284.   The Individual Defendants breached their obligations to OSI and wasted corporate assets by subjecting the Company to the Securities Class Action, causing the Company to incur substantial costs.

285.   As a direct and proximate result of the waste of corporate assets by the Individual Defendants, OSI has been and continues to be damaged.

286.   Plaintiff, on behalf of OSI, has no adequate remedy at law

## COUNT VI

## UNJUST ENRICHMENT AGAINST DEFENDANTS CHOPRA, MEHRA, EDRICK, AND FLEMING

287.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

288.   Defendants Chopra, Mehra, Edrick, and Fleming were unjustly enriched by their receipt of excessive compensation.

289.   To remedy defendants Chopra, Mehra, Edrick, and Fleming's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their excessive compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of OSI and that Plaintiff is a proper and adequate representative of the Company;

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

1    B.     Awarding the amount of damages sustained by the Company as a result

2  of the Individual Defendants' breaches of fiduciary duties;

3    C.     Ordering the Insider Selling Defendants to disgorge the profits obtained

4  as a result of their sale of OSI stock while in possession of insider information as

5  described herein;

6    D.     Ordering defendants Chopra, Mehra, Edrick, and Fleming to disgorge

7  the profits obtained as a result of their performance-based compensation based on

8  artificially-inflated performance metrics as described herein;

9    E.     Granting appropriate equitable relief to remedy the Individual

10  Defendants' breaches of fiduciary duties and other violations of law;

11    F.     Awarding to Plaintiff the costs and disbursements of the action,

12  including reasonable attorneys' fees, accountants' and experts' fees and costs and

13  expenses; and

14    G.     Granting such other and further relief as the Court deems just and

15  proper.

16              **<u>JURY TRIAL DEMANDED</u>**

17    Plaintiff hereby demands a trial by jury.

18   Dated:  April __, 2019              Respectfully submitted,

19                        WEISSLAW LLP

20                        */s/ Joel E. Elkins*
                         Joel E. Elkins (SBN 256020)

                              129
VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

jelkins@weisslawllp.com
9107 Wilshire Blvd, Suite 450
Beverly Hills, CA 90210
Telephone:  (310) 208-2800
Facsimile:  (310) 209-2348

*Liaison Counsel for Plaintiff*

BRAGAR EAGEL & SQUIRE, P.C.
David J. Stone (SBN 208961)
stone@bespc.com
Melissa A. Fortunato (SBN 319767)
fortunato@bespc.com
Todd H. Henderson
henderson@bespc.com
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:  (212) 308-5858
Facsimile:   (212) 486-0462

HYNES & HERNANDEZ, LLC
Michael J. Hynes
mhynes@hh-lawfirm.com
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone:  (484) 875-3116
Facsimile:   (914) 752-3041

*Counsel for Plaintiff*

VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT