**LTL ATTORNEYS LLP**
David W. Ammons (Bar No. 187168)
 david.ammons@ltlattorneys.com
David A. Crane (Bar No. 305999)
 david.crane@ltlattorneys.com
300 South Grand Ave., 14th Floor
Los Angeles, CA 90071
Phone: (213) 612-8900
Fax: (213) 612-3773

Peter Safirstein
**SAFIRSTEIN METCALF LLP**
350 Fifth Ave., 59th Floor
New York, NY 10118
Telephone: (212) 201-2855
Facsimile: (212) 201-2858

Hung G. Ta
**HUNG G. TA, ESQ. PLLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (646) 453-7288

*Attorneys for Plaintiff*
*Jeffery Kocen*

*[Additional counsel appear on signature page]*

FILED
CLERK, U.S. DISTRICT COURT

1/3/2020

CENTRAL DISTRICT OF CALIFORNIA
BY:      CW          DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFERY KOCEN and MICHAEL RILEY, Derivatively and on Behalf of OSI SYSTEMS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DEEPAK CHOPRA, AJAY MEHRA, | Case No. 2:18-cv-03371-FMO-SKx <br><br> **AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1 | WILLIAM F. BALLHAUS, GERALD
CHIZEVER, STEVEN C. GOOD,
2 | JAMES B. HAWKINS, MEYER
3 | LUSKIN, and DAVID T. FEINBERG,

4 |                     Defendants,

5 |          and

6 | OSI SYSTEMS, INC.

7 | Nominal Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

## AMENDED CONSOLIDATED VERIFIED
## SHAREHOLDER DERIVATIVE COMPLAINT

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

1.     Plaintiffs, Jeffery Kocen ("Kocen") and Michael Riley ("Riley") (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this Amended Consolidated Verified Shareholder Derivative Complaint ("Complaint") in the name of and on behalf of nominal Defendant OSI Systems, Inc. ("OSI" or the "Company") against certain directors and officers of OSI named herein.  Plaintiffs bring their claim based on personal knowledge as to their own acts, and on information and belief as to all other allegations, based on an investigation by counsel, including: (a) review and analysis of public filings made by OSI and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on OSI's websites concerning the Company's public statements; (d) statements made in a securities fraud filing, captioned *Arkansas Teacher Retirement System and John A. Prokop v. OSI Systems, Inc., et al*, No. 17 CV 17-08841-VAP (SKx) (C.D. Cal.) ("Securities Complaint"); (e) review of confidential OSI records obtained by means of a request for inspection of books and records under 8 *Del. C.* § 220; and (f) review of other publicly available information concerning OSI and other persons.

## SUMMARY OF THE ACTION

21
22
23
24
25
26

2.     This is a derivative action brought by two OSI shareholders on behalf of the Company against certain of its officers and directors seeking remedy for the breaches by OSI's board of directors ("Board") and senior officers in abdicating their fiduciary duty of oversight with respect to the Company's turnkey contract with the government of Albania (the "Albanian Contract").

27
28

3.     OSI manufactures and sells electronic scanning systems and components for homeland security, healthcare, defense, and aerospace. OSI has three operating

1

divisions: (a) Security, which provides security and inspection systems, turnkey security screening solutions and related services; (b) Healthcare; and (c) Optoelectronics and Manufacturing. From 2013 through 2017, the Company generated more than 50% of its revenues from its core Security division, operated primarily through its subsidiary Rapiscan Systems, Inc. ("Rapiscan"), which sells and provides services for X-ray security and inspection systems to detect explosives, weapons, drugs, and other illegal goods.

4.      Rapiscan's business relied heavily on contracts with the U.S. government. However, between 2009 and 2013, Rapiscan was accused of misleading the U.S. government through two separate schemes. As a result, the U.S. government cancelled multi-million dollar contracts, subjected OSI to increased scrutiny, and caused Rapiscan to lose market share and credibility with investors.

5.      In response to Rapiscan's scandals with the U.S. government, Defendants attempted to regain its market share and credibility by focusing on a new model of business called "turnkey security screen solutions." Under this "turnkey" model of business, Rapiscan would lease, rather than sell, security scanning equipment, to foreign governments. However, the Company had only announced turnkey contracts in Mexico and Puerto Rico, and had not announced any new major turnkey deals since 2012.  The Company needed another turnkey contract to convince the market that this new business model would be able to drive growth in OSI's key Security division.

6.      On August 21, 2013, OSI announced in a press release that Rapiscan Systems was awarded a fifteen-year contract by the government of Albania to "provide turnkey cargo and vehicle security screening services at various sites throughout the Country." OSI touted the Albanian Contract as a "significant award." The Company further announced that it anticipated gross revenues ranging from $150 million to $250 million over the term of the agreement.

7.      OSI, however, relied on bribes of Albanian government officials to win the Albanian Contract.

8.      On December 6, 2017, Muddy Waters Research ("Muddy Waters"), a widely-followed short-seller, published a scathing examination of OSI's business dealings with the government of Albania (report available at: http://www.muddywatersresearch.com/research/). In that publication, Muddy Waters concluded that the Company "was rotten to the core." In support of this contention, they cited evidence that the Company had "obtained a major turnkey contract in Albania through corruption" and that there had been an "unannounced transfer of 49% of [OSI's] project company, S2 Albania SHPK, to a holding company owned by an Albanian doctor, for consideration of less than $5.00."

9.      The Muddy Waters report further noted that the Company's financial statements were materially misstated as a result of, among other things, the failure to properly record income from the Albanian Contract.

10.     OSI responded to the Muddy Waters report in a press release on the same date, December 6, 2017, but did not deny any of the allegations of corruption involving the Albanian Contract.

11.     On January 31, 2018, Muddy Waters responded to the Company's press release with an additional report, in which Muddy Waters reaffirmed its conclusion that OSI was "rotten to the core." Moreover, Muddy Waters questioned, in addition to a number of other points, the viability of the Albanian Contract in the absence of corruption (report available at: http://www.muddywatersresearch.com/research/).

12.     On the following day, February 1, 2018, OSI announced in a Form 8-K filing that the SEC had commenced an investigation into the Company's compliance with the Foreign Corrupt Practices Act ("FCPA"). The United States Attorney's Office for the Central District of California also stated that it intended to request information related to the Company's compliance with the FCPA. Both federal investigations were in response to the Muddy Waters reports.

13.     In a February 1, 2018 Form 8-K filing, the Company also announced that both the SEC and the Department of Justice were investigating trading in the

Company's securities and that, "[i]n relation to the matters that are the subject of the trading-related investigation, the Company has taken action with respect to a senior-level employee."

14.    The investing public reacted swiftly and severely to all this news. The Company's stock (traded on the New York Stock Exchange) closed at $84.07 on December 5, 2017. The next day, following the publication of the first Muddy Waters report, the stock closed at $59.52 on very heavy volume. The stock price also dropped approximately $12.00 per share on the news of the government investigations on February 1, 2018.

15.    Stunningly, following the widespread news of the corrupt Albanian Contract, the Board acted to significantly increase the compensation of OSI's CEO, founder and Chairman, Deepak Chopra. As reported in the Company's Form 10-Q for the first quarter of 2018: "On December 31, 2017, we and Deepak Chopra, our Chief Executive Officer, entered into an amendment to Mr. Chopra's employment agreement that, among other things, provides for a $13.5 million bonus payment to Mr. Chopra on or within 45 days of January 1, 2024 contingent upon Mr. Chopra's continued employment with us through that date, subject to accelerated payout terms in the event of Mr. Chopra's death or disability after January 1, 2019. The bonus is recorded in the financial statements over the remaining term of the employment agreement."

16.    This award to Chopra, timed soon after the publication of the Muddy Waters report, is particularly troublesome given the Company's history of poor corporate governance. A significant portion of the Company's revenues over the years has resulted from contracts with the U.S. government. Yet the Company has been accused over the years of defrauding the U.S. government in connection with these contracts. The U.S. government threatened the Company with "debarment" and terminated a $67.1 million contract after concluding that for the period between 2010 and 2013, OSI's wholly-owned subsidiary, Rapiscan Systems, "provided false or misleading information to the Government."

17.     The Company's troubles with the government also resulted in a 30-month Administrative Agreement ("Administrative Agreement") between OSI and the government in June 2013, pursuant to which, among other things, the Company undertook specific corporate governance changes. In addition to the federal securities class action consolidated under *Longo v. OSI Systems, Inc., et al*., Case No. 2:17-CV-08841, an earlier derivative lawsuit, prosecuted by Plaintiff Kocen (among others) in this federal district resulted in a settlement that was finally approved on May 2, 2017 (*In Re: OSI Systems, Inc. Derivative Litigation*, 14-cv-02910-MWF) ("Derivative Settlement"). The Derivative Settlement mandated that OSI undertake remedial corporate governance changes. As described more fully herein, the breaches by OSI's Board and senior officers in failing to provide board-level oversight of the Company's compliance with the law in connection with the Albanian Contract are in violation of Delaware law, the terms of the Administrative Agreement with the U.S. government, and the terms of the Derivative Settlement.

18.     On January 11, 2018, Plaintiff Kocen made a books and records demand to the Company pursuant to 8 *Del. C.* § 220 ("Demand"), seeking to obtain documents related to the Albanian Contract. Plaintiff's investigation included numerous follow up requests to the Company.

19.     OSI produced more than 1,200 pages of documents responsive to the Demand on March 16, 2018, April 6, 2018, June 7, 2018, July 28, 2018, August 17, 2018 and August 31, 2018.

20.     The documents produced pursuant to the Demand demonstrate a complete lack of supervision by OSI's Board and a breach of the Board's fiduciary duties.

## JURISDICTION AND VENUE

21.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (i) one or more of the Defendants either resides or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) Defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES AND OTHER PERSONS

### A.     Plaintiffs

24.     Plaintiff Jeffery Kocen has owned OSI common stock continuously since January 2001. Plaintiff Kocen is a citizen of Kansas.

25.     Plaintiff Michael Riley has owned OSI common stock continuously since January 2016.  Plaintiff Riley is a citizen of North Carolina.

### B.     Nominal Defendant

26.     Nominal Defendant OSI Systems, Inc. is a Delaware corporation with its principal executive offices located in Hawthorne, California.

### C.     Executive and Director Defendants

27.     Defendant Deepak Chopra ("Chopra") is a founder of OSI, and has been an OSI director since 1987, and Chairman of OSI's Board since 1992. Chopra also serves as President and Chief Executive Officer ("CEO") of OSI, as well as of many of OSI's subsidiaries. In these roles, Chopra certified and signed the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017; and the Company's Form 10-Qs, including

6

1 | those filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014,
2 | January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016,
3 | October 31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017. Defendant
4 | Chopra is a citizen of California.

5 | 28. Defendant Ajay Mehra ("Mehra") has been a member of OSI's Board
6 | since March 1996. Mehra is OSI's Executive Vice President, and President of OSI
7 | Solutions Business. Mehra currently serves as the President of S2 Global – a position
8 | held since 2014. From 1998 to 2015, Mehra was the President of OSI's Security
9 | division. Mehra also served as President of OSI's subsidiary, Rapiscan Systems, from
10 | September of 2007 until his removal in August of 2014. Prior to serving as Executive
11 | Vice President of OSI, Mehra was the Company's CFO from November 1992 through
12 | November 2002. Mehra signed the Company's Form 10-Ks, including those filed on
13 | August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September
14 | 7, 2017. Mehra reported to Defendant Chopra and is Chopra's first cousin. Defendant
15 | Mehra is a citizen of California.

16 | 29. Defendant William F. Ballhaus ("Ballhaus") has served as a director of
17 | the Board since May 2010. Ballhaus is a member of the following OSI Board
18 | Committees: Audit, Nominating and Governance, Compensation and Benefits,
19 | Technology (Chair) and Risk Management. Ballhaus is a citizen of California.

20 | 30. Defendant Gerald Chizever ("Chizever") has served as a director of the
21 | Board since October 2016. Chizever is a member of the following OSI Board
22 | Committees: Technology and Risk Management. Chizever is a citizen of California.

23 | 31. Defendant Steven C. Good ("Good") has served as a director of the Board
24 | since September 1987, shortly after the Company was founded. Defendant Good was
25 | an initial investor in the Company. Defendant Good is Chairman of OSI's Audit
26 | Committee, and a member of OSI's Compensation and Benefits and Risk Management
27 | Committees. Defendant Good is a citizen of California.

28 | 32. Defendant James B. Hawkins ("Hawkins") has served as a director of the

7

1  Board since December 2015. Hawkins is a member of the following OSI Board
2  Committees: Audit, Nominating and Governance (Chair) and Technology. Defendant
3  Hawkins is a citizen of California.

4      33.    Defendant Meyer Luskin ("Luskin") has served as a director of the Board
5  since February 1990. Luskin is a member of the following OSI Board Committees:
6  Audit, Compensation and Benefits (Chair) and Risk Management. Luskin is a citizen
7  of California.

8      34.    Defendant Dr. David T. Feinberg ("Feinberg") is a former OSI director
9  and served from March 2010 until December 8, 2015. Feinberg was Chairman of OSI's
10 Nominating and Governance Committee and a member of the Technology Committee.
11 Feinberg is a citizen of California.

12     35.    Defendants Chopra, Mehra, Ballhaus, Chizever, Good, Hawkins, Luskin
13 and Feinberg are collectively referred to as the "Director Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.    BACKGROUND**

16     36.    OSI's business comprises primarily three divisions: (i) Security;
17 (ii) Healthcare; and (iii) Optoelectronics and Manufacturing. The largest and most
18 important division is the Security division, which represented approximately 50% of
19 the Company's net revenues between 2013 and 2017. OSI's Chief Financial Officer
20 Alan Edrick ("Edrick") described OSI's Security business as "our biggest business."

21     37.    OSI's Security division consists of two segments: (i) Rapiscan, which
22 designs, manufactures, and markets, and sells security inspection systems; and (ii) S2,
23 which provides what the Company calls "turnkey security screening solutions."

24     38.    Historically, OSI focused on its Rapiscan equipment business, which
25 includes systems for baggage and parcel inspection, cargo and vehicle inspection,
26 checked baggage screening, people screening, and radiation detection. The products
27 are used for security purposes at locations such as airports, border crossings, shipping
28 ports, military and other government installations, and freight forwarding facilities. In

addition to equipment sales, Rapiscan also generated revenues by providing "aftermarket support," including the sale of spare parts and maintenance services.

39. Rapiscan's largest and most important customer was the U.S. government, including the Department of Homeland Security ("DHS") and the Transportation Security Administration ("TSA"). These government entities purchased OSI's security and inspection systems for use at airports, border crossings, shipping ports, military installations, and other locations.

40. As OSI disclosed in its Forms 10-K filed between 2009 and 2013, "[t]he U.S. government currently plays an important role in funding the development of certain of our security and inspection systems and sponsoring their deployment at airports, ports, military installations and border crossings." Indeed, between 2009 and December 2013, OSI was reported to have received $463 million in U.S. government contracts, or nearly a third of the Security division's total reported net revenue for the same period.[1]

## A. OSI Is Accused of Defrauding the U.S. Government Resulting in Losses Of Lucrative Government Contracts

41. Under Defendant Mehra's tenure as President of Rapiscan, Rapiscan's relationship with the U.S. government deteriorated. Between 2009 and 2013, Rapiscan was accused of two separate schemes to mislead the government. These scandals led to the cancellation of multi-million dollar contracts with the U.S. government, subjected the Company to heightened scrutiny, and caused Rapiscan to lose market share.

42. First, Rapiscan manipulated test results in connection with a $173 million contract awarded by the TSA in 2009 for "whole-body imaging" scanners to be used for security screening in U.S. airports (the "2009 Contract"). In November 2012, the

---

[1]     Bloomberg, "OSI Tumbles on Possible Contract Bank for Chinese Parts" (December 9, 2013).

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  TSA issued a show cause letter alleging that Rapiscan manipulated test results in order
2  to conceal issues it discovered during the development of body scanners under the 2009
3  Contract.

4       43.    On January 17, 2013, OSI announced that the TSA had cancelled the $173
5  million 2009 Contract with Rapiscan. In May 2013, OSI announced that the DHS had
6  issued a "Notice of Proposed Debarment" resulting from the Company's attempt to
7  defraud the TSA. The Notice of Proposed Debarment claimed that "Rapiscan failed to
8  disclose a defect with the Products and replaced hardware in the Products without being
9  granted proper governmental approval." The Notice of Debarment proposed
10  prohibiting Rapiscan from doing any future business with the U.S. government.

11       44.    Shortly thereafter, Rapiscan was accused of fraud in connection with a
12  $325 million contract awarded in 2010 by the TSA for checkpoint baggage and parcel
13  scanners (the "2010 Contract"). On November 20, 2013, for the second time in a year,
14  the TSA issued another show cause letter regarding Rapiscan's use of unapproved
15  components for the scanners, concluding that Rapiscan "provided false or misleading
16  information to the Government," which "was a sufficient independent basis for TSA to
17  terminate" the contract. On December 4, 2013, the TSA canceled the 2010 Contract.
18  OSI issued a press release admitting that the component change "did not meet the
19  contractual requirement of obtaining TSA's approval in advance."

20      **B.**    **Despite the Scandals with the U.S. Government Under Mehra's**
21              **Leadership, Mehra Is Promoted**

22       45.    The Company's scandals with the U.S. government were a serious threat
23  to OSI's business. If debarred, OSI would no longer be able to obtain contracts from
24  the U.S. government, jeopardizing hundreds of millions of dollars in Company
25  revenue. To avoid this outcome, OSI made several concessions to the U.S. government,
26  including the removal of Defendant Mehra as President of Rapiscan and the imposition
27  of extensive compliance requirements.

28

46.     Although Mehra was removed from Rapiscan, he remained at OSI and was promoted to President of S2 Global, where Mehra would oversee the Company's turnkey solutions business. Edrick called the Company's turnkey business model "one of the most exciting areas within our Security business[,]" an area that "really significantly transformed our overall financial [situation]," the "number one" "biggest growth opportunit[y] for us in Security" and "a tremendous opportunity for us." In short, rather than terminating Mehra for the fraudulent schemes that occurred under his tenure as Rapiscan's President, OSI put him in charge of the turnkey solutions business, which the Company told investors was going to fill the revenue hole and credibility gap created by those schemes.

## C.     OSI's Troubles Following the U.S. Government Scandals

47.     As a result of the scandals involving OSI's U.S. government contracts, OSI entered into the 30-month Administrative Agreement with the DHS, under which the Company agreed to certain compliance upgrades and organizational improvements, made certain personnel changes, and created additional positions dedicated to compliance and quality assurance.

48.     Specifically, the Administrative Agreement required Rapiscan to "maintain a self-governance program that includes compliance programs for internal controls, designed for the effective monitoring and auditing of contracts and grants, and a business ethics program that covers all employees." It also required Rapiscan to "maintain a robust and functional program that includes business ethics compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency." Additionally, the reporting requirements required that Rapiscan "submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with [the] Agreement."

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

49.     At the same time that it entered into the Administrative Agreement, OSI was facing severe business troubles.

50.     First, the Company's body scanners were losing their competitive edge and market share, and becoming backlogged. As Edrick summarized, "So if you go back for our last four, five conference calls, we've been telling everybody about body scanners we haven't sold any units over the last two years. So the great growth that we had in Security in 2011 and 2012 lot of people thought it came from body scanners. It didn't, we didn't sell any units in those periods. And we said further that we don't expect to be selling any body scanners to the TSA going forward."

51.     Second, the U.S. government problems threatened OSI's reputation and sales, including future U.S. government contracts. For example, Oppenheimer commented that "[t]he risk is that the probe metastasizes into something bigger, threatening Rapiscan's reputation, broader TSA business (estimated at 5-10% of revenue), and US certification of the new RTT product." Likewise, Stephens reported that "[t]he greater concern … is the reputational harm caused by the missteps with the TSA, which is strong reference customer for international sales efforts. That reputational impact will be difficult and take time to assess."

52.     Third, Rapiscan's TSA contracts had been procured under a temporary stimulus package that was set to expire. Specifically, in the aftermath of the 2008- 2009 financial crisis, Congress enacted the American Recovery and Reinvestment Act of 2009 to provide temporary stimulus funding for government agencies, including the DHS, who purchased security equipment from Rapiscan.

**D.     OSI Attempts to Revitalize Its Business and Regain Credibility by Touting Its "Turnkey Security Screening Solutions"**

53.     Having suffered from the government scandals and the downturn in business, OSI realized that it needed to reduce its dependence on U.S. government contracts and regain the market's confidence. Accordingly, Defendants began to shift investors' focus to the Company's new "turnkey security screening solutions" business

1  model, which would purportedly "transform the Company," and provide future growth
2  and more consistent revenues.

3      54.    Edrick described this shift at a February 26, 2013 Morgan Stanley
4  Technology, Media & Telecom Conference, stating: "[o]ne of the areas that we've
5  really been trying to grow is our turnkey business." Likewise, at the June 4, 2013
6  Stephens Spring Investment Conference, Edrick touted that the Company's Security
7  business "has been growing significantly and we've been transforming our business
8  model … with some new turnkey services, which has led to some significant operating
9  margin expansion, not only within the Security division but all of OSI."

10      55.    According to Defendants, the turnkey model, sold through the Company's
11  S2 Global subsidiary, differed from OSI's traditional equipment sales business. Under
12  OSI's traditional model, OSI sold security equipment to a customer, who then owned
13  the equipment. However, under the turnkey model, OSI continued to own the security
14  equipment and the customer paid a subscription or pay-as-you-go plan such as a per
15  scan fee. OSI then presented the customer with a number of add-on services, including
16  design and construction of the security checkpoint site(s), installation of the equipment
17  at the site(s), selecting, training, and managing the personnel operating the site(s),
18  operation of the equipment, and maintenance and security of the site(s).

19      56.    Defendants emphasized that the turnkey model was the Company's most
20  critical business opportunity. As Edrick stated at the March 11, 2014 ROTH Capital
21  Partners Conference (the "March 11, 2014 Conference"), "Turnkey … we view it as
22  perhaps our largest growth opportunity." Likewise, at a May 14, 2014 Oppenheimer
23  Industrials Conference, Edrick stated, "[I]f you look at the Security business, I'd say
24  the three biggest growth opportunities for us in Security would be, number one would
25  be Turnkey. That's a tremendous opportunity for us."

26      57.    Additionally, Defendants repeatedly touted OSI as a "pioneer" in the
27  turnkey industry, being the first of its competitors to offer the service and the only
28  Company in the world to obtain three such contracts. Defendants consistently boasted

1  that the Company had "100% market share" of the turnkey security business. For

2  example, at a Jefferies Global Industrials Conference on August 14, 2014, Edrick

3  stated: "[T]here have been three contracts awarded in the world. So, right now, we're

4  batting a thousand, and we think that first mover advantage is going to lead to

5  substantial capturing of future business going forward …."

6        58.    In addition to assuring the market that the Company's turnkey business

7  would drive growth, Defendants also boasted that the turnkey model had numerous

8  purported advantages that would result in a strategic edge over OSI's competitors. For

9  instance, Defendants repeatedly emphasized that turnkey contracts generate higher

10  profit margins than standard equipment contracts for the Company. At the March 11,

11  2014 Conference, Edrick stated that "[t]he new turnkey revenues is really an exciting

12  business model in order to have recurring revenues as substantially higher margins

13  makes a big impact for us and gives us a great deal of visibility as we look forward."

14  Defendants also claimed that the turnkey contracts would provide a consistent long-

15  term and recurring revenue stream. As Edrick stated during a February 8, 2017

16  conference, the turnkey model "has been extraordinarily successful for us…. It's a nice

17  revenue, higher margin business for us of a recurring nature."

18        59.    To convince the market that the turnkey model would drive growth at OSI,

19  Defendants had to show that foreign governments were willing to pay higher fees for

20  long term service contracts, as opposed to simply buying the equipment and running it

21  themselves (which was far cheaper). However, the Company had only booked a total

22  of two turnkey contracts in Mexico and Puerto Rico and had not announced a new

23  major turnkey deal since 2012. Unsurprisingly, analysts repeatedly questioned the

24  Company about the timing of the next big turnkey contract.

25

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## II.    THE ALBANIAN CONTRACT

### A.    OSI Announces The Albanian Contract As Proof Of The Turnkey Business Model's Success

60.    Against this background, on August 21, 2013, OSI announced in a press release entitled, "*OSI Systems Receives a Fifteen-Year Agreement to Provide Turnkey Screening Services in Albania*," that "the Government of Albania has awarded its Security Division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country." The Company further stated: "The Company currently anticipates that total gross revenues may range from $150 million - $250 million over the term of the agreement. Actual revenues could differ significantly from the range provided as the generation of revenue is based upon the volume of cargo and other factors."

61.    Defendants hailed the deal as proof that the Company's turnkey model was a success. For instance, in the August 21, 2013 press release, Defendant Chopra stated: "This significant award from Albania to provide turnkey screening services builds upon similar long-term agreements awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services continues to be well received in the marketplace."

62.    In the same press release, Defendant Mehra stated that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud to have been selected to execute this critical program. Our selection reinforces the attractiveness and compelling value of our turnkey service model."

63.    At the Company's January 28, 2014 conference call for the second quarter of fiscal year 2014 ("2Q14") (the "January 28, 2014 Conference Call"), Edrick highlighted that the Albanian Contract validated the turnkey model: "Although this

new 15-year contract is not expected to contribute much to the top line in fiscal '14, we expect that it could contribute more substantially in fiscal '15 and beyond and further validates the increasing acceptance of this model in the global market for security screening solutions." Likewise, on the same call, Defendant Chopra boasted: "[a]fter winning the new turnkey services contract earlier this year in Albania, we have clearly established our leadership in growing this particular service segment[.]."On March 4, 2014, Edrick stated that the turnkey model provided the Company with a "first-mover advantage" over competitors.

**B.     The Albanian Contract Was Procured By Corruption**

64.     According to a May 10, 2013 Official Gazette of the government of Albania (the "May 10, 2013 Official Gazette"), the Albanian government issued a request for proposal for the Albanian Contract in 2012. However, OSI had been pursuing the Albanian Contract since at least late 2011 when Albania was governed by the Democratic Party, led by then-Prime Minister Sali Berisha ("Berisha"). Almost immediately, OSI began receiving favorable treatment from Albania's government.

65.     For example, on November 11, 2011, Berisha's government granted OSI an 8% bonus on its bid – thereby giving OSI a significant advantage against any potential competitors. Specifically, a decision of the Council of Ministers of the government of Albania signed by Berisha awarded a "bonus of 8% for the technical and financial result in the procedure selective bidding (unsolicited proposal)."

66.     Further, although OSI originally proposed a €32 scanning fee, the Democratic government inexplicably awarded Rapiscan a contract with a €39 scanning fee, and agreed to pay the scanning fee to OSI for all customs declarations, even if OSI did not actually scan them.

67.     The Albanian Contract was awarded at a time of political upheaval in Albania. In June 2013, the opposition Socialist Party won the majority of seats in the Albanian parliament. However, in August 2013, Berisha of the Democratic Party was

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    still the Albanian Prime Minister. It was not until September 2013 that the Socialist

2    Party and its partners selected a new Prime Minister, replacing the old government.

3        68.    According to the May 10, 2013 Official Gazette, the Albanian Contract

4    was officially entered into on April 10, 2013 for the financing, establishment, and

5    operation of scanning services for containers and other vehicles. News reports indicate

6    that the contract was signed by Jonathan Fleming, then-President of S2 Global, and by

7    then-Minister of Finance, Ridvan Bode ("Bode"), a member of the Albanian

8    Democratic Party.

9        69.    The government of Albania required OSI to form an Albanian subsidiary

10   to own all rights and obligations of the concession. Accordingly, on March 19, 2013,

11   OSI formed a company, S2 Albania SHPK ("S2 Albania"). OSI's wholly-owned

12   subsidiary, Rapiscan, held the shares in S2 Albania.

13       70.    On September 6, 2013, Defendant Mehra authorized an unannounced

14   transfer of 49% of OSI's interest in S2 Albania to an Albanian holding company called

15   Inspection Control & Measuring Systems SHPK ("ICMS"), which was owned by an

16   Albanian dentist named Olti Peçini ("Peçini") for consideration of less than $5.00.

17   Specifically, on September 6, 2013, Mehra signed a Power of Attorney in Los Angeles

18   explicitly authorizing an Albanian attorney named Endrit Shijaku ("Shijaku") to "carry

19   out the [] sale" of S2 Albania to ICMS "for 490 Albanian lekë" (the equivalent of

20   $4.50), sign the contract transferring 49% of S2 Albania to ICMS, and execute any

21   necessary steps to complete the sale.

22       71.    Peçini had no reported experience in the security industry. However,

23   Peçini was connected with the outgoing Albanian Prime Minister Berisha, who is also

24   a doctor. According to a January 14, 2012 press release by the Albanian Council of

25   Ministers, entitled "PM Berisha attends inauguration of Italian-Albanian SALUS

26   hospital," Berisha attended and spoke at the inauguration of the Salus Hospital, which

27   was founded by Peçini.

28       72.    According to S2 Albania's Historical Register, on September 19, 2013,

1  OSI completed the transfer of the 49% ownership in S2 Albania. At the time of the

2  transfer, ICMS's sole shareholder was Peçini.

3      73.   Albanian records also show that ICMS had little or no business other than

4  its ownership interest in S2 Albania.

5      74.   Although Peçini only paid $4.50 for a 49% stake in the lucrative S2

6  Albania, he used his stake to immediately secure a €1.9 million loan. According to a

7  Pledge Agreement dated December 7, 2013, Peçini pledged 49% of ICMS's shares for

8  a €1.9 million loan from the National Bank of Commerce sh.a.

9      75.   Meanwhile, in June 2013, Berisha's party lost power and began

10  transitioning to a new administration. Once Berisha departed from office, the newly-

11  elected government denounced the Albanian Contract. In fact, the Albanian

12  Competition Authority at first recommended revision of the contract. The business

13  community was also opposed to the contract due to the extremely high service fee. As

14  was later reported by the *Monitor*, an Albanian language publication, the new

15  government of Albania refused to implement the contract and attempted to terminate

16  it.[2] The reaction in Albania was scathing. A July 7, 2015, Pamfleti Online article called

17  the Albanian Contract a "Mafia of scanning concession," while Ora News published in

18  Albanian a television news program called "Rapiscan, Theft of the Century" referring

19  to the Albanian Contract.

20      **C.   OSI Conceals The Problems Concerning The Albanian Contract**

21      76.   By August 2014, OSI's troubles in Albania were still entirely unknown in

22  the United States. On August 27, 2014, Defendants cryptically informed investors of

23  the Albanian government's decision to suspend the contract. OSI's Form 10-K for

24  fiscal year 2014 stated that, "in August 2013, we announced a 15-year contract award

25  from the Government of Albania to provide turnkey cargo and vehicle screening

26  services at various sites throughout the country. We were recently notified that the

27  _____

28  [2]   *See* "New 'Tax' on Customs," *Monitor*, July 13, 2015.

Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights." Defendants did not mention the corrupt circumstances in which OSI won the Albanian Contract or of the secret arrangement with ICMS and Peçini.

77.     In 2014, OSI sought to enforce the Albanian Contract and filed for arbitration in Vienna seeking compensation in the amount of $359 million.

78.     On April 28, 2015, OSI and the government of Albania reached a settlement of the arbitration regarding the Albanian Contract (to be effective on October 31, 2015) on terms less favorable to OSI and more favorable to the government of Albania. The value of the renegotiated Albanian Contract now contemplated a decrease of more than 100 million euros in projected revenue to OSI compared with the previously negotiated contract.

79.     Under the renegotiated contract, OSI's payment terms were contingent on the amount of each customs declaration. For example, for all customs declarations over 1,000 euros, OSI would be paid a scanning fee of 22 euros – *i.e.*, 17 euros or approximately 44% less than the fee in the original contract. Moreover, for customs declarations under 1,000 euros, Albania would charge a fee of 5 euros.  On June 5, 2015, the Council of Ministers of Albania submitted the renegotiated concession to the Albanian Assembly, and stated that the value of the contract had been reduced from approximately 316 million euros to 210 million euros, a difference of 106 million euros.[3]

80.     The Company, however, was silent as to the turmoil surrounding the implementation of its previously highly-touted Albanian Contract. As a result, investors were led to believe that the Albanian Contract, announced with great fanfare in a press release in August 2013, was steadily progressing.

81.     OSI did not disclose to investors the material information regarding its

---

[3]     *Pamfleti*, "The scan concession crashes Ball with Berisha" (December 12, 2017).

1   procurement of the Albanian Contract or the material change in terms resulting from
2   the arbitration. For example, in June 2014, the Company stated that, "in Albania,[ ] the
3   construction is ongoing, which is our latest deal, as well as the equipment." In late
4   August 2014, Defendants disclosed that the Government of Albania was "halting
5   further progress" of the turnkey contract, but continued to knowingly conceal the true
6   facts and corrupt history of the turnkey contract, including the 49% transfer and profit-
7   sharing agreement with ICMS.

8       82.    When Defendants announced the reinstatement of the Albanian deal,
9   Defendants continued to mislead investors and deliberately conceal the secret
10  arrangement with ICMS and the corruption underlying the contract. For example, on
11  October 13, 2015, OSI issued a press release announcing that "the Company has
12  commenced the operations phase with the Government of Albania to provide turnkey
13  cargo and vehicle security screening services at multiple sites throughout the country.
14  The Company currently anticipates total revenues to be approximately €200 million
15  over the multi-year term of the agreement."

16      83.    Similarly, during an October 29, 2015 conference call, Edrick stated:
17  "Albania we expect to be fully ramped during the course of this fiscal year. It's moving
18  up at a nice pace and we think will enter fiscal 2017 at a full ramp rate. So we are very
19  pleased with the progress that we are making in Albania." Edrick highlighted that the
20  Albanian contract was worth $10-$15 million a year, stating: "We also note that
21  Albania is expected to ramp in FQ3'16 (March). This contract is expected to generate
22  $10M-$15M in recurring annual revenue."

23      84.    Defendants also went to great lengths to conceal their joint venture with
24  ICMS from investors. This was reflected in the offering documents for the Company's
25  issuance of $250 million in OSI Bonds. In Exhibit 1.1 to the Purchase Agreement for
26  the notes, OSI explicitly represented that it fully owned all of the shares of each
27  subsidiary, stating:

28          Except as otherwise disclosed in the General Disclosure Package

20

and the Final Offering Memorandum, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable and is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity. None of the outstanding shares of capital stock of any Subsidiary was issued in violation of the preemptive or similar rights of any securityholder of such Subsidiary…. The only Subsidiaries of the Company are the subsidiaries listed on Schedule D hereto.

85.    Schedule D of the Purchase agreement listed S2 Albania as a wholly owned "Subsidiary." Nowhere in the Purchase Agreement did OSI disclose anything about the secret arrangement with ICMS or its 49% interest and profit-sharing rights in S2 Albania.

**D.    The Truth Emerges Regarding The Albanian Contract**

86.    On December 6, 2017, Muddy Waters issued a report that cited its independent research, finding that "[w]e believe [OSI] obtained a major turnkey contract in Albania through corruption." Muddy Waters stated that, "[i]t appears to us that [OSI's] accounts do not reflect the transfer [of 49% of OSI's project company]– there are no deductions for non-controlling interests in the income statement, and February 2017 bond offering documents appear to show the subsidiary as 100% owned by [OSI]." Muddy Waters concluded that OSI was "rotten to the core."

87.    The Muddy Waters report contained translations from previously undisclosed Albanian reports referring to the Albanian Contract as the "theft of the century."

88.    On December 6, 2017, OSI issued a press release responding to the Muddy Waters report. OSI stated that its Albanian Contract was the result of a "public tender." The Company also stated that its Albanian turnkey security program was run in partnership with a local company, ICMS, and that significant capital contributions had been made. At no time did OSI deny any of the allegations of corruption.

89.     On January 31, 2018, Muddy Waters responded to OSI's December 6, 2017 press release with another published report. In that report, Muddy Waters reiterated its conclusions of corruption in connection with the Albanian Contract. The January 31, 2018 Muddy Waters report cited further evidence that ICMS was a farce, noting that, at the end of 2015, ICMS had "$1,300 cash," "zero inventory," "$20,000 in plant and machinery," and "office equipment of just $514".

90.     The next day, on February 1, 2018, OSI announced that both the SEC and the U.S. Department of Justice were investigating OSI in connection with the allegations set forth by Muddy Waters.  While the government has informed OSI that the investigation is no longer being pursued (*see* OSI Press Release, *OSI Systems Notified That U.S. DOJ and SEC FCPA Inquiries Have Been Closed* (June 5, 2019), available at: https://investors.osi-systems.com/news-releases/news-release-details/osi-systems-notified-us-doj-and-sec-fcpa-inquiries), the significance of the government opening the investigation cannot be denied.  Pursuant to guidelines, the government will only open an investigation under certain limited circumstances.  The opening of an investigation is often considered a material event requiring disclosure by a public company.  On the other hand, the closing of an investigation does not indicate there was no wrongdoing.  The government closes investigations regularly for reasons that often have nothing to do with guilt or innocence.  In fact, the perpetrator of the largest securities fraud in U.S. history, Bernie Madoff, is serving a life sentence following the closing of a government investigation.

## III.   FIDUCIARY DUTIES OF THE DEFENDANTS

### A.  Defendants' Duty Under *Caremark*

91.     By reason of their positions as officers, directors, and fiduciaries of OSI and because of their ability to control the business and corporate affairs of OSI, Defendants at all relevant times owed fiduciary duties to OSI and its stockholders, including the duties of care, loyalty and good faith.

92.     Under *In re Caremark Int'l Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996) and its progeny, a board of directors of a Delaware corporation, as well as its officers, have the specific fiduciary duty to: (a) implement an information reporting system and controls; and (b) oversee and monitor the operations of that information and reporting system.

93.     Under the first prong of *Caremark*, the board of directors must make a good faith effort to put in place a reasonable board-level system of monitoring and reporting about the corporation's central compliance risks.[4]

94.     Under the second prong of *Caremark*, directors and officers breach their fiduciary duty of loyalty if, having implemented a reporting and information system and controls, they consciously fail to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention.[5]

95.     The *Caremark* duty is especially heightened with respect to the monitoring of fraudulent and criminal conduct, as opposed to other, more general business risks. As the Delaware Court of Chancery has stated, "Directors should, indeed must under Delaware law, ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct."[6] More recently, the court stated that "imposing *Caremark-type* duties on directors to monitor business risk is fundamentally different from imposing on directors a duty to monitor fraud and illegal activity."[7]

---

[4]     *Marchand v. Barnhill*, No. 533, 2018, 2019 Del. LEXIS 310, at *36 (Del. 2019).

[5]     *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[6]     *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009).

[7]     *In re Goldman Sachs Group, Inc. S'holder Litig.*, No. 5215-VCG, 2011 Del. Ch. LEXIS 151, at *72 (Del. Ch. Oct. 12, 2011) (internal quotation omitted), *cited in Reiter v. Fairbank*, No. 11693-CB, 2016 Del. Ch. LEXIS 158, at *23 (Del. Ch. Oct. 18, 2016).

96.     Here, one of the central (indeed, "mission critical") risks that OSI faced was non-compliance with legal and regulatory requirements regarding the procurement of government contracts. Defendants were well aware that OSI was at a heightened risk for running afoul of these requirements because the Company had previously been accused of committing fraud in connection with its government contracts.

97.     As set forth in greater detail herein, Defendants breached their fiduciary duty under *Caremark* by failing to **implement a board-level system of monitoring and reporting** about the Company's central compliance risks. Alternatively, to the extent there was any such Board-level monitoring and reporting system, Defendants breached their fiduciary duty by failing to **oversee and monitor** the Company's information and reporting systems, thereby disabling themselves from being informed of the non-compliance and fraudulent/unlawful practices and mission critical compliance risks of the Albanian Contract.

98.     For example, despite the fact that the June 21, 2013 Administrative Agreement with the Department of Homeland Security ("DHS") required the OSI Audit Committee to be "responsible for overseeing the OSI compliance functions and promoting communication with the other board members," there was no discussion in the Audit Committee meeting notes of FCPA or DHS compliance until October 28, 2015 and, even then, there was no discussion of the Albanian Contract. After this meeting, there was no further Audit Committee discussion of FCPA or DHS compliance until April 21, 2016 and, again, there was no discussion of the Albanian Contract.

99.     Moreover, none of the meetings of the full Board of Directors addressed the mission critical Albanian Contract compliance risks.

100.    The Board thus disabled itself from being informed of the compliance risks and red flags of problems requiring their attention, including events such as: (i) the transfer, authorized by Defendant Mehra, of 49% of OSI's interest in S2 to the Albanian holding company ICMS, owned by an Albanian dentist Peçini, for

consideration of less than $5.00; (ii) the joint venture and profit-sharing agreement with ICMS; (iii) the recommendation by the Albanian Competition Authority for the revision of the contract; and (iv) the new Albanian government's refusal to implement the contract and attempt to unilaterally terminate it.

101.   As alleged herein, Defendants owed very specific responsibilities to implement and then monitor their information and reporting systems for fraudulent and criminal conduct, and to ensure that the Company complied with all legal and regulatory requirements. Moreover, these responsibilities indisputably were known by Defendants. By failing to act in the face of a known duty to act, and by demonstrating a conscious disregard for their responsibilities, Defendants failed to act in good faith and breached their fiduciary duty of loyalty.

**B.     Specific, Additional Duties of The Audit Committee**

102.   At all relevant times, Defendants Good, Luskin, Hawkins and Ballhaus were members of OSI's Audit Committee.

103.   According to the Audit Committee Charter, "the Committee will assist the Board in fulfilling its oversight responsibilities with respect to: (i) the annual and quarterly financial information to be provided to stockholders and the SEC; (ii) the system of internal controls that management has established; and (iii) the internal and external audit process."

**C.     Specific, Additional Duties of The Risk Management Committee**

104.   At various pertinent times hereto, Defendants Ballhaus, Chizever, Good and Luskin were members of OSI's Risk Management Committee.

105.   According to this Committee's Charter, "[t]he purpose of the Risk Management Committee … will be to assist the Board in its oversight of the Company's management of key risks, including strategic, operational, legal, regulatory, compliance, security, reputational and other risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks."

106.   Moreover, the Risk Management Committee's Charter also states: "[r]isk assessment and risk management are the responsibility of the Company's management. The Committee has an oversight role and, in fulfilling that role, it relies on the reviews and reports provided by Company management. The Committee shall have the authority, as it deems appropriate, to conduct investigations into any matters within its scope of responsibility and retain as needed any independent counsel, consultants and other outside experts or advisors as the Committee believes to be necessary or appropriate to perform its duties and responsibilities."

107.   Specifically, the Risk Management Committee's Charter also charges the Committee with responsibility to:

- Monitor all enterprise risks, with the understanding that certain specific responsibilities for risk oversight have been delegated to other Board committees.

- Coordinate with the other standing committees of the Board to assist such committees in their review of the Company's risks, the oversight of which has been delegated to them.

- Review with management, at least quarterly, (i) the Company's program for promoting and monitoring compliance with applicable legal and regulatory requirements, and (ii) the Company's major legal compliance risk exposures and the steps management has taken to monitor or mitigate such exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

- Assess the adequacy of the funding of the Company's ethics and compliance program.

- In conjunction with the Audit Committee, review for potential conflicts of interest and improprieties all related-party transactions in which the amount involved exceeds the pre-established threshold as set periodically by the Audit Committee.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Adopt and monitor a code of ethics for senior financial and other officers and provide for and review prompt disclosure to the public of any material change in, or waiver of, such code of ethics.
- Receive as and when appropriate, reports from the Company's internal audit function on the results of risk management reviews and assessments.
- Assess the adequacy and effectiveness of management's efforts to develop a Company-wide culture of transparency and integrity that supports risk awareness, escalation, and remediation, as appropriate.
- Monitor the processes used by management to address allegations of potential misconduct or unethical conduct and violations of Company policy (including the Company's Code of Ethics and Conduct).
- Review and assess the effectiveness of the Company's enterprise-wide risk assessment processes and recommend improvements, where appropriate.
- Monitor proxy advisory services and governance rating agencies (e.g., Institutional Shareholder Services and Glass Lewis) and their assessment of the Company's risk and make recommendations as appropriate to the Board.
- Review and approve the appointment or replacement of the Chief Ethics and Compliance Officer.
- Together with the Chief Executive Officer, develop and regularly assess the continuing appropriateness of a succession plan for the Company's Chief Executive Officer and, as applicable, the Company's other Executive Officers. Annually review the succession plan with the Board.
- Review risk-related disclosures in the Company's Securities and Exchange Commission filings.
- Maintain minutes or other records of meetings and activities of the Committee.

- Ensure Committee members receive ongoing education regarding risk management concepts, leading practices, and emerging risks.
- Review and reassess annually the Charter, structures, process and membership of the Committee.

**D.    Specific, Additional Duties Under OSI's Code of Ethics and Conduct**

108.    The Company revised its Code of Ethics and Conduct ("Code") in May 2016. The Code "contains [the] company's general guidelines and requirements for conducting business according to the highest ethical standards and best practices. This Code applies to employees, officers, and directors of OSI Systems, Inc. [ ] and our subsidiaries worldwide."

109.    The Code unambiguously states that "[o]beying the law is part of the foundation on which our ethical standards are built. You have an obligation to comply with every applicable local, regional, or national law or regulation in those jurisdictions in which we have a presence and operate our business. Violations of these laws can be extremely costly to us and can subject us (or you) to civil and criminal penalties."

110.    As to financial reporting, the Code provides that, "[a]s a publicly traded company, we are obligated to comply with applicable securities laws, regulations, and reporting requirements. Our corporate policy and these rules and regulations mandate that we report financial transactions accurately, completely, fairly, and in a timely and understandable manner. We will not tolerate inaccurate, incomplete, delayed, or falsified reporting. Employees who are involved with financial reporting are required to understand and comply with applicable accounting standards and laws. If you have any questions or concerns about our financial reports or disclosures, Speak Up."

111.    With regard to government contracting compliance, the Code states that "OSI is committed to compliance with U.S. and international government contracting. Business dealings with government customers often include additional regulatory and legal requirements. Employees involved in federal contracting processes (solicitation,

bids, proposals, contract and program management, operations, etc.) must: review and understand all applicable laws, regulations, and customer requirements associated with our bids, proposals, and contracts; provide timely, thorough, and accurate information in connection with our proposals, certifications, and representations; follow company protocol with regard to the review, approval, and signature of contract-related documents and processes; complete annual contracting compliance training, and; Speak Up and report any suspected misconduct or unethical conduct associated with a government contract or subcontract (including, but not limited to, overbilling the government, false information or claims, violation of law or statute, or other unethical behavior)."

112.   With respect to anti-corruption and anti-bribery, the Code states that "[w]e are firmly committed to complying with international anti-corruption and anti-bribery laws including the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K.  Bribery Act. OSI's Anti-Corruption Compliance (ACC) Policy strictly prohibits making, offering, promising, or authorizing a corrupt payment of money, or anything of value, to a government official or any other person in order to obtain or retain business, or to direct business, or to achieve any business-related objective. You are also prohibited from receiving a corrupt payment of money, or anything of value, in connection with your employment with our company. All employees are required to read and abide by our Anti-Corruption Compliance Policy, which places strict guidelines on extending gifts and entertainment, covering travel and accommodation expenses for third-parties, and interacting with OSI's business partners."

## E.   Specific, Additional Duties Under Regulatory and Shareholder Settlements

113.   OSI's repeated scandals with the U.S. government had serious implications for the Company. On May 17, 2013, DHS issued OSI with a Notice of Proposed Debarment and automatic suspension of Rapiscan that became effective on May 20, 2013. In addition to losing government contracts valued in the hundreds of

1    millions of dollars, a sustained debarment from the DHS would have prevented OSI

2    from contracting with the U.S. government in the future, jeopardizing hundreds of

3    millions of dollars in Company revenue.

4        114.   To avoid debarment, on June 21, 2013, the Company announced that its

5    subsidiaries, Rapiscan Systems, Inc. and Rapiscan Government Services, Inc., had

6    entered into a 30-month Administrative Agreement with the DHS whereby the

7    Company "agreed to certain compliance upgrades and organizational improvements,

8    including maintenance of a robust compliance program. Rapiscan has also made certain

9    personnel changes and has created additional positions dedicated to government

10   contracting compliance and administration, corporate compliance, and quality

11   assurance. Further, for the duration of the term of the Agreement, Rapiscan has agreed

12   to the continued review of its compliance and ethics program, including the retention

13   by Rapiscan of an independent consultant to perform semi-annual assessments of its

14   compliance policies, procedures, and practices. Rapiscan has also agreed to additional

15   DHS reporting requirements."

16       115.   The Administrative Agreement stated in relevant part:

17           Rapiscan agrees to maintain a self-governance program that includes
18           compliance programs for internal controls, designed for the effective
             monitoring and auditing of contracts and grants, and a business ethics
19           program that covers all employees. The business ethics program
             shall be maintained with the goal that Rapiscan and each of its
20           employees maintains the business honesty and integrity required of
             a government contractor and that Rapiscan operates in compliance
21           with all applicable laws, regulations, and the terms of any contract.
22           Rapiscan represents that the business ethics program includes the
             following components;
23

24           A. Rapiscan employees are subject to a Code of Ethics and Conduct
             (Code of Conduct). The Code of Conduct specifically addresses
25           ethical business practices; securities laws; antitrust and competition;
             anticorruption; export control; political activities; conflict of interest;
26           gifts and gratuities; employment laws; financial reporting; health and
27           safety; and reporting suspected violations of law or the Code of
             Conduct. This Code of Conduct includes a non-retaliation policy,
28

---

which prohibits retaliation against employees for reporting suspected violations of the Code. Rapiscan will provide to the DHS SDO a copy of the Code Ethics and Conduct within 30 days following the execution of this agreement.

116.   The Administrative Agreement also required Defendants to maintain "robust" compliance, ethics and monitoring programs that would be overseen by the Company's General Counsel under the direct supervision of Defendant Chopra:

4.   COMPLIANCE UPGRADES AND ORGANIZATIONAL IMPROVEMENTS:

Rapiscan has implemented and agrees to maintain a robust and functional program that includes business ethics, compliance programs, and internal controls to ensure that Rapiscan effectively monitors, audits, and communicates about its compliance and ethics obligations and its commitment to the highest standards of integrity and transparency.

Both prior to and in response to TSA's Show Cause Letter, Rapiscan took and will maintain the following measures:

…

B. Development of an OSI Systems ("OSI") wide corporate compliance program. Corporate Compliance directly reports to OSI's General Counsel, who has and will continue to directly report to the Chief Executive Officer of OSI. In accordance with the OSI Board Audit Committee Charter, the Audit Committee comprising independent directors are responsible for overseeing the OSI compliance functions and promoting communication with the other board members. OSI's Vice President, Internal Audit reports directly to OSI's Board, and is responsible for assessing the sufficiency and effectiveness of the company's compliance programs.

C. Created new position of Director, Corporate Compliance, with direct access to OSI's Board of Directors on compliance issues and related activities. Christopher Cook is Director of Corporate Compliance for OSI. . . . As Director of Corporate Compliance, Mr. Cook is responsible for, among other things;

1. Designing, implementing and monitoring the compliance program;

2. Reporting on a regular basis to the General Counsel;

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

3. Revising the compliance program periodically, as appropriate;

4. Developing, coordinating and participating in compliance training and education;

5. Ensuring that contractors and agents are aware of Company compliance requirements; and

6. Independently investigating and acting on compliance matters.

117.   As part of the Administrative Agreement, Defendants were also required to submit written reports to the federal government regarding the implementation of such changes. The agreement stated:

Semi-annually, Rapiscan shall submit a written report to DHS describing the measures taken by Rapiscan during the semi-annual period to implement the business ethics program and to ensure compliance with this Agreement. The reports shall be submitted in time to be received by the DHS SDO within 20 days of the end of the semiannual period. The final report shall be presented to the DHS SDO no later than one month prior to the final day of this Agreement. The reports shall include the following:

A. Any standards of conduct, ethics, or compliance training conducted, subject matter covered, and the number and types of people that attended;

B. Information notifications or initiatives related to the business ethics program;

C. Information required by the terms of this Agreement;

D. The initiation of and status of any ongoing investigation or legal proceedings involving Rapiscan related to the facts described herein;

E. A statement by the Rapiscan verifying that the Code of Business Ethics and Conduct is being maintained; and

F. A statement of any problems or weaknesses identified through the Ethics and Business conduct process, corrective action proposed or initiated, and the status of any corrected action.

118.   As a result of the Administrative Agreement, Defendants were required to monitor its contracts – including the centrally important turnkey Albanian Contract— for any compliance, ethics, or legal issues.

119.   Moreover, in settling the prior derivative litigation, OSI undertook even more stringent corporate governance requirements to ensure compliance with the law. Under the Derivative Settlement (finally approved on May 2, 2017), a "Formal Investigations Protocol was adopted to formalize responsibility for investigating ethics and compliance violations." In addition, OSI agreed to conduct "Corporate Governance Reviews," under which OSI was "required to retain an ethics and compliance specialist to conduct periodic reviews for one year after the expiration of the Administrative Agreement, currently set to expire in December 2017."

120.   The Derivative Settlement also resulted in the appointment of a Lead Independent Director who is to "advise the Chairman of the Board as to the quality, quantity, and timeliness of the flow of information from the Company's management that is necessary for the independent directors to perform their fiduciary duties, and although the Company's management is responsible for the preparation of materials for the Board, the Lead Independent Director may specifically request the inclusion of certain material." The settlement further resulted in the appointment of a New Independent Director who "will have compliance related experience—defined as successful experience in a highly-regulated industry (*e.g.*, government contracting or healthcare)." That New Independent Director is Defendant Chizever.

121.   As an added incentive to having an effective compliance program in place, the Derivative Settlement directly tied compensation to compliance. The settlement provided that "OSI shall amend its Compensation Committee Charter to include compliance as a factor in determining incentive compensation. OSI already has implemented ethics and compliance as a component of performance reviews affecting compensation. OSI shall amend this committee's charter to specify that in determining incentive compensation for relevant senior executives, the Compensation Committee will consider conduct in compliance with or in violation of the Company's Code of Ethics."

## IV.   DEFENDANTS' BREACHES OF FIDUCIARY DUTY

### A.   Although OSI's Turnkey Business Model Involved Essential And Mission Critical Compliance Risks, Defendants Failed To Provide Board Level Oversight

122.   As alleged in Section I above, OSI's Security division was the Company's single most important division, accounting for 49%, 50%, 50%, and 58% of total revenues for fiscal years 2014, 2015, 2016, and 2017, respectively. The Company repeatedly represented that the success and growth of the Security division was being driven by its turnkey business. As such, the Albanian Contract, and legal and regulatory compliance with respect to the procurement of that contract, was critical to the success of the Company.

123.   In addition, the turnkey business by nature carried heightened risks. In carrying out its turnkey business, OSI targeted foreign jurisdictions that were known for corruption. According to the Company, it sought to do business with countries where a "fear of corruption" existed and the government might be looking to lend credibility to their programs. As Edrick explained:

> We are dealing with governments, and we are not generally dealing with the Western world. Most of the turnkeys we are looking at are not in the US or Western Europe. They are in places that have other unique challenges. . . . [O]thers might have other concerns in their particular country such as fear of corruption and things like that. And being able to outsource it to another Company could lend greater credibility to the overall program.

124.   Indeed, Albania's dismal record on transparency and corruption was notorious. In 2013, when OSI secured its Albania turnkey contract, "[c]orruption in all branches of government was pervasive," and "officials frequently engaged in corrupt practices with impunity," according to the State Department. In 2013, Albania ranked 116th on Transparency International's Corruption Transparency Index.

125.   As alleged below, despite the duties alleged above and the importance of

1    ensuring legal and regulatory compliance with respect to the Albanian Contract, neither

2    the Audit Committee nor the Board put in place a reasonable board-level system of

3    monitoring and reporting these essential and mission critical compliance risks.

4         126.    There was no Board committee that addressed essential and mission

5    critical compliance risks associated with the award and implementation of the turnkey

6    Albanian Contract. There was no regular process or policy for management to apprise

7    the Board of developments with respect to the Albanian Contract, or compliance risks

8    associated with that contract. The Board did not schedule a regular consideration of

9    essential and mission critical compliance risks associated with the award and

10   implementation of the turnkey Albanian Contract or discussion of these issues. The

11   Board minutes do not reflect that management presented any concerns about delays,

12   negotiations, or arbitration of the Albanian Contract to the Board, despite the

13   Company's growing problems.

14        127.    Even if the Board's actions somehow could be construed as the

15   implementation of a board-level monitoring and reporting system about the Company's

16   central compliance risks, the Board failed to take even basic steps to monitor that

17   reporting system. Among other steps, Defendants should have familiarized themselves

18   with the circumstances surrounding the Albanian Contract. At no time did any

19   Defendant inquire as to the circumstances of the procurement of the Albanian Contract.

20   Importantly, when certain "red flags" appeared, identified with particularity herein,

21   such as delays in the implementation of the Albanian Contract, the need to renegotiate

22   the Albanian Contract, and the need for arbitration concerning the Albanian Contract,

23   Defendants did not conduct any investigation, made no inquiries and did not follow up.

24        **B.    OSI's Audit Committee Failed To Implement A Board-Level
25              Monitoring And Reporting System, Or Alternatively, Failed To
              Monitor Any Such Reporting System**
26

27        128.    As reflected in the minutes of their meetings, the Audit Committee

28   consciously disregarded its duties by failing to implement a monitoring and reporting

---

35

system concerning the Company's central compliance risks as they related to government contracts and particularly the Albanian Contract. Alternatively, the Audit Committee failed to monitor OSI's information reporting system to assess the state of the Company's compliance. The minutes show that, over a period of five years, there were only *two* discussions by the Audit Committee of the Albanian Contract – one on October 21, 2013 and one on April 21, 2016, both of minor substance.

129.    None of the produced minutes indicate any discussion of the multiple red flags raised by the Albanian Contract, including: (i) the unexplained favorable treatment from the Albanian government, such as receiving, on November 11, 2011, an 8% bonus on OSI's bid; (ii) the transfer, authorized by Defendant Mehra, of 49% of OSI's interest in S2 to the Albanian holding company ICMS, owned by an Albanian dentist Peçini, for consideration of less than $5.00; (iii) the joint venture and profit-sharing agreement with ICMS; (iv) the denouncement of the contract by the newly-elected government upon Berisha's departure from office; (v) the recommendation by the Albanian Competition Authority for the revision of the contract; and (vi) the new Albanian government's refusal to implement the contract and attempt to unilaterally terminate it.

130.    According to the Company's minutes, on October 21, 2013, the Audit Committee met. Defendants Good, Luskin, and Ballhaus attended the meeting. Jason Lawson, from Moss Adams LLP (OSI's auditors), discussed "the Company's new turnkey security system in Albania." The minutes reflect no details of the discussion and no follow-up by the Audit Committee. Moreover, no books and records produced by the Company show what, if any, information Lawson had regarding the Albanian Contract, or what he shared with the Audit Committee, and there is no suggestion that Lawson was even privy to the details surrounding the awarding and implementation of the Albanian Contract.

131.    Between October 21, 2013 and April 21, 2016, the Audit Committee never again discussed the Albanian Contract. In other words, there was no functioning

monitoring and reporting system as it related to government contracts and the Albanian Contract in particular. For example, on October 28, 2015, the Audit Committee met. Defendants Good, Luskin and Ballhaus attended the meeting. The minutes reflect that the Company's VP of Internal Audit, Felipe Velasquez ("Velasquez"), reported on "compliance with the Administrative Agreement with DHS, and FCPA compliance. In response to questions from Messrs. Luskin and Ballhaus, Messrs. Velasquez and Cook [VP, Corporate Compliance] discussed the environment for ethics and compliance at the Company." The minutes of that meeting further reflect that compliance programs were generally discussed and that Mr. Cook discussed the upcoming report to DHS under the Administrative Agreement. However, the Audit Committee members did not discuss the Albanian Contract at this meeting.

132.   On January 25, 2016, the Audit Committee met again. Defendants Good, Luskin and Ballhaus attended the meeting. The minutes reflect that Velasquez reported on "compliance with the Company's Anti-Corruption program, the Administrative Agreement with DHS, and the Enterprise Risk Management program." However, again, the Audit Committee did not discuss the Albanian Contract at this meeting.

133.   It was not until the Audit Committee's meeting on April 21, 2016 that the Albanian Contract was once again mentioned. Defendants Good, Luskin and Ballhaus attended the meeting. According to the minutes, Edrick responded to questions from Good and "discussed cash flows for the Company's turnkey scanning program in Albania and overall collections." However, books and records produced by the Company do not show what, if any, information Edrick shared with the Board regarding the Albanian Contract other than cash flows.

134.   On October 26, 2016, the Audit Committee met. Defendants Good, Luskin and Ballhaus attended the meeting. The minutes reflect that Velasquez reported on "the Company's compliance with the FCPA and the Administrative Agreement with DHS." According to the minutes, Cook "reported on the activities of the Compliance Department" and also discussed the "independent assessment of the Company's Ethics

1 and Compliance Program." There is no reference to any discussion of the Albanian

2 Contract at this Audit Committee meeting.

3      135.  On January 25, 2017, the Audit Committee met. Defendants Good, Luskin

4 and Ballhaus attended the meeting. The minutes reflect that Velasquez reviewed "the

5 Company's compliance with the DHS Administrative Agreement… and the FCPA."

6 The minutes also reflect that Cook "reported on interactions with the DHS relating to

7 the Administrative Agreement." There is no reference to any discussion of the Albanian

8 Contract at this Audit Committee meeting.

9      136.  On August 22, 2017, the Audit Committee met.  Defendants Good, Luskin

10 and Ballhaus attended the meeting. Velasquez "discussed compliance with the

11 Administrative Agreement with DHS and the FCPA...." The minutes also reflect that

12 Cook "reviewed the activities of the Ethics and Compliance function during fiscal

13 2017… [and] also reported on the status of the Administrative Agreement with the

14 DHS." There is no reference to any discussion of the Albanian Contract at this Audit

15 Committee meeting.

16      137.  On October 25, 2017, the Audit Committee met. Defendants Good,

17 Luskin and Ballhaus attended the meeting. According to the minutes, Cook "reported

18 on compliance with the DHS Administrative Agreement, stating that the compliance

19 consultant had issued her last report to DHS… [and] stated that the report was positive

20 and reviewed its key findings." There is no reference to any discussion of the Albanian

21 Contract at this Audit Committee meeting.

22      138.  In short, since 2013, there have only been two meetings at which the Audit

23 Committee referred to the Albanian Contract. Remarkably, at those two meetings, the

24 Audit Committee did not even discuss any of the specifics related to the circumstances

25 of obtaining the Albanian Contract, the accounting for the Albanian Contract, or the

26 subsequent dispute with the Albanian Government.

27      139.  What is even more remarkable about the Audit Committee's (and the

28 Board's) lack of attention to the Albanian Contract is the fact that, in their interim

review for the period ending December 31, 2015, OSI's auditor, Moss Adams LLP, categorized "Albania contract update" as a topic under "*Items of Significance for Quarterly Review*." (emphasis added). OSI has produced no minutes showing any discussion regarding this entry by any member of the Audit Committee or by any member of the Board. An auditor's identification of an item of "Significance for Quarterly Review" constitutes a red flag that should have garnered serious attention by the Audit Committee and the other members of the Board. However, neither the Audit Committee nor the other members of the Board inquired about the Albanian Contract at all.

**C.    The Board as A Whole Failed To Implement A Board-Level Monitoring And Reporting System, Or Alternatively, Failed To Monitor Any Such Reporting System**

140.   Apart from the Audit Committee, the Board as a whole consciously disregarded its duties by failing to implement a monitoring and reporting system concerning the Company's central compliance risks as they related to government contracts and particularly the Albanian Contract. In the alternative, the Board failed to monitor any such reporting and information system. Specifically, none of the Board minutes produced by the Company indicate any discussion of the multiple red flags facing the Company which include: (i) the unexplained favorable treatment from Albania's government such as receiving, on November 11, 2011, an 8% bonus on OSI's bid; (ii) the transfer, authorized by Defendant Mehra, of 49% of OSI's interest in S2 Albania to the Albanian holding company ICMS, owned by an Albanian dentist Peçini, for consideration of less than $5.00; (iii) the joint venture and profit-sharing agreement with ICMS; (iv) the denouncement of the contract by the newly-elected government upon Berisha's departure from office; (v) the recommendation by the Albanian Competition Authority for the revision of the contract; and (vi) the new Albanian government's refusal to implement the contract and attempt to unilaterally terminate it.

141.   On October 21, 2013, the full Board met. The meeting minutes reflect that Defendants Chopra, Good, Luskin, Feinberg and Ballhaus attended the meeting. Edrick discussed the Albania "turnkey security screening programs, including cash flows, profits and return on investment." However, books and records produced by the Company do not show what, if any, information Edrick shared with the Board regarding the Albanian Contract.

142.   The full Board met again on April 23, 2014. The meeting minutes reflect that Defendants Chopra, Good, Luskin, Feinberg and Ballhaus attended the meeting. Chopra discussed the status of the Company's turnkey screening program in Albania. However, no books and records produced by the Company show the particularity of what was discussed with the Board or that the Board inquired about or learned of the circumstances surrounding the awarding of the Albanian Contract.

143.   On August 22, 2014, the full Board met again. The meeting minutes reflect that Defendants Chopra, Mehra, Good, Luskin, Feinberg and Ballhaus attended the meeting. Chopra discussed the status of the Company's turnkey screening program in Albania. However, no books and records produced by the Company show the particularity of what was discussed with the Board or that the Board inquired about or learned of the circumstances surrounding the awarding of the Albanian Contract.

144.   This was despite the fact that, among the materials presented to the Board in connection with the August 22, 2014 Board meeting, there was an update which referred specifically to the Albanian Contract and which stated prominently, on the bottom border of the document, "Challenging Situation." In addition, under the heading "Other" there were three items – "Operating Start date delayed"; "Government Administration change"; "US Embassy very supportive." Remarkably, neither the Board minutes nor the accompanying Board materials reveal that any member of the Board inquired, or was told any details, about the Albanian Contract, why it was a "Challenging Situation" and/or what the significance was of the change in government administration. Being told that a significant Company contract has resulted in a

1   "Challenging Situation" is a red flag that would warrant additional inquiry. The
2   Director Defendants had no functioning reporting system, or failed to monitor any such
3   system.

4       145.   On October 21, 2014, the full Board met. The meeting minutes reflect that
5   Defendants Chopra, Mehra, Good, Luskin, Feinberg and Ballhaus attended the
6   meeting. Mehra, who was personally involved in the misconduct concerning the
7   Albanian Contract, "provided an update on the turnkey security services business…
8   [and] discussed the status of the turnkey programs in Puerto Rico and Albania."
9   However, no books and records produced by the Company show what was discussed
10  with the Board or that the Board inquired about or learned of the circumstances
11  surrounding the awarding of the Albanian Contract.

12      146.   The full Board met again on December 12, 2014. The meeting minutes
13  reflect that Defendants Chopra, Good, Luskin, Feinberg and Ballhaus attended the
14  meeting. According to the minutes, "Mr. Chopra responded to questions from the other
15  directors regarding turnkey scanning programs in Mexico, Puerto Rico and
16  Albania.…" However, the specific details of what was discussed with the Board (or
17  what the Board inquired about or learned regarding the circumstances surrounding the
18  awarding of the Albanian Contract) are not evident in any of the books and records
19  produced by the Company.

20      147.   On April 22, 2015, the full Board held another meeting. Defendants
21  Chopra, Mehra, Good, Luskin, Feinberg and Ballhaus attended the meeting. According
22  to the minutes, Mehra reported on the status of the Company's turnkey security
23  inspection program in Albania and on "the financial results for the turnkey services
24  business." However, the specific details of what was discussed with the Board (or what
25  the Board inquired or learned regarding the circumstances surrounding the awarding
26  of the Albanian Contract) are not evident in any of the books and records produced by
27  the Company.

28      148.   The materials presented to the Board in connection with the April 22, 2015

Board Meeting included, among other things, a status sheet with the following bullet points appearing under the heading "Albania": "Significant discussions ongoing to find a resolution" and "Arbitration Process continues." Remarkably, neither the Board minutes nor the accompanying materials show that any member of the Board inquired about or was told any details about the Albanian Contract and/or any details of the arbitration. Being told that a major Company contract has resulted in "Significant discussions ongoing to find a resolution" and an ongoing arbitration are red flags that would warrant additional inquiry. The Board had no functional reporting system, or in the alternative, failed to monitor the reporting system.

149.   On August 19, 2015, the full Board met. Defendants Chopra, Mehra, Good, Luskin, Feinberg and Ballhaus attended the meeting. According to the minutes, Mehra reported on the status of the Company's turnkey security inspection program in Albania and on "the financial results for the turnkey services business." However, no books and records produced by the Company show that the Board followed up as to the "Significant discussions" or arbitration that were reflected in the Board materials from the April 22, 2015 Board meeting. The Board continued to ignore the red flags.

150.   The full Board met again on October 28, 2015. Defendants Chopra, Mehra, Good, Luskin, Feinberg (by telephone) and Ballhaus attended the meeting. According to the minutes, Edrick "provided financial results for security turnkey solutions." Then, "[i]n response to a question from Mr. Luskin, Mr. Chopra discussed the Security Division's maintenance and repair service business." "Mr. Chopra also discussed the cargo inspection projects and business dynamics in that market." Further, "Mr. Mehra provided the Board with an update on the status of the turnkey screening program in Albania." The minutes do not reflect any discussion regarding: the terminated Albanian Contract; OSI's arbitration of the Albanian Contract; the renegotiated Albanian Contract; or any follow up from the April 22, 2015 Board Meeting. The Board had no reporting system to enable them to learn of these red flags, or alternatively failed to monitor for these red flags.

151.   The full Board met again on December 8, 2015. Defendants Chopra, Mehra, Good, Luskin, Ballhaus and Hawkins attended the meeting. According to the minutes, Mehra "provided an update of the turnkey solutions business" and a discussion on the "status of turnkey screening programs" in Albania, Puerto Rico and Mexico. The minutes also reflect that "Mr. Mehra then answered the Board's questions about the turnkey solutions business, including a question from Mr. Hawkins about the financial models employed and a question from Mr. Luskin about opportunities in Japan." "Financial results for security turnkey solutions" was also discussed. The minutes do not refer to any discussion regarding: the terminated Albanian Contract; OSI's arbitration of the Albanian Contract; the renegotiated Albanian Contract; or any follow up from the April 22, 2015 Board Meeting.  The Board had no reporting system to enable them to learn of these red flags, or alternatively failed to monitor for these red flags.

152.   The full Board met again on January 25, 2016.  The Board materials sent to the Board in connection with the meeting reflect that "Albania becomes fully operational in Q3 FY16."  In addition to some financial information and some site information, the materials state that Albania "is ramping up nicely" and that there are "no payment issues."  There appears to be no discussion as to what accounted for the delay and no discussion of the change in contractual terms or the circumstances surrounding the procurement of the Albanian Contract.

153.   The full Board met again on April 21, 2016.  The Board materials sent to the Board in connection with the April 2016 Board meeting reflect that "Albania became fully operational in Q3."  In addition to some financial information and some site information, the materials state that Albania "is fully operational and contributing nicely" and that there are "no payment issues."  There appears to be no discussion as to what accounted for the delay and no discussion of the change in contractual terms or the circumstances surrounding the procurement of the Albanian Contract.

154.   The full Board met again in August 2016 and October 2016. For both

43

meetings, the materials circulated to the Board in connection with the meetings state, in identical language, the following information regarding the Albanian Contract: "Fully operational and contributing nicely" and "no payment issues."

155.   The full Board met again in January 2017. The Board materials sent to the Board in connection with the January 2017 Board meeting reflect that "Albania became fully operational in Q3 FY16."

156.   The full Board met again in April and August 2017. Board materials sent to the Board in connection with the April and August 2017 Board meetings reflect that "Albania became fully operational in Q3 FY16," that Albania "was fully operational and contributing nicely" and that there were "no payment issues."

157.   With regard to each of the Board meetings in 2017 reflected above, there appears to be no discussion as to the circumstances surrounding the procurement of the Albanian Contract nor any of the other issues surrounding the delay, renegotiation, or arbitration regarding the Albanian Contract.

158.   Notably, the FY 2017 Internal Audit Annual Report shows that, in testing controls overseas, Albania was not tested.

## D. Defendants Further Breached Their Fiduciary Duty By Making Material False Statements And Omissions Regarding The Albanian Contract

159.   OSI's Board was charged with the fiduciary duty of ensuring that the Company's filings with the SEC were complete and truthful. Defendants breached this duty because they made materially false statements and omissions regarding the success and sustainability of the turnkey model and the Albanian Contract.

160.   At all relevant times, OSI touted in its SEC filings that its turnkey model was the Company's most promising new business segment and that it would provide higher profit margins, greater revenue visibility and consistency, and substantial growth opportunities in international markets.

161.   On August 21, 2013, the Company announced its highly anticipated third

turnkey contract, the Albanian Contract. In an August 21, 2013 press release entitled, "OSI Systems Receives a Fifteen-Year Agreement to Provide Turnkey Screening Services in Albania," the Company announced that "[the] Government of Albania has awarded its Security division, Rapiscan Systems, a fifteen-year contract to provide turnkey cargo and vehicle security screening services at various sites throughout the country." The Company touted that it expected total gross revenues from the Albanian contract to "range from $150 million - $250 million over the term of the agreement."

162.   Immediately upon announcing the Albanian contract, Defendants hailed the deal as proof that the Company's turnkey model was a success. For instance, in the August 21, 2013 press release, Defendant Chopra stated:

> This significant award from Albania to provide turnkey screening services builds upon similar long-term agreements awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services continues to be well received in the marketplace.

163.   In the same press release, Defendant Mehra represented that "[t]he Albanian government's initiative to secure its ports and land crossings represents another significant step in the security inspection arena. We are proud to have been selected to execute this critical program. Our selection reinforces the attractiveness and compelling value of our turnkey service model."

164.   Defendants' statements were materially false or misleading when made, and/or omitted material facts necessary to make their statements not misleading, in light of the circumstances under which they were made.

165.   First, the Albanian Contract was subject to a secret and corrupt arrangement with an undisclosed partner (ICMS) whereby OSI would transfer 49% of its interest in the S2 Albania contract entity to ICMS for $4.50 and provide lucrative

"profit shar[ing]" rights in connection with the contract. Thus, Defendants' representations created the false and misleading impression that OSI alone was "selected to execute" the Albanian Contract, and that the contract was awarded solely and would inure solely to the benefit of OSI, when in reality, 49% of the "significant award" had been sold to a third party, ICMS, for less than $5. Moreover, these statements left investors with the impression that OSI had fairly procured the contract on the merits of its turnkey business, when in reality the "selection" of OSI and "award" to OSI's Security division was only achieved through the secret profit sharing arrangement with an Albanian partner associated with the outgoing Albanian government.

166. Second, the Company's secret arrangement with ICMS and undisclosed favorable terms from the outgoing Albanian government subjected the Company to substantial undisclosed risks, including that: (a) the contract would be terminated and/or materially reduced once the arrangement was disclosed; and (b) the transaction would be subject to government investigations and/or fines, including under the FCPA. The arrangement with ICMS jeopardized the credibility and sustainability of the turnkey business model, caused the Company to be vulnerable to potential civil and criminal liability and adverse regulatory action, and increased the risk that U.S. and foreign governments would refuse to do business with OSI once the details surrounding the Albanian turnkey contract were revealed. Thus, Defendants' statements that the "significant award" of the contract "reinforced" the "compelling value of our turnkey service model" were misleading because they touted the purported benefits of the contract while concealing the real risks associated with the contract as a result of their corrupt arrangement.

167. Third, Defendants' statements were materially misleading to investors because they created a false and/or misleading impression that the turnkey model was thriving and would be a primary driver of OSI's future growth and provide a sustainable competitive advantage in the security industry, when in reality, the contract had not

been procured on the merits of the turnkey business but instead had been procured through the undisclosed 49% transfer and profit sharing arrangement with ICMS. Information about the Company's turnkey business and contracts was highly material to investors, given that Defendants had repeatedly touted it as the key to the Company's future prospects and growth.

168.   Fourth, once Defendants spoke about and affirmatively touted the Albanian Contract, including by citing it as proof of the "the attractiveness and compelling value of our turnkey service model" and the anticipated "total gross revenues," Defendants had a duty to disclose the material facts above as they were necessary to ensure that investors were not misled regarding the value of the Albanian Contract, the undisclosed profit sharing agreement associated with the contract, the viability of the turnkey business, and the foreseeable risks associated with the ICMS arrangement.

169.   In the months following the announcement of the Albanian Contract, Defendants repeatedly trumpeted the progress of the contract, creating the misleading impression that the Albanian Contract faced no impediments and would soon generate considerable revenues. For instance, at the January 28, 2014 Conference Call, Edrick stated: "[W]e have been busy preparing to go live before fiscal year end for our latest turnkey contract award in Albania." On the same call, Defendant Chopra stated: "I should mention here that the build-out phase for the Albanian turnkey services project is well underway, and we're happy to announce that it'll start generating revenues before the end of the fiscal year."

170.   Defendants continued to make similar statements throughout 2014. At a March 4, 2014 Morgan Stanley Technology, Media, and Telecom Conference, OSI confirmed the progress of the Albanian Contract, stating: "Albania, we're ramping up as we speak." OSI reiterated this status update at the March 11, 2014 Conference, stating: "[a]nd most recently earlier in our fiscal year, we sold our third deal in Albania, which we're ramping up right now. So very, very exciting for us. It's really changed

1   our profile significantly." Likewise, on an April 30, 2014 conference call ("April 30,

2   2014 Conference Call"), Defendant Chopra emphasized: "[r]egarding Albania, we are

3   making progress and we are on track. But I don't think so there will be any contribution

4   in revenue in Q4. But we are moving on target. We're working diligently with it and

5   looking forward to 2015."

6        171.   Unbeknownst to investors, immediately after Berisha's departure from

7   Office, the newly-elected government denounced the contract. By June 2014, the

8   Albanian Competition Authority recommended the revision of the contract. Business

9   opposition by this time was also considerable due to the extremely high service fee,

10  according to a July 13, 2015 Monitor article titled, "New 'Tax' on Customs" (the "July

11  13, 2015 Article").

12       172.   As a result of this opposition, the new government refused to implement

13  the Albanian Contract and attempted to unilaterally terminate it, according to the July

14  13, 2015 Article. None of these facts were disclosed to investors.

15       173.   Defendants' statements regarding the success of the turnkey business

16  continued into 2015. For example, at the March 10, 2015 ROTH Growth Stock

17  Conference, Defendant Chopra touted the turnkey business as a "growing opportunity,"

18  as well as OSI's position as "a pioneer in that [turnkey business]." Chopra further

19  discussed the importance of the turnkey business, stating that OSI was "well positioned

20  to further revenue, earnings and EBITDA growth; market share gains and a very strong

21  pipeline of new products driven by R&D … Significant growth in service revenues."

22  Chopra emphasized the importance of the turnkey model as being "one of the fastest

23  growing segments and with high gross margins" and as a "large addressable market for

24  turnkey security solutions …."

25       174.   During the August 20, 2015 Conference Call, Defendant Chopra

26  highlighted the importance of the turnkey business, announcing that Defendant Mehra

27  would exclusively focus on the turnkey "solutions" business:

28

> Ajay Mehra, who led Rapiscan to strong success over a number of years, is now focused exclusively on the solutions business, reflecting the importance, and the priority we have, on growing our turnkey business, expanding service and solutions to Security customers, as well as developing service offerings to other markets.

175. On August 25, 2014, the Company referred to the Albanian government's decision to suspend the contract. However, the Company provided no information as to the allegations of corruption or the political turmoil that had surrounded the awarding of the contract. The Company stated:

> Last year, we announced a 15-year contract that we received from the government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country of Albania. Unfortunately, we recently learned that the customer, the Albanian newly elected government, has halted further progress on the contract and put into doubt the continuation of the program. The program had been proceeding smoothly and ahead of schedule. We intend to strongly enforce our contractual rights and hope to reach an amicable outcome. I would also note here that no revenues from Albania are included from this contract in the revenue guidance we are providing for fiscal 2015. You can understand that, under the circumstances, we cannot comment further at this time.

176. Additionally, OSI's Form 10-K for fiscal year 2014 further stated that "in August 2013, we announced a 15-year contract award from the Government of Albania to provide turnkey cargo and vehicle screening services at various sites throughout the country. We were recently notified that the Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights." Again, the Company made no reference to the allegations of corruption or to the political turmoil that had surrounded the awarding of the contract.

177. Defendants' statements were highly misleading because they led investors to believe that the contract had simply been halted by a change in power in Albania, rather than as a result of corruption in the procurement of the Albanian Contract and

the secret arrangement with ICMS and Peçini. Indeed, Defendants continued to conceal, *inter alia*: (i) their 49% transfer of S2 Albania to Peçini, who was associated with the outgoing Albanian administration, for $4.50; (ii) the Company's joint venture and profit-sharing agreement with ICMS; (iii) the 8% bonus and more favorable contract terms that Berisha inexplicably awarded the Company during its bid; (iv) accusations reported in Albania that the Company's bid had been collusive; and (v) the undisclosed opposition to the deal due to allegations of corruption. Moreover, because all of these facts and accusations were partially reported only in Albania (and in Albanian), OSI's investors remained completely in the dark.

178.   Unable to proceed under the contract, OSI brought an action against the Government of Albania before the International Court of Arbitration. On April 28, 2015, OSI settled the case under less favorable contract terms, to be effective by October 31, 2015, according to Law No. 75/2015 of the Assembly of the Republic of Albania.

179.   Under the renegotiated contract, OSI's payment terms were contingent on the amount of each customs declaration. For example, for all customs declarations over 1,000 euros, OSI would be paid a scanning fee of 22 euros – *i.e.*, 17 euros or approximately 44% less than the fee in the original contract. Moreover, for customs declarations under 1,000 euros, Albania would charge a fee of 5 euros. On June 5, 2015, the Council of Ministers of Albania submitted the renegotiated concession to the Albanian Assembly, and stated that the value of the contract had been reduced from approximately 316 million euros to 210 million euros, according to a December 9, 2017 Lapsi article titled, "The scan concession crashes Ball with Berisha." The value of the Albanian Contract was thus reduced by 106 million euros.

180.   When announcing the reinstatement of the Albanian Contract, Defendants continued to mislead investors and deliberately concealed the secret arrangement with ICMS and the corruption underlying the contract. On October 13, 2015, OSI issued a press release announcing that "the Company has commenced the operations phase with

1  the Government of Albania to provide turnkey cargo and vehicle security screening

2  services at multiple sites throughout the country. The Company currently anticipates

3  total revenues to be approximately €200 million over the multi-year term of the

4  agreement." However, the new value of the Albanian contract was approximately 116

5  million euros less than the reported value of 316 million euros prior to the halting of

6  the contract.

7      181.   Defendant Chopra added: "With Albania now operational, along with the

8  Puerto Rico and Mexico turnkey programs, we continue to innovate and differentiate

9  ourselves in the turnkey solutions space where we expect to experience additional

10 growth."

11     182.   On October 29, 2015, OSI issued a press release announcing its financial

12 results for the first quarter of fiscal year 2016 ("1Q16") (the "October 29, 2015 Press

13 Release"). On the same day, the Company held a conference call to discuss the results

14 of 1Q16 (the "October 29, 2015 Conference Call"). On the call, Defendants also

15 trumpeted the commencement of the Albanian turnkey contract, stating in part:

16
17         We were pleased to reach agreement with the Government of
           Albania on certain contract changes, which led to the
18         commencement of activities. We expect to ramp up to our full
           run rate this fiscal year.
19
20         This 15-year contract for turnkey cargo and vehicle security
           screening services at various checkpoints throughout the country
21         is valued at approximately EUR200 million. Initial site
           operations are going smoothly and we look forward to increasing
22         revenues from this contract throughout this fiscal year as new
           sites come online.
23
24         Following Puerto Rico and Mexico, this is the third major
25         turnkey services program now in operation. Similar to that in
           Mexico, Albania's service cost is based on a fixed amount per
26         site per month.
27     183.   On January 27, 2016, Defendants issued a press release announcing OSI's
28

51

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

financial results for the second quarter of fiscal year 2016. On the same day, Defendants held a conference call to discuss and expand upon the Company's 2016 second quarter financial results and further touted the growth opportunity of OSI's turnkey services and the performance of the Albanian Contract, stating:

> In turnkey services, another major growth opportunity for us with a long sales cycle, we continue to see a strong pipeline. We are optimistic of landing new turnkey deals and have added additional resources to support these opportunities. However, the timing of these deals has been and will continue to be influenced by the macroeconomic factors discussed earlier. Our most recent turnkey contract in Albania is performing well, and we expect to be fully operational within this quarter. In addition, our other turnkey programs continue to perform well.
>
> We are well situated for growth in products and services including turnkey programs and have a strong balance sheet that can easily absorb the capital requirements from longer lead time builds or turnkey opportunities that often require significant initial capital outlay …. The strength in our backlog and bookings trend and continued strength in foreseeable demand for our products globally gives us confidence in the second half and delivering a very strong Q4 in security.

184.   On March 15, 2016, Defendants participated in the ROTH Conference. Defendant Chopra touted the turnkey business and the Albanian Contract at the conference:

> One of the big growth opportunities for us is in the large-scale turnkey screening solutions with significant global expansion opportunities …. [T]he latest win was Albania. So that in this space, this is a new evolving market because you're trying to get to be a service provider in the security field to your customer. And a site to have a site to show is a big win for us …. Margins tend to be very good compared to selling just the equipment.

185.   During an April 27, 2016 Conference Call, Defendant Chopra proclaimed that, "[o]n the turnkey services front, Mexico, Puerto Rico and Albania turnkey screening service contracts continue to perform well and we continue to add new

1   opportunities to the turnkey pipeline."

2       186.   On April 28, 2016, Defendants filed a Form 10-Q with the SEC for the

3   2016 third quarter and stated that the increase in Security division revenues were due,

4   in part, to the implementation of Albania turnkey contract:

> Revenues for the Security Division for the three months ended
> March 31, 2016 increased primarily as a result of a $23 million
> equipment sale to a Middle East customer and the
> implementation of our turn-key screening operations in Albania.

187.   On an August 16, 2016 conference call, Chopra emphasized that the turnkey "market represents a key growth driver for us going forward … we believe we are in excellent position to capture additional turnkey services opportunities."

188.   On October 21, 2016, the Company filed a Form DEF 14A with the SEC which was signed by OSI's Audit Committee. In describing its executive compensation, which was tied to certain performance targets, the Company stated that its "key achievements" for fiscal 2016 included the "[s]ignificant 15-year booking and successful rollout of our turnkey screening solutions program in Albania."

189.   On January 26, 2017, Defendants held a conference call to discuss the Company's 2017 fiscal year second quarter results. During the call, Defendant Chopra touted the Albanian turnkey contract, stating that "[i]n turnkey services, our programs in Puerto Rico, Mexico and Albania continue to perform well. Overall, we see the pipeline staying robust and we remain optimistic that OSI will capture new turnkey programs in the near future."

190.   On February 15, 2017, the Company entered into a purchase agreement (the "Purchase Agreement") for the issuance and sale of $250 million of the Company's OSI Bonds. On February 22, 2017, the Company closed the offering. On the same day, the Company filed a Form 8-K explaining the transaction and attaching a copy of the Purchase Agreement and indenture.  In the Purchase Agreement, OSI represented that each of its Subsidiaries was in good standing and that all its subsidiaries were listed:

> The Company does not own or control, directly or indirectly, any corporation, association or other entity other than the subsidiaries listed in Exhibit 21 to the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2016, except as disclosed in the General Disclosure Package and the Final Offering Memorandum and such other subsidiaries none of which, in the aggregate, would constitute a "significant subsidiary" of the Company under Rule 1-02 of Regulation S-X. The only Subsidiaries of the Company are the subsidiaries listed on Schedule D hereto.

191. Schedule D of the Purchase Agreement listed S2 Albania (Albania) as one of eight "Subsidiaries" referenced the Purchase Agreement as the "only Subsidiaries of the Company."

192. In the Purchase Agreement, OSI further represented that all of the issued and outstanding stock of each Subsidiary, specifically including S2 Albania, was owned by the Company "free and clear" of any "security interest, mortgage, pledge, lien, encumbrance, claim or equity":

> Except as otherwise disclosed in the General Disclosure Package and the Final Offering Memorandum, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable and is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity. None of the outstanding shares of capital stock of any Subsidiary was issued in violation of the preemptive or similar rights of any securityholder of such Subsidiary.

193. At a March 14, 2017 ROTH Capital Partners Conference, the Company continued to tout the turnkey business, stating: "We've won three deals. These are multi-year deals ranging so far anywhere between 6 and 15 years. And then just four, five short years since we launched this idea, this has already become north of 30% of our security division revenues. So, it's a nice business that has been highly successful for us." Defendants repeated similar comments at a May 24, 2017 B. Riley & Co.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Institutional Investor Conference; a June 7, 2017 Jefferies Global Healthcare Conference; and a June 15, 2017 Drexel Hamilton Aerospace & Defense Conference.

194. For the reasons stated above, all of these statements were false and misleading. OSI repeatedly failed to disclose that the Company's $150 to $250 million turnkey contract with the Albanian government was the result of a corrupt arrangement whereby OSI transferred 49% of its Albanian Contract and that lucrative "profit shar[ing]" rights had been transferred to an undisclosed Albanian shell entity ostensibly owned by the Albanian dentist, Peçini, who reportedly had ties to the outgoing Albanian government that issued the contract to OSI. Defendants also concealed that the Company was not entitled to all of the contract's profits as it had entered into a secret "profit share" arrangement with the dentist's company, and that the 49% transfer occurred under suspicious circumstances the same week that the outgoing Albanian government (who had given OSI extremely favorable terms on the contract) left office. As a result, investors were left with the impression that OSI had a lucrative new turnkey contract and that its turnkey business was growing as planned when, in fact, Defendants had virtually given away half of the contract in order to secure it.

195. As Muddy Waters later revealed in its December 6, 2017 report, previously untranslated Albanian reports pointed to the contract as evidence of collusion and corruption with the former government, and highlighted the exorbitant fees to be imposed under the contract. A July 7, 2015 Pamfleti Online article called the Albanian contract a "Mafia of scanning concession," while Ora News published in Albanian a television news program called, "Rapiscan, Theft of the Century" referring to the Albanian contract.

196. Until the December 6, 2017 Muddy Waters Report was published, however, neither analysts nor investors were aware of the material facts concealed by Defendants.

197. Defendants had an affirmative duty to disclose the facts surrounding the Albanian Contract, including the hidden ICMS arrangement and profit sharing

agreement, the sale of 49% of the contract entity for $4.50, and the clear foreseeable risks arising from the Albanian deal. Defendants chose to affirmatively speak about and repeatedly emphasize the significance of the Albanian Contract, including that: (i) OSI owned S2 Albania and the contract "free and clear" of any other interest; (ii) the Albanian Contract would generate hundreds of millions of dollars in revenue solely for OSI; (iii) the contract demonstrated the viability, sustainability and success of the turnkey model which would "transform" the entire Company from an equipment based sales model to a "service" business; and (iv) the Company owned 100% market share of every turnkey contract in the world (there were only three). Defendants therefore came under a duty to disclose information necessary to make their statements made, in the light of the circumstances under which they were made, not misleading. Here, Defendants failed to disclose the facts surrounding the secret Albanian partnership arrangement (or even the fact that it had a 49% partner at all), thus misleading investors regarding the true nature of the Albanian Contract, the purported success of the turnkey business, and OSI's ability to book additional turnkey deals in the future (something the Company failed to do for five years following the Albania announcement).

198.   Further, given the importance of the Albanian Contract as the proxy for the success and sustainability of the new turnkey model, the facts surrounding the secret 49% transfer and profit sharing arrangement with ICMS were highly material and significantly likely to alter the total mix of information available to OSI investors when deciding to purchase or sell OSI Securities. The facts surrounding the Albanian arrangement, and the foreseeable risks arising from the concealed partnership, were necessary for investors to understand the true nature of the Albanian turnkey program, the amount of revenues and profits OSI would actually generate under the deal, and the overall success of the new "service" based turnkey model. In addition to the fact that the Albanian Contract was touted as generating hundreds of millions of dollars of revenue (and related profits) solely for OSI and was one of only three turnkey contracts in the world, the concealed facts regarding the Albanian arrangement were also

qualitatively material because "the misstatement concern[ed] a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150-52. Finally, the precipitous stock price declines and negative market reactions to the revelation of the facts and risks surrounding the Albanian arrangement on December 6, 2017 and February 1, 2018, demonstrate the importance of the information to investors in deciding whether the buy or sell OSI securities.

199. In the Company's Form 10-Ks, including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and September 7, 2017, Defendant Chopra certified that:

> 1. I have reviewed this Annual Report on Form 10-K of OSI Systems, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

200.   In the same Form 10-Ks, Defendant Chopra also certified that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods presented in the Report."

201.   Similarly, in the Company's Form 10-Qs, including those filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014, January 27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October 31, 2016,

February 1, 2017, April 27, 2017, and October 31, 2017, Defendant Chopra certified that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> * * *

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

202.   In addition to certifying the accuracy and truthfulness of the SEC filings, the Form 10-Qs filed on January 30, 2014, October 24, 2014, January 27, 2015, April 8, 2015, October 30, 2015, January 28, 2016 also certified that:

> Based upon an evaluation of the effectiveness of disclosure controls and procedures, our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") have concluded that, as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures as defined under Exchange Act Rule 13a-15(e) and 15d-15(e) were effective to provide reasonable assurance that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the

59

Securities and Exchange Commission and is accumulated and communicated to management, including the CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

203.    Certain of these Form 10-Qs, including those filed on October 25, 2013 and April 28, 2016, also represented that:

We maintain disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is processed, recorded, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure.

We carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the disclosure controls and procedures as of September 30, 2013, the end of the period covered by this report. Based upon that evaluation, our management, including our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of September 30, 2013.

204.    Defendants Chopra and Mehra, as OSI's executive officers and/or directors, controlled the contents of the Company's public SEC filings. Each was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance. By virtue of their respective positions and access to material non-public information regarding the Company, each knew or recklessly disregarded that the adverse facts alleged herein concerning the Albanian Contract had not been disclosed to, and were being concealed from, the public, and that the positive representations made were materially false, and misleading. As a result, Defendants

1  Chopra and Mehra were responsible for the accuracy of OSI's public SEC filings, and
2  were therefore responsible and liable for the representations contained therein or
3  omitted therefrom.

4      205.   As alleged herein, Defendant Chopra signed the Company's Form 10-Ks,
5  including those filed on August 16, 2013, August 27, 2014, August 24, 2015, August
6  19, 2016, and September 7, 2017; and the Company's Form 10-Qs, including those
7  filed on October 25, 2013, January 30, 2014, May 2, 2014, October 24, 2014, January
8  27, 2015, April 28, 2015, October 30, 2015, January 28, 2016, April 28, 2016, October
9  31, 2016, February 1, 2017, April 27, 2017, and October 31, 2017, each of which
10  contained the material false and misleading statements alleged herein, as set forth
11  above.

12      206.   Defendant Mehra signed the Company's Form 10-Ks, including those
13  filed on August 16, 2013, August 27, 2014, August 24, 2015, August 19, 2016, and
14  September 7, 2017, each of which contained the misleading statements alleged herein
15  as set forth above.

16  **E.     Defendants' Insider Trading and Executive Compensation**
17  **        Structure**

18      207.   During this period, Defendants Chopra and Mehra collectively dumped
19  over $51 million in OSI common stock while in possession of adverse material,
20  nonpublic information regarding the Company's turnkey operations and the secret
21  Albanian arrangement with ICMS. As a result of Defendants' materially false and
22  misleading statements and omissions, these stock dispositions were executed at
23  artificially inflated prices under suspicious circumstances.

24      208.   Defendant Chopra disposed of 338,896 shares of OSI common stock at an
25  average price of $74.38, for a total approximate value of $25.2 million. Defendant
26  Mehra disposed of 226,978 shares at an average price of $74.24, for a total approximate
27  value of $17.5 million. Moreover, Edrick disposed of 112,524 shares at an average
28  price of $77.35, for a total value of approximately $8.8 million.

209. Both the amount and timing of Defendants' trades were highly unusual and suspicious. For example, the shares Chopra disposed of during this time represented 46% of his total reported holdings in OSI common stock as of October 1, 2013. Additionally, only weeks after OSI announced that the Albanian government "halted further progress" on the turnkey contract, on September 11, 2014, the Company abruptly disclosed that Chopra had entered into a "Rule 10b5-1 trading plan" to immediately sell 48,000 shares of OSI common stock for over $3 million in illicit proceeds. The execution of this trading plan while knowingly concealing material adverse information surrounding the Company's turnkey operations and the corrupt arrangement with ICMS reinforces the highly unusual and suspicious nature of Chopra's trading.

210. Likewise, the shares Mehra disposed of during this time represented 69% of his total reported holdings in OSI common stock as of October 1, 2013. The shares Edrick disposed of during this time represented 28% of his total reported holdings in OSI common stock as of October 1, 2013.

211. The timing and pricing of these trades further highlight their suspicious nature. Notably, each of these three had record high sales in 2015 precisely around the time that the Company settled on revised terms with the Albanian government in the fall of 2015.

## V.   OSI HAS SUFFERED SIGNIFICANT DAMAGE AS A RESULT OF DEFENDANTS' BREACHES

212. As a result of Defendants' breaches, OSI shareholders have suffered significant harm. Defendants' wrongdoing in connection with the Albanian Contract and their related misstatements and omissions created the significant and foreseeable risk that OSI would be investigated for violations of the FCPA. As discussed above, Defendants' conduct created a material and entirely foreseeable risk that OSI would be subjected to an investigation and potential criminal and civil penalties—which could prohibit OSI from doing business with the U.S. and foreign governments. Defendants

1   knew that such a result would be devastating for OSI.

2   213.   As a result of the events surrounding the Albanian Contract, the Company

3   was forced to expend time and money defending itself as a subject of an investigation

4   by the Enforcement Division of the SEC and by the U. S. Department of Justice. In

5   addition, the Company is currently expending time and money as a defendant in

6   ongoing litigation pending in federal court.

7   214.   Moreover, as a serial recidivist, it is clear that the Company, despite

8   having entered into the Administrative Agreement calling for enhanced corporate

9   governance protocols and the prior Derivative Settlement calling for yet even further

10  enhanced corporate governance protocols, may face debarment proceedings as a

11  government contractor and may have to undertake a more radical transformation at the

12  Board level than experienced so far.

## VI. TWO DEFENDANTS WERE RICHLY REWARDED DESPITE THEIR INVOLVEMENT IN THE MISCONDUCT IN CONNECTION WITH THE ALBANIAN CONTRACT

215.   Soon after the Muddy Waters report was published on December 6, 2017, the Board apparently acted to financially reward Chopra. The Board had no questions during the years of turmoil regarding the Albanian Contract, but within days of the reporting of serious allegations of broad misconduct, which resulted in two governmental investigations, the Board acted swiftly to increase Chopra's compensation. As reported in the Company's Form 10-Q for the first quarter of 2018: "On December 31, 2017, we and Deepak Chopra, our Chief Executive Officer, entered into an amendment to Mr. Chopra's employment agreement that, among other things, provides for a $13.5 million bonus payment to Mr. Chopra on or within 45 days of January 1, 2024 contingent upon Mr. Chopra's continued employment with us through that date, subject to accelerated payout terms in the event of Mr. Chopra's death or disability after January 1, 2019. The bonus is recorded in the financial statements over the remaining term of the employment agreement."

216.   This financial award is directly contrary to the Charter of the Compensation and Benefits Committee, which states: "In determining incentive compensation for relevant senior executives, the Committee will consider conduct in compliance with or in violation of the Company's Code of Ethics and Conduct. It is also contrary to the terms of the Derivative Settlement.

217.   The 2017 financial award was not the only curious compensatory award by the Board. In 2015, OSI's Compensation Committee established a separate incentive program tied to the annual performance of the Company's turnkey solutions business.

218.   In 2016, 23,800 RSUs owned by Mehra vested a result of his achieving a bookings target of $225 million. In 2017, Mehra received $705,000 for exceeding the operating income target of $10 million in the turnkey segment.

219.   Moreover, in 2017, although the Company had "determined not to adjust any base salary levels" for any of its executive officers, Mehra's "salary was increased by approximately 14% to $400,000 to compensate him for taking on significantly greater responsibility for the oversight and management of the cargo and vehicle inspection and turnkey business lines within our Security division."

## DERIVATIVE ALLEGATIONS

220.   Plaintiffs bring this action derivatively in the right of and for the benefit of OSI to redress injuries suffered, and to be suffered, by OSI as a direct result of the violations of state law, including breaches of fiduciary duty by Defendants.

221.   OSI is named as a nominal defendant in this case solely in a derivative capacity. Plaintiffs were shareholders of OSI at the time of the transgressions of which he complains, and continues to be so. Plaintiffs will adequately and fairly represent the interests of OSI and its shareholders in prosecuting and enforcing their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

222.   The wrongful acts complained of herein subject, and will continue to subject, OSI to continuing harm because the adverse consequences of the actions are

still in effect and ongoing.

223. The wrongful acts complained of herein were unlawfully concealed from OSI shareholders.

## DEMAND FUTILITY

224. Demand upon the OSI Board that they institute this action in the Company's name would be entirely futile and is therefore excused.

225. OSI's current Board consists of the following seven individuals: Defendants Chopra, Mehra, Good, Luskin, Ballhaus, Hawkins, and Chizever.

226. Demand is futile because at least half of the Board faces a substantial likelihood of liability from the breach of fiduciary duty claims asserted herein. The Individual Defendants breached their duty of loyalty and good faith to OSI by consciously allowing OSI to operate illegally.

227. Each Individual Defendant is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, for the reasons stated below.

228. Demand is excused as to Chopra because he has served as OSI's President and CEO, pursuant to which he has received substantial monetary compensation and other valuable benefits. Chopra is also CEO of OSI's major subsidiaries. Based thereupon, OSI readily admits (including in the Company's Proxy Statements) that Chopra is not "independent" under its own standards, the rules and regulations of the SEC, or pursuant to NASDAQ Stock Market listing rules. Accordingly, demand is excused as to Chopra because of his lack of independence.

229. Demand is excused as to Mehra because his principal professional occupation is his employment with OSI as Executive Vice President of the Company and as President of its Rapiscan division, pursuant to which he received and continues to receive substantial monetary compensation and other valuable benefits. Based thereupon, similar to Chopra, OSI readily admits that Mehra is not "independent" under its own standards, the rules and regulations of the SEC, or pursuant to NASDAQ Stock

1  Market listing rules. Accordingly, demand is excused on Defendant Mehra because of
2  his lack of independence.

3      230.   Defendants Chopra and Mehra are further incapable of considering a pre-
4  suit demand because both stand accused of securities fraud and face a substantial
5  likelihood of liability.

6      231.   Moreover, Chopra and Mehra are cousins who live in the same
7  neighborhood (Palos Verdes Estates, CA), frequently socialize, and are known to have
8  business ties outside of the Company. Since 1994, Defendants Chopra and Mehra have
9  worked closely together as part of an Indian joint venture called ECIL-Rapiscan
10  Security Products Limited. Defendant OSI owns a 36% interest, Defendant Chopra
11  owns a 10.5% interest, and Defendant Mehra owns a 4.5% interest in ECILRapiscan
12  Security Products Limited

13      232.   Demand is excused as to Defendant Good because of his financial ties to
14  the Mehra and Chopra families. Defendant Mehra is the brother of – and Defendant
15  Chopra is the first cousin of – Rajiv Mehra, a longtime business colleague and
16  investment partner of Defendant Good. Good and Rajiv Mehra were partners together
17  at the accounting firm of Good, Swartz, Brown & Berns, and its predecessors and
18  successors, from approximately 1987 until 2010, and remain employed by its successor
19  firm, Cohn Reznick. Rajiv Mehra also held significant investments in OSI alongside
20  Good as part of the pension and profit plan of Good, Swartz, Brown & Berns. As a
21  result of these personal relationships, Chopra, Mehra, and Good are incapable of
22  bringing suit against each other on behalf of the Company.

23      233.   Demand is excused as to Defendant Luskin because of his particularly
24  close personal relationship with Defendant Chopra. Luskin performed the wedding
25  ceremony for Chopra's daughter, who describes Luskin as like a grandparent to her.[8]

26  _____

27  [8]    "They are not only like grandparents to me, Papa Meyer even performed Alex
28  and my marriage ceremony…" available at https://www.instagram.com/p/
   ByGSZIWpC37/.  *See also* WEDDING - Chopra-Silverman, Star News Online, Nov.

66

1   As a result of this longstanding personal and professional relationships among

2   themselves, Defendants Luskin and Chopra are incapable of bringing suit against each

3   other on behalf of the Company.

4         234.   Demand is excused as to Defendant Chizever because, as a Partner at Loeb

5   & Loeb LLP, Chizever performs substantial legal work for OSI and would not bring

6   suit against the Board of Directors for fear of losing the income to the law firm and

7   potentially his position as Partner to the extent that that position is dependent on him

8   providing clients to the firm, as law firm partner positions often are. For example, on

9   Chizever's attorney profile webpage on the Loeb & Loeb LLP website, Chizever

10   features several representations of OSI including: *Represented OSI Systems, Inc.*

11   *(NASDAQ: OSIS) in connection with its acquisition of Spacelabs Medical, Inc., a*

12   *subsidiary of General Electric Company*; *Represented OSI Systems, Inc. in connection*

13   *with the acquisition of a global explosive trace detection (ETD) business from Smiths*

14   *Group plc for $75.5 million in cash*; and *Represented OSI Systems, Inc. in a $287*

15   *million 144A financing involving convertible senior notes*.[9] In fact 3 out of 13, or 23%

16   of his featured representations on this page are from OSI and the two most recent

17   representations listed on this page are OSI representations.

18         235.   Demand is excused as to Defendant Hawkins because he is being

19   investigated by the SEC for trades in the publicly traded medical device manufacturer

20   company IRadimed. Hawkins is a board member of IRadimed and a board member of

21   Eldorado Resorts and along with Hawkins, another Eldorado board member and the

22   Eldorado CEO have all been subpoenaed. Faced with an SEC investigation of insider

23   trading liability, Hawkins is incapable of bringing suit against the OSI directors on

24   _____

25   5,   2015,   available   at   https://www.starnewsonline.com/article/NC/20151105/
Lifestyle/605048061/WM/ "Mr. Meyer Luskin… longtime friend of the Chopras, gave

26   the blessings and honored Alex's late father, Mr. Steven Silverman, followed by a

27   magical black tie reception for 900 at the resort."

28   [9] https://www.loeb.com/en/people/c/chizever-gerald-m.

1    behalf of the Company and cannot exercise independent judgment about the best
2    interests of OSI.

3           236.   Defendants Good, Luskin, Ballhaus, and Hawkins are all incapable of
4    considering a pre-suit demand because they are, and have been, members of the Audit
5    Committee. Each of these Director Defendants failed to abide by the Audit
6    Committee's Charter and failed to abide by the Administrative Agreement in that they,
7    among other things, (i) failed to assess the sufficiency and effectiveness of the
8    Company's compliance programs regarding the Albanian Contract despite the essential
9    and mission critical compliance risks; (ii) failed to create board level oversight of
10   management regarding major financial and compliance risks regarding the Albanian
11   Contract; and (iii) failed to ensure that the Company maintained effective internal
12   controls over the financial reporting pertaining to the Company-critical Albanian
13   Contract.

14          237.   As alleged above, Article 4.B. of the Administrative Agreement required
15   compliance upgrades and organizational improvements to maintain a robust and
16   functional program that includes business ethics, compliance programs, and internal
17   controls to ensure effective monitoring, auditing, and communications about the
18   Company's compliance and ethics obligations. DHS charged the OSI Audit Committee
19   with overseeing the OSI compliance functions and promoting communication with the
20   other Board members.

21          238.   Audit Committee members Good, Luskin, and Ballhaus therefore
22   specifically violated the DHS Administrative Agreement, which was effective June 21,
23   2013, by not discussing any DHS or FCPA compliance until October 28, 2015 – more
24   than two years after being required to do so.

25          239.   The DHS Administrative Agreement states "failure to meet any of its
26   obligations pursuant to the terms and conditions of this Agreement constitutes a
27   separate cause for suspension and/or debarment." As Audit Committee members,
28   Defendants Good, Luskin, and Ballhaus have subjected OSI to potential suspension

1 and/or debarment by violating the Administrative Agreement. Accordingly, these
2 Audit Committee members cannot fairly and impartially consider a demand.

3     240.   Additionally, Defendants Good, Luskin and Ballhaus are members of the
4 Risk Management Committee. The Risk Management Committee Charter mandates
5 that the Committee members oversee management as to key enterprise risks, including
6 strategic, operational, legal, regulatory and compliance. Each of these Director
7 Defendants therefore had additional heightened duties and are incapable of considering
8 a pre-suit demand because they face a substantial likelihood of personal liability for
9 breaching their fiduciary duty.

10     241.   Each member of the current Board cannot impartially consider a pre-suit
11 demand to bring a Claim for Relief against the Director Defendants because each
12 member of the current Board faces a substantial likelihood of personal liability as a
13 Director Defendant for breaching his fiduciary duty under *Caremark*.

14     242.   As demonstrated by the minutes of the various Board meetings and the
15 Board presentation materials, the Director Defendants failed to make a good faith effort
16 to create a board-level reporting system related to the essential and mission critical
17 compliance risks to the turnkey Albanian Contract, or failed to monitor any such
18 reporting system. The Director Defendants thereby disabled themselves from being
19 informed of the compliance risks and problems requiring their attention. The Director
20 Defendants therefore face a substantial likelihood of liability for breach of their
21 fiduciary duty under *Caremark*, and are interested for purposes of any demand.

22     243.   Demand is excused as to Defendants Chopra, Mehra, Luskin, and Good
23 because of their entrenched positions and long tenures at OSI. Defendant Chopra
24 founded OSI and has been a director since May 1987. Defendant Mehra joined OSI in
25 1989. Defendant Luskin has been a director of OSI since February 1990. Defendant
26 Good has been a director of OSI since September 1987. In addition, Defendants
27 Chopra, Luskin, Mehra, and Good all owned shares of OSI prior to the Company's IPO
28 and sold shares to the underwriters in that process. As a result of these longstanding

1  relationships, these Defendants are incapable of bringing suit against each other and

2  cannot exercise independent judgment about the best interests of OSI.

3     244.  Defendants Good, Luskin, and Ballhaus are further incapable of

4  impartially considering a demand because of the consistently excessive compensation

5  each has received from OSI from at least 2013 to the present. OSI has a market

6  capitalization of $1.9 billion and is therefore a "mid-cap" company.[10] According to FW

7  Cook's 2018 Director Compensation Report, which studies non-employee director

8  compensation at 300 companies of various sizes and industries, technology companies

9  tend to provide the highest median total pay for directors compared to other sectors.

10  Even so, the median compensation for directors of mid-cap companies in 2018 was

11  $205,000 and the upper 75th percentile compensation was $250,000.[11] Defendant

12  Good's yearly compensation from 2013 to 2018 has never been lower than $444,458

13  (2018) and has been as high as $509,136 (2016) – at least $200,000 to $300,000 per

14  year more than comparable companies. Defendant Luskin's yearly compensation from

15  2013 to 2018 has never been lower than $395,401 (2018) and has been as high as

16  $515,136 (2016) – at least $145,000 to $310,000 per year more than comparable

17  companies. Defendant Ballhaus's yearly compensation from 2013 to 2018 has never

18  been lower than $298,470 (2013) and has been as high as $391,534 (2017) – at least

19  $50,000 to $85,000 per year more than comparable companies.[12] Because of this

20  excessive compensation, Defendants Good, Luskin, and Ballhaus are paid almost like

21  employees and do not have the independence necessary to fairly and impartially

22  evaluate a demand made on the Board.

23

24  ─────────────

25  [10]    The range for mid-cap companies is $1 billion to $5 billion.

    [11]    Average compensation for previous years was lower.

26  [12]    In addition, the directors make millions when they sell their OSI stock. For

27  example, Defendant Hawkins owns over 2,000 units of OSI stock worth over

28  $13,272,030 and over the last 15 years he sold OSI stock worth over $14,422,648.

## COUNT I: BREACH OF FIDUCIARY DUTY

245.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

246.   By reason of their fiduciary relationship with OSI, each of the Director Defendants owed, and owes, OSI the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

247.   In derogation of these duties, the Director Defendants have harmed the Company by their failure to implement, properly monitor, properly supervise, properly ensure themselves of adequate internal controls, and properly account for and disclose the events concerning the Albanian Contract.

248.   As a result of their breaches, OSI has suffered and will suffer significant financial and reputational harm. Thus, the Director Defendants are liable to the Company.

249.   Plaintiffs, on OSI's behalf, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

- Against all of the Director Defendants and in favor of OSI for the amount of damages sustained by the Company as a result of the Director Defendants' breaches of fiduciary duties;

- Directing OSI to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, the termination of certain directors and the placing of a supervisory monitor within OSI;

- Declaring that Defendant Chopra forfeit his bonus of $13.5 million and that Defendant Mehra return his bonus of $705,000;

- Awarding to Plaintiffs the costs and disbursements of this action, including

1      reasonable attorneys' fees, accountants' and experts' fees, costs, and

2      expenses;

3    •   Declaring that Plaintiffs may maintain this derivative action on behalf of OSI

4      and that Plaintiffs are proper and adequate representatives of the Company;

5      and

6    •   Such other relief as this Court deems just and proper.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>**JURY TRIAL DEMANDED**</u>

Plaintiffs hereby demand a trial by jury.

DATED:  January 3, 2020                    Respectfully submitted,

**LTL ATTORNEYS LLP**
David W. Ammons
David A. Crane

Peter Safirstein
Elizabeth Metcalf
**SAFIRSTEIN METCALF LLP**
350 Fifth Ave., 59th Floor
New York, NY 10118
Telephone: (212) 201-2855
psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

Hung G. Ta
JooYun Kim
Natalia D. Williams
**HUNG G. TA, ESQ. PLLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (646) 453-7288
hta@hgtlaw.com

*Attorneys for Plaintiff*
*Jeffery Kocen*

73

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRAGAR EAGEL & SQUIRE, P.C.
David J. Stone (SBN 208961)
stone@bespc.com
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:  (212) 308-5858
Facsimile:   (212) 486-0462

BRAGAR EAGEL & SQUIRE, P.C.
Melissa A. Fortunato (SBN 319767)
fortunato@bespc.com
101 California Street, Suite 2710
San Francisco, CA 94111
Telephone: (415) 365-7149
Facsimile:  (212) 214-0506

HYNES   KELLER   &   HERNANDEZ,
LLC
Michael J. Hynes
mhynes@hkh-lawfirm.com
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone:  (484) 875-3116
Facsimile:   (914) 752-3041

*Counsel for Plaintiff Riley*

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Jeffery Kocen v. Deepak Chopra, et al.**

I am a party to this action, and I have read the foregoing Amended and Consolidated Shareholder Derivative Complaint (the "Complaint") and know its contents. The matters stated in the complaint are true based on my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 18, 2019, at Overland Park, Kansas.

Jeffery Kocen

## VERIFICATION

I, Michael Riley hereby verify that I have authorized the filing of the attached

Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder

Derivative Complaint and that the facts therein are true and correct to the best of my knowledge,

information and belief. I declare under penalty of perjury that the foregoing is true

and correct.

December ____15____, 2019

*Michael D. Riley*
Michael D. Riley (Dec 15, 2019)

Michael Riley